**Exhibit 4**



THE CITY OF SAN DIEGO

Home   Contact the City

| Business | City Hall | Community | Departments | Information | Leisure | Services A-Z | Visiting |     Search

# Homeless Services

**Assisting the City's Homeless Community Find Long-Term Solutions**

Overview

Programs

Contact Us

News

Homeless Providers and Services



| Homeless Services Home | Overview | Programs | Top of Page |
| Contact Us | News | Homeless Providers and Services |

| Community Services Programs |

Site Map   Privacy Notice   Disclaimers

| Home | Business | City Hall | Community | Departments | Information | Leisure | Services A-Z | Visiting |
| Search | Site Map | Contact the City | Privacy Notice | Disclaimers |

4-1

4



| Home | Contact the City
Business | City Hall | Community | Departments | Information | Leisure | Services A-Z | Visiting | Search

HOMELESS SERVICES HOME | OVERVIEW | PROGRAMS | CONTACT US | NEWS | HOMELESS PROVIDERS AND SERVICES

# Homeless Services Overview

The City of San Diego plans, organizes, and coordinates initiatives and strategies to assist the City's homeless community in collaboration with other public and private organizations and programs. Through contracts with nonprofit service providers, funds from the City's Community Development Block Grant and Social Services programs help provide services to the Winter Shelter Program, Neil Good Day Center, 150-bed Cortez Hill Family Center and the Seniors Transitional Housing Program.

The City's Homeless Adminstrator represents the City on regional homeless committees, including the San Diego Regional Task Force on the Homeless, the San Diego Regional Continuum of Care Council and the East Village Redevelopment Homeless Advisory Committee.

The City works in a joint collaboration with the County of San Diego to provide mainstream resources to establish a continuum of care for episodic, transitional and chronic homeless individuals and families in the area.

**For specific shelter and service information, call the homeless service agencies directly or call the INFO LINE of San Diego.**

| Homeless Services Home | Overview | Programs | Top of Page |
| Contact Us | News | Homeless Providers and Services |

| Community Services Programs |

Site Map | Privacy Notice | Disclaimers

| Home | Business | City Hall | Community | Departments | Information | Leisure | Services A-Z | Visiting |
| Search | Site Map | Contact the City | Privacy Notice | Disclaimers |

4-2



# Homeless Services
# Programs

The City of San Diego provides a number of programs designed to assist homeless individuals in getting off the streets and finding the help they need. The programs include:

- Homeless Outreach Teams
- Special Needs Housing Program
- Winter Shelter Program
- Cortez Hill Family Center

| Homeless Services Home | Overview | Programs | Top of Page |
| Contact Us | News | Homeless Providers and Services |

| Community Services Programs |

Site Map | Privacy Notice | Disclaimers

| Home | Business | City Hall | Community | Departments | Information | Leisure | Services A-Z | Visiting |
| Search | Site Map | Contact the City | Privacy Notice | Disclaimers |

4-3



HOMELESS SERVICES HOME | OVERVIEW | PROGRAMS | CONTACT US | NEWS | HOMELESS PROVIDERS AND SERVICES

## Homeless Services
# Contact Us



The City of San Diego plays an active role in addressing the needs of its homeless citizens. While the City helps fund a variety of homeless services, it does not provide direct assistance. **For specific shelter and service information, call the homeless service agencies directly or call the INFO LINE of San Diego.**

For more information regarding the City of San Diego's Homeless Services Program, please contact:

Sharon Johnson,
Homeless Services Administrator
City of San Diego
1200 Third Ave., MS-51F
San Diego, CA 92101
Tel: (619) 533-6525
Fax: (619) 236-5596
Email: srjohnson@sandiego.gov

| Homeless Services Home | Overview | Programs | Top of Page |
| Contact Us | News | Homeless Providers and Services |

| Community Services Programs |

Site Map   Privacy Notice   Disclaimers

| Home | Business | City Hall | Community | Departments | Information | Leisure | Services A-Z | Visiting |
| Search | Site Map | Contact the City | Privacy Notice | Disclaimers |

4-4



## Homeless Services
## News

01/11/05    United Way To Bring National, Local Leaders Together To Develop Plan To End Chronic Homelessness In San Diego

12/15/04    City's Winter Homeless Shelter Program to Begin

09/14/04    Federal Government Lauds Local Efforts to End Chronic Homelessness

04/13/04    City Invests $2 Million in Rescue Mission's Harbor View Transitional Housing Facility

| Homeless Services Home | Overview | Programs | Top of Page |
| Contact Us | News | Homeless Providers and Services |

| Community Services Programs |

Site Map   Privacy Notice   Disclaimers
| Home | Business | City Hall | Community | Departments | Information | Leisure | Services A-Z | Visiting |
| Search | Site Map | Contact the City | Privacy Notice | Disclaimers |

4-5





# Homeless Services
# Homeless Providers and Services

The City of San Diego wants to assist homeless people by providing the most useful and direct resources for information and services. For those needing shelter, food or meals, clothing, or other types of assistance, contact INFO LINE of San Diego. INFO LINE operators access a centralized database of agencies, shelters, and services for people who are homeless or have other community needs. Their services are available by phone throughout the City and County of San Diego. Please use the following numbers for available information on homeless services providers and their programs or visit the INFO LINE Web site at
www.infoline-sd.org:

- Greater San Diego - (619) 230-0997
- North County Coastal - (760) 943-0997
- North County Inland - (760) 740-0997
- From Outlying Areas - 1-800-227-0997

| Homeless Services Home | Overview | Programs | Top of Page |
| Contact Us | News | Homeless Providers and Services |

| Community Services Programs |

Site Map | Privacy Notice | Disclaimers
| Home | Business | City Hall | Community | Departments | Information | Leisure | Services A-Z | Visiting |
| Search | Site Map | Contact the City | Privacy Notice | Disclaimers |

4-6



# East Village Redevelopment Homeless Advisory Committee

The East Village Redevelopment Homeless Advisory Committee has been formed to identify any potential physical impacts of homeless displacement caused by the proposed activities on the East Village and surrounding communities. Identified representatives of local government agencies and social services representatives will work to develop and recommend remedies for any identified impacts.

| Homeless Services Home | Overview | Programs | | Top of Page |
| Contact Us | News | Homeless Providers and Services |

| Community Services Programs |

Site Map   Privacy Notice   Disclaimers

| Home | Business | City Hall | Community | Departments | Information | Leisure | Services A-Z | Visiting |
| Search | Site Map | Contact the City | Privacy Notice | Disclaimers |

4-7

# Exhibit 5

# PLAN TO END CHRONIC HOMELESSNESS IN THE SAN DIEGO REGION



## SEPTEMBER 2006

E-1

5

# ACKNOWLEDGEMENTS

## LEADERSHIP COUNCIL

CHAIR: Dene Oliver, OliverMcMillan, Inc.

VICE CHAIR: Doug Sawyer, United Way of San Diego

Fred Baranowski, United Way of San Diego

Paul Brenner, Physician

Robert Coates, Advisor

Steve Escoboza, Hospital Association of San Diego and Imperial Counties

Mary Herron, San Diego Grantmakers

Ernie Linares, City of San Diego Community Services

Suzanne Lindsay, San Diego State University

Mike Madigan, Madigan, Inc.

William Maheu, City of San Diego Police Department

Patricia McQuater. Solar Turbines, Inc.

Bob Morris, Scripps Health Foundation

Rene Santiago, County of San Diego Health & Human Services Agency

Judith Yates, Hospital Association of San Diego and Imperial Counties

*The Plan to End Chronic Homelessness in the San Diego Region*

was made possible by support from:

**The California Endowment**

**The Parker Foundation**

**Union Bank of California**

**United Way of San Diego**

**The Waitt Family Foundation**

**Printing donated by San Diego National Bank**

## SPECIAL THANKS

*The Leadership Council would like to acknowledge the dedicated and hard work of hundreds of individuals listed in Appendix C.*
*Your time, input, and support are truly appreciated. Thank-you!*

*Deep gratitude to Dene Oliver whose leadership was the engine that drove this plan and to Oliver McMillan, Inc. for the design, the initial printings of the plan and the hours of support services donated by the company.*

*A very special thank you to Hannah Cohen, our United Way consultant, who had the vision, leadership and gracious persistence to bring together the talent needed to produce this exemplary Plan to End Chronic Homelessness in the San Diego Region.*

Editing by Jerry Meier, MPH

E-2

# TABLE OF CONTENTS

Executive Summary .......................................................................... 1-3

Introduction ................................................................................... 4-5

Current Snapshot of the Homeless ..................................................... 6-8

Community Planning Process ............................................................ 9-15

Developing a Housing First/Housing Plus Model........................... 16-19

Preventing Chronic Homelessness ................................................ 20-22

Implementation Plan ....................................................................... 23-24

Footnotes ...................................................................................... 24-25

**Appendices**
    A: Glossary
    B: Major Issues Surrounding Homelessness
    C: Participants in the Planning Process
    D: Data and Statistics
    E: Bibliography
    F. Implementation Group

The San Diego Regional Task Force on Homelessness estimates that San Diego County has more than 9,600 homeless people[1]. A subgroup that tends to be the most visible and utilize a disproportionate amount of resources is a group of about 1,400 people who experience homelessness on a protracted or repeated basis[2]. This subgroup, **the chronically homeless**, consists primarily of single male adults with a long-term history of mental illness, substance abuse, physical disabilities, and subsequent and frequent prolonged homelessness.

More than one hundred San Diego homeless died needlessly in alleys, on sidewalks, or alone in dingy motel rooms in 2004[3]. This heartbreak is compounded by the unconscionable fact that at least 22% of San Diego's homeless citizens are veterans[4].

*We identified 11 key elements shared by many approaches for reducing chronic street homelessness. The most important element is a paradigm shift in the goals and approaches of the homeless assistance network.* **The Urban Institute**[5]

In 2005, approximately $70 million in public funds were allocated to programs that serve the homeless in San Diego County. Funding was provided via direct cash assistance and through a number of programs such as transitional shelters and mental health services[6]. Not all these expenditures target the chronically homeless nor do they include the "hidden" costs associated with the chronically homeless such as law-enforcement, emergency medical encounters, paramedics, and hospital costs.

With annual expenses in the millions, housing advocates agree that more progress could and should be made to address the underlying factors that perpetuate the chronic homelessness problem. Moreover, worthwhile local endeavors that house, feed, and care for thousands of homeless

individuals and families have yet to fully address the quintessential solution to chronic homelessness: Permanent Supportive Housing[7,8].

San Diego County is one of 100 communities encouraged by the Bush administration to address the issue of chronic homelessness. As part of this national effort, San Diego homeless advocates have taken the lead in developing a local plan to end chronic homelessness by 2012. In 2004, the City and County officially launched the local endeavor with unanimous resolutions to collaborate in developing a **Plan to End Chronic Homelessness in the San Diego Region**. The United Way of San Diego joined the effort in the role of convener. All three partners have signed a Memorandum of Agreement.

A steering committee known as the **Leadership Council** was formed to provide oversight and executive leadership for The Plan. The Council is comprised of well-respected and dedicated leaders who have an expressed interest in addressing and ending chronic homelessness.

The recommendations outlined herein represent the hard work of six committees and four subcommittees formed by the Council. The Committees' recommendations are evidence-based and draw from the best practices of innovative programs and initiatives throughout the country. Implementation is planned to begin in 2007 under the auspices of a separate implementation group (see Appendix F).

The core of the San Diego Plan focuses on two key elements. First, San Diego needs to develop a Housing First/Housing Plus model that has documented success in other communities[8]. Second, strategies must be implemented that prevent individuals and families from becoming homeless.

5-4

### Housing First/Housing Plus

In cities across the United States, permanent supportive housing has been shown to be an effective and efficient way to take the chronically homeless off the street[9]. Early research has shown that providing independent supportive housing as the first step for the chronically homeless may have a greater impact on reducing homelessness and improving quality of life than the more traditional sequence of placements from emergency shelters through transitional housing, and then on to supervised independent living[10]. However, to establish positive long-term outcomes, successful Housing First models must be accompanied by appropriate and comprehensive supportive services (Housing Plus).

In contrast to traditional sequential approaches, a Housing First/Housing Plus model assumes that the factors that led to homelessness can be most successfully addressed from a permanent home, rather than requiring a homeless person to achieve sobriety or mental health standards before they qualify for permanent housing assistance. This model also recognizes and accepts that because of the complexity of the challenges faced by this population, lifelong support may be needed for some in order to prevent future homelessness.

The solution to chronic homelessness is more complex than simply providing more housing and supportive services. A comprehensive expansion of the current system is needed to include housing first and housing plus models of care that augment existing emergency and transitional housing services.

Addressing the problem means changing the way the current system operates. It means that elected officials and executive leadership of agencies serving the homeless must advocate for systems change. For example, the Plan calls for establishing Regional Access and Intervention Centers located throughout the County, possibly in existing government facilities. Each Center would link consumers with appropriate resources including local or out-of-region existing support systems, and treatment opportunities in their own area.

For San Diego to make a paradigm shift in the way it assists the chronically homeless, the Leadership Council identified five strategic planning areas that must be developed to enact an effective and lasting Housing First/Housing Plus model.

1. Identify and Secure Sufficient Permanent Housing

2. Develop Housing Plus Wrap-around Services Model

3. Strengthen Intervention, Outreach, and Case Management

4. Implement a Systems-wide Data Collection, Evaluation, and Sharing Plan

5. Establish Regional Access and Intervention Centers

### Prevention Plan

While the Housing First/Housing Plus model focuses primarily on the chronically homeless, renewed efforts should also be directed at preventing chronic homelessness. San Diego has more than 200 agencies and programs that serve the homeless[11]. More often than not, services are initiated *after* the state of homelessness is reached. It is recommended that a Prevention Plan be implemented in tandem with the Housing First/Housing Plus model. Both initiatives overlap in many areas and should be viewed as complementary endeavors to ending chronic homelessness. Thus, effective prevention of chronic homelessness means an individual or family who enters the system at any point is given viable options for maintaining permanent housing.

San Diego's prevention efforts should focus on the following five areas:

1. Strengthen Programs That Serve At-risk Populations

2

5-5

2. Improve Discharge Planning

3. Address Employment Issues

4. Address Tenant Landlord Issues

5. Develop Mental Health Courts

## Implementation

Achieving the long-term goals outlined in this Plan require additional organizing, research, and analysis prior to implementation. One of the underlying principles is the need for recent, yet proven creative programs that will result in new and/or expanded systems of care along with the development of new housing solutions[9, 10]. These worthy goals require ongoing planning, community building and consensus building.

While the ultimate goal of the Plan is to end chronic homelessness, implementation efforts must give consideration to and augment other initiatives that address homelessness in San Diego County, particularly homelessness within other vulnerable groups such as disabled veterans, seniors, and the Lesbian/Gay/Transgender/Bisexual population. Moreover, the Plan must also integrate with ongoing strategic planning efforts of the Regional Continuum of Care Council (RCCC). Comprised of representatives of the city and county housing authorities, government staff members and nonprofits operating throughout the County of San Diego, the RCCC is currently developing a comprehensive "Blueprint" for all homeless services in the San Diego region.

The Plan must also integrate with the ongoing planning efforts regarding the Mental Health Services Act (MHSA) and Proposition 63 as a number of new services in San Diego County will be funded through Proposition 63 revenues.

This Plan provides a preliminary framework for ending chronic homelessness. But the critical work will fall to an implementation group responsible for developing an

Implementation Plan, researching the feasibility of various governance structures, and reviewing the Plan in concert with previously adopted public policies regarding homelessness in participating cities.

The Implementation Plan should be developed as a working tool to provide a framework for leaders, planners, and providers to monitor progress in regards to 10 Key Performance Measures.

1. Annual reduction in the number of chronically homeless people.

2. The number of new housing opportunities created.

3. Progress in implementing comprehensive Housing Plus wrap-around model.

4. Progress in establishing a centralized web-based data system that can be used to strengthen intervention, outreach, case management, and evaluation activities.

5. Number of outreach teams created.

6. Number of individuals within each geographic region that are able to access appropriate services.

7. Progress in establishing institutional discharge planning protocols.

8. Number of chronically homeless who find and maintain employment.

9. Progress in establishing Mental Health Courts.

10. Increase in amount of available State, Federal, private and corporate funding.

5-6

# INTRODUCTION



**OUR VISION**

*All previously chronically homeless individuals will have access to safe, decent, affordable housing along with the necessary support services throughout the San Diego region by 2012.*

The San Diego Regional Task Force on Homelessness estimates that San Diego County has 9,667 homeless people, with nearly half concentrated in the City of San Diego[1]. However, there are less than 4,000 homeless shelter beds within the County of San Diego, leaving homeless agencies struggling to meet the high demand[1]. A subgroup of homeless that tends to be the most visible and utilize a disproportionate amount of resources is a group of about 1,400 people who experience homelessness on a protracted or repeated basis[12]. Identified as the **chronically homeless**, this group has been defined by the U.S. Department of Housing and Urban Development as an unaccompanied homeless individual with a disabling condition who has either been continuously homeless for a year or more OR has had at least four episodes of homelessness in the past three years.

Throughout San Diego, efforts are underway to find solutions to house these 1,400 chronically homeless individuals. These are the people routinely seen sleeping in "non-housing" environments such as streets, canyons, doorways and parks. Extreme poverty, poor job skills, lack of education, and negative childhood experiences are common features within the chronic homeless population. They present a complex set of multi-problem challenges to service providers. The presence of a disabling condition is almost universal in the population. These conditions involve mental illness, serious health conditions, and substance abuse. The prevalence of a disabling condition runs as high as 85 percent having one of more of these chronic problems[13].

There is also a need to address chronically homeless families that routinely live in emergency or short-term homeless shelters in the San Diego region. The County's Health & Human Services Agency is currently working to develop data on the actual number of chronically homeless families.

Beginning in 2000, the national focus has been on meeting the special needs of the chronically homeless people and getting them off the streets and into permanent housing with case management to ensure proper access to needed services[24].

Dedicated people in hundreds of agencies toil day in and day out in San Diego to service the chronically homeless population. Their efforts are effective in providing food, shelter, health care and other supportive services. In fact, local efforts have received national recognition in alleviating the chronically homeless problem. Started in January 2000, the Serial Inebriate Program (SIP) is an innovative effort involving a number of agencies including law enforcement, city and county government, and the justice system. The SIP program seeks to reduce the number of chronic, homeless alcoholics going in and out of Detoxification Centers, County Jail, and local emergency departments through intervention and treatment. Since its inception, SIP has improved the lives of program participants while reducing expenses related to police, hospital and emergency services[14].

While the SIP program has shown promising results in a small population of chronically homeless alcoholics, San Diego taxpayers continue to pay millions of dollars for services

to support a larger chronic homelessness problem that rarely offers lasting solutions. The costs to taxpayers of servicing the chronically homeless is staggering and include police and fire support, ambulance transportation, emergency room treatment, jail expenses, shelter, food and more. Those who have studied the problem have come to realize that current costs to manage the chronic homeless problem may far exceed the cost of developing a viable solution[15].

It is time to move beyond *managing* and take concrete steps toward *ending* chronic homelessness. As a community, San Diego needs viable, long-term solutions. It is essential to find treatment for the mentally ill, disabled and drug dependent *before* they become tomorrow's homeless. It is time to develop and enact a long-term solution.

Coordinated prevention efforts are needed to identify groups at risk of homelessness and create complementary programming to obviate the need for living on the street. It is time for community leaders to come together and take the hard numbers to heart.

Many communities throughout the United States have begun to implement strategies to end chronic homelessness that focus on permanent housing first, effective supportive services, and data collection strategies that ensure rigorous evaluation of results. These strategies have reduced the number of chronically homeless people on the streets[15].

San Diego County needs to develop similar strategies based on documented best practices. Local efforts need to include a methodology for conducting regularly scheduled counts of street homelessness and then establish a baseline number to monitor results. Plus, it is critical to establish within each sub-community a central, cross-agency record of people experiencing chronic homelessness. Data needs to be collected to document their involvement with government and nonprofit organizations to better identify

resources and relationships that can assist with housing.

San Diego County and its 18 incorporated cities must make a long-term commitment to defeat chronic homelessness and regularly assess progress, while testing new yet proven, methods of implementation. A national effort, driven in part by the National Alliance to End Homelessness[16], has prompted the County of San Diego, City of San Diego and United Way to establish a group of civic leaders and experts at agencies addressing homelessness to begin developing a plan to end chronic homelessness. When the planning process is complete, it will be in the hands of a new **implementation group** and hundreds of dedicated volunteers and staff that work with the homeless to ensure the Plan's long-term success. Those who care about the homeless are called upon to take action to better the lives of San Diegans by supporting the local officials' Plan to end and not just manage chronic homelessness.



Recall what it feels like to return home after a long, hectic day. We see ourselves breathing a sigh of relief, not only because the day is over, but also because we are home. Our homes provide safety from the elements, warmth and comfort. That is obvious. Beyond this, however, is the feeling that we have space to call our own, unique from other places, surrounded by things we enjoy, possessions, mementos and pictures of loved ones. Our homes are places over which we feel some level of control in our lives or autonomy. Our homes nurture us by providing a sense of belonging there, and are places where we can rest and be rejuvenated for the next task at hand. Can we imagine life without such a place? If the spirit has no such permanent resting place, how does it manage to heal itself?

### San Diego Homeless Profile



Chronically homeless people represent 10% of the homeless population nationally and consume an estimated 50% of available resources, including emergency medical services, shelters, mental health support, law enforcement services, and detox facilities.

## Homeless Profile

Estimating the homeless population is a difficult and inexact process but is vital in local planning efforts. The Regional Task Force on the Homeless (RTFH) provides historic estimates of the homeless population in the San Diego region[1].

Estimates are based on surveys, street counts, shelter counts and expert opinion provided by government agencies, law enforcement agencies, businesses and community organizations. The RTFH divides the San Diego homeless population into two general groups: urban homeless persons and homeless farm workers and day laborers.

*In 2004, the "Point-In-Time" estimate of the homeless population in San Diego County was at least 9,667[1].*

Urban homeless comprised approximately 75% of the total, with the remainder comprised of homeless farm workers and day laborers.

*Of the 9,667 homeless, it is estimated that almost 1,400 individuals (14%) qualify as chronically homeless as defined by U.S. Department of Housing and Urban Development[17].*

## In San Diego[1, 18]

- Single adults comprise the majority of the homeless (4,840 or 66 percent).

- Over 1,400 single adult women are homeless.

- Family members make up 32 percent (2,373) of the urban homeless population.

- Single women head the majority of homeless families.

- Increasing numbers of single male parents with children have become homeless.

- About 110 homeless street youth reside in the region at any given time.

- More than 300,000 individuals live below the federal poverty level and are on the brink of homelessness.



SNAPSHOT: Urban Homeless (N=7,323)

Families 32%

Youth (alone) 2%

Single Adults 66%

5-9

In addition to the 1,400 chronically homeless, The RTFH has identified several additional categories of homeless. None of these populations have been allocated sufficient "beds" to meet their needs as identified in the *Homeless Beds Snapshot[13]*. Moreover the RTFH identified no beds designated by area homeless agencies as "chronically homeless beds."



## Homeless Populations[1, 19, 20]

*Domestic Violence:* More than 530 homeless family members are in need of domestic violence services at any given point-in-time. These numbers reflect only reported instances of domestic violence.

*Persons with HIV/AIDS:* There are just over 400 persons with HIV/AIDS who are unsheltered in San Diego County.

*Mentally Ill Persons:* There are over 1,400 severely mentally ill *homeless* persons in San Diego County. Those most vulnerable, are the homeless who also suffer from grave and long-term mental illness. Nationally, mental illness is found at disproportionately high rates among the homeless. Although approximately 4% of the general population suffers from mental illness, in excess of 20% of the homeless have a mental disability.

*Parolees:* Senior Parole Agents estimate that eight to ten percent of parolees are homeless, representing 700 homeless parolees in San Diego County, at any given moment.

*Senior Homeless Persons:* There are 360 homeless seniors at any given point-in-time in our region.

*Substance (Alcohol and/or Drug) Users:* About 2,200 urban homeless adults may abuse alcohol or drugs.

*Veterans:* Estimated at over 900, homeless veterans represent at least sixteen percent of the homeless adults in our region. But an additional 317 have been identified in programs serving other homeless persons, i.e. substance abuse programs. This produces a total of at least 1,219 homeless veterans.

## The Cost of Homelessness

Nearly $70 million in public funds has been allocated to homelessness in San Diego County in 2005[6]. These funds include more than $6.3 million in cash assistance / food stamps and more than $63 million allocated to homelessness through several major program categories. These costs do not capture the "hidden" costs of law-enforcement, emergency departments, paramedics, and hospital costs.

As the chart below indicates Transitional Shelters and Mental Health Services received a combined total of almost $30 million representing approximately 43% of all funds allocated to the homeless. Permanent supportive housing received $4.6 million, representing 7.2% of total funds allocated.

### 2005 Regional Homeless Expenditures[6]

| Program Category | Amount ($millions) |
|---|---|
| Transitional Shelter | $15.0 |
| Mental Health Services | $14.1 |
| Substance Abuse Services | $8.9 |
| Health Services | $7.6 |
| Emergency Shelter | $6.4 |
| Permanent Supportive Housing | $4.6 |
| Case Management/Info/Referral | $2.8 |
| Employment Assistance | $2.4 |
| Day Shelter | $0.8 |
| Food | $0.6 |
| Planning, Admin. & Coord. | $0.5 |

SNAPSHOT
"Hidden" Chronic Homeless Costs
An analysis of the medical charges
incurred by fifteen randomly selected
homeless clients during the period of July
1, 1997 to December 31, 1998
demonstrated a total of nearly $1.5 million
in costs at two regional medical centers,
equating to nearly $100,000 per client[1].

## Housing Expenditure Trends

The Homeless Housing Expenditures Snapshot below documents a gradual increase of expenditures in public funds for permanent housing up until 2005 when funding declined by $400,000[6]. Nevertheless in 2000, permanent housing represented 4% of all homeless housing expenditures in San Diego County. By 2004 the percentage had risen to 8% and then dropped to 7.2% in 2005. Moreover, homeless *housing* expenditures represented 38% of the total *homeless* expenditures in 2000 and increased only slightly to 40.9% of total homeless expenditures in 2005[6].

### SNAPSHOT
### Homeless Housing Expenditures



## San Diego's Housing Crisis

As the Housing Crisis Snapshot indicates there are unprecedented barriers to affordable housing in general, as well as housing for very low-income people, and those with co-occurring disabilities such as the chronically homeless. As a result of these barriers, the total stock for housing for residents in the lowest income bracket has decreased dramatically over the last decade. Moreover, rents for efficiencies and one-bedroom apartments far exceed the incomes for low-income individuals with disabilities who rely on Supplemental Security Income (SSI).

SNAPSHOT
San Diego's Housing Crisis[21, 22]

- San Diego's high housing prices, coupled with its relatively low wages, make it the second least affordable area in the country

- On average, San Diegans with disabilities are paying 123 percent of their monthly Supplemental Security Income (SSI) income to rent a modest one-bedroom apartment and 108 percent to rent an efficiency

- The median price of housing in San Diego doubled between 2000 and 2004, but the median household income only increased 10.4 percent

- Just 11 percent of households are able to purchase the median-priced home

- One in every five – or 20 percent – of every renter household spends at least 50 percent of its income on housing

- The average apartment rent in San Diego is $1,210 – a nearly 100 percent increase from 1990 when average rents were $643

5-11

## The Leadership Council

In July 2000 the National Alliance to End Homelessness (NAEH) outlined the concept of a 10-year plan to end chronic homelessness as part of a more ambitious plan to end homelessness altogether[23]. The goal to end chronic homelessness was adopted by the White House when Housing and Urban Development (HUD) Secretary Mel Martinez endorsed it in a keynote address at the NAEH's 2001 conference. Most importantly, Martinez announced reactivation of the Interagency Council on the Homeless (ICH)[24]. Dormant for more than 5 years, the ICH was charged with coordinating 18 federal departments and agencies in an effort to end chronic homelessness. In January 2003, the Bush Administration challenged 100 mayors to create their own 10-year plans to end chronic homelessness[25].

San Diego has vigorously accepted the challenge and now efforts are underway to produce a plan and complete implementation by 2012 to provide appropriate housing and supportive services to the chronically homeless. In 2004 the City and County unanimously passed resolutions to collaborate in developing a *Plan to End Chronic Homelessness in the San Diego Region*. The United Way of San Diego joined the effort in the role of convener. All three partners have signed a Memorandum of Agreement.

A steering committee known as the **Leadership Council** was formed to provide oversight and executive leadership for the Plan. The planning process then moved forward through the hard work of several committees comprised of more than 80 individuals united in a common goal to defeat chronic homelessness (see Appendix B). The Leadership Council will be the driving force in obtaining Plan approval from elected officials and laying the foundation for a new **governance structure** responsible for Plan implementation.

San Diego's plan will build upon and integrate with existing efforts that serve the chronically homeless and be driven by a "best practice" approach that borrows from successful strategies implemented in other communities. In fact the San Diego Region currently has some very successful models of permanent supportive housing, including treatment and care, for the homeless[26, 27]. Moreover, San Diego City and County have received joint national recognition because of the Homeless Outreach Teams (HOT) and Serial Inebriate Program (SIP) programs for the chronically homeless. Both programs were mentioned in an Urban Institute report pointing to these two programs as models for other regions[15].

Implementation is to begin in 2007 under the auspices of a separate governance structure. One of the challenges faced by those tasked with implementation will be to integrate efforts to end *chronic* homelessness with programs and services that address general homelessness in San Diego County.



LEADERSHIP COUNCIL
Dene Oliver, Chair
Doug Sawyer, Vice Chair
Fred Baranowski
Paul Brenner
Robert Coates, Advisor
Steve Escoboza
Mary Herron
Ernie Linares
Suzanne Lindsay
Mike Madigan
William Maheu
Patricia McQuater
Bob Morris
Rene Santiago
Judith Yates

## Working Committees

The Leadership Council marshaled the region's most talented problem solvers to improve the region's health and social safety net to more effectively address and prevent chronic homelessness. Several working committees dedicated hundreds of man-hours to provide input into developing the outcome-oriented Plan. Committees were comprised of a broad spectrum of stakeholders including representatives from faith-based agencies, healthcare, social service agencies, educational institutions, the justice system, and civic organizations.

---

### Committees

- Data, Outcomes, & Evaluation
- Outreach, Early Intervention & Engagement
- Prevention (divided into 4 subcommittees)
  - Discharge Planning Subcommittee
  - Mainstream Resources Subcommittee
  - Services/Program Analysis Subcommittee
  - Employment Subcommittee
- Creative Housing Solutions
- Justice Systems
- Implementation

---

## 5 Goals to End Chronic Homelessness

If the San Diego region is to defeat chronic homelessness, the goals outlined in this Plan must engage the entire community in finding effective solutions. Success will be defined in part, by an increase in the supply of available housing and improved coordination and responsiveness of the current system. Implementation of the Plan will help San Diego achieve the goal of ending chronic homelessness in the San Diego Region instead of merely attempting to manage the homeless population.

## FIVE GOALS

### Housing First

We will provide permanent supportive housing for chronically homeless individuals and families with the goal of eliminating chronic homelessness in the San Diego Region. To accomplish this, we will build permanent supportive housing, rehabilitate existing housing, maximize master leasing opportunities, adapt other buildings to use for permanent supportive housing, and address permitting requirements of each type of housing.

### Housing Plus
**(wraparound services and support)**

We will provide for the multiplicity of needs of the chronically homeless. We will ensure linkage to community resources (mental health, health care, judicial services, life skills education, employment preparation, and case management) and increase the availability and awareness of formal community supports to promote housing stability and self-sufficiency.

### Prevention

We will forestall and prevent homelessness for those at imminent risk by expanding the range and availability of prevention strategies, increasing their immediate accessibility, and improving their long-term effectiveness.

### Enhance Data Collection

We will increase our ability to measure outcomes and evaluate intervention through improved and enhanced data collection, aggregation, and analysis capabilities related to available homeless persons, housing, and environmental indicators and benchmarks.

### Secure Mainstream Resources

We will strive to put existing mainstream resources to optimal use, maximize our efforts to secure funding as it becomes available, and ensure that the budget plan is designed to meet our goals.

Committee topics were initially assigned by the Leadership Council in direct response to "The Ten Essentials" outlined in The National Alliance to End Homelessness' Toolkit for Ending Homelessness[26]. However, the scope of each committee evolved over the course of planning development.

As committees completed their work, it became obvious that many had developed overlapping goals and objectives. These common goals and objectives have been consolidated and refined into the core of San Diego's Plan and will be described in detail in the next two sections—**Developing a Housing First/Housing Plus Model** and **Preventing Chronic Homelessness.** Following is a brief summary of the work of each committee and its recommended goals for the planning process.

## Data, Outcomes, & Evaluation Committee

Using best practice models of research and evaluation, and promising plans from across the country, the committee worked to develop the following goals for the San Diego region.

1. To develop policies, procedures, and implementation strategies that will be used to implement an evidence-based, outcome driven, monitoring and evaluation structure for chronically homeless persons accessing both public and private resources.

2. To develop process / outcome indicators of program success and appropriate benchmarks for those indicators that will be established to evaluate the use of unduplicated aggregate data.

3. To develop a method of gathering data that ensures the confidentiality of homeless persons served and ensures essential training and education for the proper collection of data.

4. To utilize population-based public health principals including surveillance, investigation, geographic mapping, and evaluation in the on-going monitoring of program implementation.

## Outreach, Early Intervention, & Engagement Committee

This committee addressed the barriers confronting chronically homeless individuals that hinder their engagement with social services, healthcare and placement in appropriate housing. Most chronically homeless people who reside in public spaces have mental illness and substance abuse issues among their co-occurring disorders. They have rejected or been rejected by the systems of care intended to help them due to their multiplicity of needs and geographic instability. No one strategy will work with this diverse and difficult population to achieve the ultimate goal of permanent housing. The Outreach, Early Intervention and Engagement Committee designed its component of the plan to allow a significant paradigm shift based on best practices cited by the Urban Institute[5].

The goals of the Outreach, Early Intervention and Engagement Committee are to amend the present system by:

1. Facilitating higher quality interventions that break down barriers to engagement.

2. Increasing intervention coverage to include ALL chronically homeless persons through focused outreach and case management.

3. Increasing intervention coverage through expanded "points of access" that focus on the needs and environment of the homeless.

## Prevention Committee

The most economically efficient and humane way to end chronic homelessness is to prevent its occurrence in the first place. A wide array of providers and services are available to the chronically homeless, but intervention typically occurs after the state of homelessness is reached. The Prevention Committee was tasked with developing a system of improved communication and delivery among providers and services in order to develop region wide planning with the goal of preventing chronic homelessness. A key element is to establish a "no wrong door" entry into the homelessness

5-14

prevention network. Four subcommittees were formed to accomplish the committee's assignment:

- Discharge Planning Subcommittee
- Mainstream Resources Subcommittee
- Program and Services Analysis Subcommittee
- Employment Subcommittee

➤ **Discharge Planning Subcommittee**
Developing a system of region wide discharge planning for the chronically homeless will require improved coordination of services and communication with providers. The synchronized effort should include all forms of temporary shelter including hospitals, skilled nursing facilities, residential programs, treatment programs, institutions of incarceration, foster care, for-profit / non-profit agencies, and case management. The primary goal will be to ensure that all homeless individuals and families will be discharged to a housing/supportive housing/treatment setting, and will not be discharged to the street. The goals of Discharge Planning Subcommittee are to:

1. Slow or stop the revolving door cycle of the chronically homeless going in and out of shelters, detoxification centers, County Jail, and emergency rooms.

2. Divert newly discharged individuals off the street and into housing combined with wraparound services.

3. Significantly reduce uncompensated costs, time constraints, and manpower burdens to the county's healthcare, law enforcement, and judicial infrastructure caused by the chronically homeless.

4. Give people who routinely live on the street an opportunity to create a stable mainstream lifestyle.

➤ **Mainstream Resources Subcommittee**
Mainstream organizations must become more involved in developing an effective community response. People in need will be better served if the justice, mental health and welfare systems, child protective services, employment assistance programs, housing developers, neighborhood organizations, and other areas of the public/private sectors do more individually and collectively to eliminate homelessness. The goals of this subcommittee are to:

1. Identify resources within the county (by region) that are appropriate to the chronically homeless.

2. Create a first-time ever comprehensive service inventory that is appropriate to this population.

3. Improve access by developing strategies that address barriers and barrier reduction.

4. Develop a Summary Report of Available Mainstream Resources that profiles current and potential resources to address chronic homelessness in San Diego County.

➤ **Services / Program Analysis (Housing Plus) Subcommittee**
Housing Plus is a comprehensive model that ensures that any and all services needed by a chronically homeless individual are integrated through a cohesive, individualized plan that guides those services through case management.

The Plan does not mandate that existing shelter programs utilize the Housing First/Housing Plus model. In fact, as current chronically homeless persons in shelter and transitional housing are moved into permanent housing, a reallocation and/or restructuring of current service delivery efforts for the chronically homeless may occur. As more comprehensive services are developed to ensure that formerly homeless persons remain in their housing units, shelter and transitional housing services will still be needed for homeless populations not defined as chronically homeless.

Housing Plus (wraparound services) is the supportive key to keeping formerly homeless individuals and families in housing. The goals of the Services/Program Analysis Subcommittee are:

1. Decrease the number of chronically homeless individuals sleeping on the streets of San Diego County.

2. Identify existing services, public systems (health care, judicial system, etc.) and programs that can be coordinated to better meet the immediate and long-term needs of the chronically homeless non-residents as well as resident consumers.

3. Identify the need for additional but effective services, and programs that can be coordinated with public systems to better meet the needs of the chronically homeless non-residents as well as resident consumers throughout the region.

4. Identify possible paradigm shifts (e.g. moving away from a shelter model to a transitional model, or permanent supportive housing model) that may be optimal in meeting needs.

➤ **Employment Subcommittee**
Chronic unemployment and underemployment are major contributing factors to homelessness[30]. They affect quality of life, economic development, and public safety. Long term housing stability is dependent upon our citizens' ability to earn a wage level that will afford housing (rent and utilities) that utilize no more than 30% of their income. It must also be expected that many of the chronically homeless may never be able to achieve full-time employment with benefits. But many can and will find meaningful employment. Therefore this subcommittee's goals are:

1. Enabling employment programs to meet the special needs of homeless adults at different stages of recovery and job readiness.

2. Matching homeless adults to jobs that offer potential salary increases, health benefits, and the opportunity for further education and career advancement.

3. Developing strategies that focus on job retention and long-term workforce success.

## Creative Housing Solutions Committee

The Creative Housing Solutions Committee focused on finding a way to end homelessness for those who have lived on the streets, canyons or riverbeds sometimes for years. The Committee proposes to identify possibilities for rehabilitation of housing, master-leasing opportunities, adapt other buildings to use for housing and address the permitting requirements of each type of housing.

Committee members foresee possible phasing down or converting shelters and some transitional housing programs in favor of permanent supportive housing units. The committee proposes to identify, create or mobilize approximately 2000 units (or less if chronically homeless have been placed in appropriate permanent housing with access to adequate supportive services and appropriate healthcare). For some, permanent housing will mean a unit in a subsidized multi-family development with on-site supportive services. For others, permanent housing will be individual apartment units with a temporary rent subsidy, monthly case management, and facilitated access to community supportive services. It is anticipated that the type of permanent housing will change over time.

The overall goal of the Creative Housing Solutions Committee is to create appropriate housing units to provide housing coupled with associated supportive services to formerly chronically homeless individuals and families. New housing approaches should include building, acquiring, renovating or leasing, drop-in centers, stabilization/treatment centers, transitional facilities, and permanent supportive housing. The goals are to:

1. Develop appropriate Housing First/Housing Plus models for individuals and families.

2. Create new permanent supportive housing units with project-based housing subsidies for persons with serious and persistent disabilities.

3. Develop more rental subsidies that are both project-based and tenant-based.



4. Make existing public housing more accessible and work with landlords to increase the acceptance of rental subsidies.

5. Use local public funding to create or subsidize more housing units for homeless individuals and families.

## Justice Systems Committee

In California there is a growing list of political leaders, including the Governor, who believe it's time for a new approach to incarceration and re-entry regarding California's prison system[29]. However, coordinated local efforts have yet to fully address re-entry into local jails, which roughly account for ten times the number of persons who re-enter society from California's prisons[31].

The primary charge for the Justice Systems Committee has been to create process descriptions and plans, which together could form a network to prevent individuals who are released form the local justice system from becoming homeless.

First, as persons exit courts, custody and/or mental health settings, mechanisms must exist to provide immediate access to appropriate housing. Second, supportive transition housing options must be available so that the underlying conditions causing homelessness and criminality can be resolved. Third, mechanisms must exist to provide civil legal services needed to resolve outstanding legal matters impeding reintegration into society. Fourth, mechanisms must exist to assure that each individual remains within and completes treatment. And finally, if an individual does not complete treatment, mechanisms must be in place to ensure that he or she is immediately returned to the justice system so that the issue(s) can be appropriately addressed.

It is the vision of the Justice Systems Committee that all components of the justice system will identify the housing needs of persons coming into contact with any component of the justice system. Upon contact, protocols must be in place that effectively link individuals to appropriate housing as they re-enter the community from institutions or the Courts.

The following goal statements are dependent on a **SYSTEM** that will take clear direction from elected bodies. It will also take effective administrative analysis, and finally, it will require funding and a sustained intention and multi-agency teamwork not commonly found between governmental entities. Local justice systems need to be created or modified so that:

1. Persons leaving institutions will be provided benefits to which they are legally entitled (e.g. SSI) prior to or at the time of their release from custody and, if needed, immediate supported transition to housing.

2. Police agencies will have immediate access to a range of community based agencies that will receive and immediately house or obtain housing appropriate to the individual to keep such persons from becoming homeless and from re-offense.

3. There will be mechanisms of competent assessment of each individual in custody, and those encountered by peace officers on the street.

4. Other needed services, including civil legal services, will be linked to clients once their housing needs have been met.

5. Pre-sentencing assessments for every person will include housing and employment needs and plans.

6. Probation and Parole reports will include housing and employment needs and a plan for every person.

## Implementation Committee

The Implementation Committee recommended a new entity to be developed to guide implementation of the Plan. Efforts to develop an Implementation Group (IG) have begun (see Appendix F). Members of the IG will be appointed to standing seats representing a



broad cross section of community stakeholders. At a minimum the IG will be comprised of individuals representing elected officials, the business sector, service providers, the justice system, the Regional Taskforce on the Homeless, The Regional Continuum of Care Council, County of San Diego Health and Human Services (e.g. mental health/drug and alcohol), law enforcement, philanthropy, formerly homeless individuals, and HUD.

As convener of the Plan, United Way will start the process of contacting the agencies and associations identified as part of the IG, with the newly formed IG holding its first meeting in December 2006. Between January 2007 and June 2007 the IG will finalize the Implementation Plan and decide on the final governance structure, with implementation of the Plan to begin in July 2007.

As the Plan moves forward in 2007, a number of challenges will face those charged with its implementation. More than 200 agencies and programs serve the homeless in the San Diego Region[11]. Their efforts are guided in part by the Regional Continuum of Care Council (RCCC). Comprised of representatives of the city and county housing authorities, government staff members and nonprofits operating throughout the County of San Diego, the RCCC is currently developing a comprehensive "Blueprint" for all homeless services in the San Diego region. The Plan must be integrated into ongoing strategic planning efforts of the Regional Continuum of Care Council (RCCC).

The goals of implementing the Plan are to:

1. Support the strategies within the Plan to End Chronic Homelessness to reduce the number of chronically homeless people in the region incrementally over the next 5 years.

2. Develop strategies to overcome barriers and gaps .by addressing policies to maximize existing systems and resources.

3. Increase San Diego's rate of success in competing for the amount of available State and federal funding.

4. Enhance San Diego's leveraging viability with private and corporate foundations.



# DEVELOPING A HOUSING FIRST/HOUSING PLUS MODEL
## Five Key Implementation Strategies

To assist the chronically homeless with their more complicated service needs to return to housing, there is a need to make a renewed investment in case management, increasing coverage, reducing caseloads, and providing a more intense level of engagement. The San Diego Region needs to develop a **primary outreach and drop-in services system of behavioral health professionals** who are trained in mental health, substance use and co-occurring disorders to provide mental health assessments, intensive case management and other appropriate support services.

In cities across the United States, permanent supportive housing has been shown to be an effective and efficient way to take the chronically homeless off the street[9]. Research indicates that homeless participants in Housing First models are able to obtain permanent housing earlier, remain permanently housed, and report greater satisfaction with overall quality of life while maintaining similar outcomes related to psychiatric and substance abuse symptoms when compared to persons in more traditional step-by-step homeless programs[10]. As might be expected, significant supportive services (Housing Plus) are required to maintain housing once it has been secured.

As opposed to emergency housing or transitional shelters, the Housing First/Housing Plus model approach assumes that the factors that led up to homelessness can best be remedied once permanent housing has been provided. The Housing First/Housing Plus model also accepts that lifelong support may be needed for some in order to prevent future homelessness. The San Diego Region has made the chronically homeless the focus of efforts to find solutions, realizing that successful implementation may have the added benefit of liberating resources for the temporarily or transitional homeless population.

The Housing First/Housing Plus model seeks long-term self-sufficiency, promoted through a wraparound service philosophy. But the problem is more complex than simply providing more housing and supportive services. Addressing the problem of the chronically homeless means changing the way the current system operates. It means that leadership from elected officials, government, and social service agencies must be committed to the elimination of chronic homelessness which may require significant system change.

For San Diego to make a paradigm shift in the way it serves the chronically homeless, there are five strategic planning areas that must be developed concurrently to establish an effective and lasting Housing First/Housing Plus model. In developing the following five implementation strategies, the hard work of the various working committees and subcommittees has been consolidated and prioritized in an effort to provide a concise, outcome driven plan that will move San Diego toward its goal of eliminating chronic homelessness.

## 1. Identify and Secure Sufficient Permanent Housing

The Leadership Council recognizes that assessment of local resources is continually updated by the Regional Task Force on Homelessness (RTFH). This assessment will form the foundation for developing an action plan to ensure that sufficient housing is available for the chronically homeless and those at risk of chronic homelessness.

As a first step, there needs to be a comparative analysis of existing facilities and regional housing needs assessment that will aid in the production of an action plan mapping out where housing construction, rehabilitation, or conversion is required. The needs assessment should also include transitional and permanent supportive housing for the disabled homeless. The analysis will identify a wide range of facilities or potential sites for appropriate housing, emergency shelters, "Safe Havens," case-managed hotel/motel voucher programs, group homes, sober living facilities, treatment programs, board and care facilities, SROs (single room occupancy), CUs (compact unit or efficiency), and permanent-supportive housing alternatives.

Second, there is a need to identify and seek local, state, federal and other grant funding opportunities to develop new permanent housing opportunities. A development plan based on the research of the Mainstream Resources Subcommittee will need to be created to secure resources. The development plan should also identify available federal, state, county and city land.

An expansion of the current system is needed to include housing first and housing plus models of care that augment existing emergency and transitional housing services. Permanent housing can be provided in a number of creative ways. It may be new construction, rehabilitation, master leasing, set-asides in affordable housing, or scattered site housing, either purchased or rented. Perhaps overtime as the need diminishes, even some transitional housing programs and shelters may be restructured to accommodate permanent supportive housing units. However, existing emergency and transitional housing services must be continued as vital resources until such time that objective rate indicators (i.e. vacancy rates) demonstrate that the need no longer exists.

In developing its housing resources needs assessment and subsequent action plan, the Leadership Council recommends that the plan must, at a minimum, incorporate the following four elements:

1. Broad support from a variety of stakeholders such as the public, elected officials and those serving the homeless must be established early on in the process.

2. Housing must be coupled with the availability of services and employment opportunities throughout San Diego County rather than concentrated in a specific neighborhood to improve the likelihood of successful outcomes.

3. Resources must be distributed based on regional allocation.

4. Immediate access to shelter and care must be a primary focus.

## 2. Develop Housing Plus Wrap-around Model

The wrap-around model engages many traditional homeless service providers in increasing the availability and awareness of formal community supports, and ensures linkage to community resources. Thus, the Housing Plus component may be on-site case management with full-range supportive services, or monthly case management with facilitated access to community support services.

As a first step to creating wrap-around services, the implementation group should draft a summary report inventorying mainstream resources being used to address chronic homelessness in San Diego County. The report should identify all public mainstream resources for analysis and potential use for supporting programs to address chronic homelessness throughout the county. The report should also address the ongoing planning efforts regarding the Mental Health Services Act (MHSA) and Proposition 63 as a number of new services in San Diego County will be funded through Proposition 63 revenues.

The special needs of homeless veterans must also be prioritized, as homeless veterans do not always fare well in programs designed for the general homeless population[1]. The report should also identify how each of the identified mainstream resources is currently used and to what extent, if at all, they are currently used to address chronic homelessness in San Diego County.

Following the analysis/needs assessment and subsequent recommendations, it is envisioned that a comprehensive wrap-around model will be implemented that moves the chronically homeless from the streets into permanent housing solutions. Upon entry into the homeless services system, each individual and family will be assessed for eligibility of mainstream resources. Services will follow the family or individual into permanent housing and will be available as long as necessary, even indefinitely. Housing placement and housing plus services including job-training services (with the goal of livable wage employment), other income supports, and childcare if needed, will be provided along with primary health care, mental health and substance abuse services. Case management will be provided as necessary.

## 3. Strengthen Intervention, Outreach, and Case Management

To assist the chronically homeless with more complicated service needs, there must be a renewed investment in case management, outreach, and intervention services. Wrap-around services must increase coverage, reduce caseloads, and provide a more intense level of engagement.

As a first step it is proposed to develop a primary outreach and drop-in services system of behavioral health professionals who are trained in mental health, substance use and co-occurring disorders to provide mental health assessments, intensive case management, other appropriate support

services and then follow-up once housing has been secured.

A key goal of the new system will be to revise the current triage system to take the most seriously disabled off the streets first. Consumers should be placed on a waiting list based on a hierarchy of need or "triage" approach. Case studies have shown that beginning case management intervention is a cost-effective approach to getting the chronically homeless off the street[13]. This strategy should expand upon the current HOT Team (Homeless Outreach Team) Program, providing expert back-up to other officers and field outreach teams. The goal is to place the person in appropriate, stable housing as quickly as possible and to provide appropriate supportive services to help them retain their tenancy.

### Cost Effectiveness

Once chronically homeless people are in permanent supportive housing, success is achieved by providing supportive services that enable them to stay off the streets and out of hospitals and jails. This approach is very cost effective. A 1999 study in New York City found that once placed into service-enriched housing, a homeless mentally ill individual reduces his or her use of publicly funded services by an average of $12,145 per year.[13]

To support enhanced outreach, intervention and case management efforts, the Leadership Council recommends establishing a centralized web-based consumer case management system that will systematize and coordinate case management of approximately 1,400 chronically homeless consumers. A new Case Management System Coordinator position will be needed to oversee the new system and manage the priority "triage" list. This new system should be designed to assist behavioral health case management professionals to prioritize consumer needs, identify their location, complete the placement process, evaluate progress and maintain contact.

5-21

## 4. Implement a Systems Wide Data Collection, Evaluation, and Sharing Plan

The Implementation Plan calls for establishing a Data and Outcomes Implementation Team to meet regularly to guide the implementation of enhanced data collection and reporting functions. Improved data collocation will increase the ability to measure outcomes.

First, implementation group members should work with the Regional Task Force on Homelessness (RTFH) and other stakeholders to help establish outcome indicators in the broad categories of homeless persons, housing stock (including supportive housing, board and care facilities, treatment facilities, subsidized housing, shelters, etc.), and the environment (poverty, jobs, availability of SSI etc.).

Second, providers should improve current methods for collecting information about chronically homeless persons, services delivered to those persons, and program outcomes by broadening the number of participants reporting into untraditional sources such as hospitals and community centers.

The Leadership Council should be the driving force in establishing partnerships between all current and potential stakeholder groups currently collecting data related to homeless persons. It must also be recognized that current policies may have to be modified to allow the aggregation of data in a way that facilitates program monitoring and evaluation while at the same time protecting the confidentiality of clients.

A more innovative way is needed to collect and evaluate data. First, it is proposed to utilize the Geographic Information Systems (GIS) to visually map issues related to homelessness in the county including indicators related to persons, housing stock, and the environment. The use of statistical spatial analysis as well as the analysis of multi-level data at the individual and community level will enhance the understanding of the chronic homeless in San Diego County. Second, aggregate data collected by the Regional Task Force on Homelessness and from the proposed web-based consumer case management system should be used for quality assurance, monitoring, and evaluation. On-going aggregate data collection and analysis will be critical in the evaluation of specific interventions and regular monitoring of progress toward the goals of the Plan.

## 5. Establish Regional Access and Intervention Centers

To enhance the effectiveness of wrap-around and prevention services the Leadership Council proposes that Regional Access and Intervention Centers should be located throughout the County of San Diego. Regional Centers would link consumers with appropriate resources including local or out-of-region existing support systems, and treatment opportunities in their own areas. The Regional Centers could also serve as a sort of "data clearing house" to aide in monitoring performance indicators.

It is recommended that a contact location be established at existing County facilities (or other appropriate facilities) in each of the seven regions: North Coastal, North Inland, South, East, Southeast Central, and North Central. Service availability in each region should be increased to 24 hours per day, 7 days per week. It is anticipated that Regional Centers will serve as a nexus for sharing local standards of service delivery and best practices that can then be shared and adapted throughout the County.

5-22

# PREVENTING CHRONIC HOMELESSNESS
## A Five Point Plan

While the Housing First/Housing Plus model focuses primarily on the chronically homeless, the Leadership Council suggests that renewed efforts be directed at preventing chronic homelessness. Presently, more than 200 agencies and programs serve the homeless[11]. However, these services are typically initiated after the state of homelessness is reached. The Council recommends implementation of the following Five Point Plan in tandem with implementation of the Housing First/Housing Plus model. Both initiatives overlap in many areas and should be viewed as complementary endeavors to ending chronic homelessness. Thus, effective prevention of chronic homelessness means an individual or family who enters the system at any point is given viable options for maintaining permanent housing.

## 1. Strengthen Programs That Serve At-risk Populations

There is a need to strengthen the safety net supporting homeless persons who repeatedly use temporary shelters without any hope of obtaining permanent housing. These individuals (and families) need to be provided a clear path to permanent housing free of bureaucratic entanglement. The Leadership Council recommends identifying communities where there is a high use of temporary shelters and to develop a system for identifying and utilizing homeless prevention and emergency services to ensure that long-term permanent solutions are available.

There is also a need to educate and strengthen the efforts of safety net providers that work with at-risk populations—primarily the poor. Action steps should be implemented to ensure that mainstream health and welfare programs (mental health, substance abuse, TANF, child welfare, etc.) that provide care and services to low-income people consistently assess and respond to their housing needs.

As a military town San Diego has a large population of homeless veterans. There is a need to address the multiple barriers (e.g. unemployment) that veterans face in transitioning from homelessness. The Leadership Council recommends developing a system to better track homeless veterans and calls for the development of a local plan for implementation of State Assembly Bill 1594 that promotes comprehensive assistance for homeless veterans. Moreover, the Interagency Council on the Homeless has compiled a listing of resources for homeless veterans that should be integrated into the San Diego Plan[32].

## 2. Improve Discharge Planning

Several working committees identified the need to develop a system of region wide discharge planning, especially for the chronically homeless. Improved discharge planning will require improved communication between providers and services. The ultimate goal of this effort will be to ensure that all homeless individuals and families are discharged to a housing/supportive or housing/treatment setting and not discharged to the street.

The Justice Committee recommends several actions to prevent the revolving door cycle of the chronically homeless going in and out of shelters, detoxification centers, County Jail, and emergency departments. First, there should be an analysis of current discharge policies, practices and protocols to help identify gaps and challenges. Second, homeless serving agencies in San Diego County should work more closely with courts and law-enforcement agencies to establish institutional discharge plans prior to release from hospitals, treatment facilities, detention or incarceration facilities, shelters, and foster

care. Effective discharge plans should be developed to ensure that clients are transferred into housing coupled with necessary services. Finally, there is a need to establish rapid re-housing placement services that improve cost-efficiency and long-term stability. Consideration should be given to establishing dedicated housing search services that can be viewed as "real estate agents" for homeless persons. Specialized housing search services have shown promise in other communities[33].

As an example consider individuals moving from incarceration to parole or probation. These individuals are at high risk of becoming homeless. Protocols should be established to identify the housing options needed to prevent both their criminal recidivism and their being homeless. Criminal defendants should be comprehensively "assessed" as to their individual needs for treatment, mental health care, types of needed housing, etc. This assessment should be done in the custodial setting for those convicted while in custody and an assessment process established for those out of custody.

### 3. Address Employment Issues

Chronic unemployment and underemployment are major contributing factors to homelessness in the San Diego Region[30]. As a first step the Council recommends identifying barriers to homeless individuals' ability to secure and retain a job. Second there is a need to strengthen and expand current job readiness programs that should be combined with job commitments from city agencies and private employers. To ensure that job training and placement efforts are maintained, there should be continuing follow-up case management services for two years after stable employment is achieved. Further, it must be recognized that many of the chronically homeless may never be able to maintain full-time employment with benefits.

There are a number of system changes that must be addressed to help support and strengthen employment efforts. Welfare policies need to be reformed to permit welfare recipients to participate in work-related education. Lack of transportation is a key barrier to sustained employment and thus public transportation affordability should be addressed. Finally, there is a need to expand the availability of affordable quality childcare for working parents.

### 4. Address Tenant Landlord Issues

An estimated ten families are evicted each month in downtown landlord-tenant courts and are, thereby, made homeless[31]. Many that are evicted receive Section 8 supportive housing. As a result many families with disabled family members are presently being evicted into homelessness. Mechanisms based on current "best practices" need to be created, with the cooperation of interested landlord's attorneys, the Legal Aid Society, other defense counsel, and the City Housing Commission. An implementation team of these interested parties, plus the court, needs to be assembled to work on tenant landlord issues, component-by-component.

Efforts should also be directed to help at-risk households remain housed through landlord education of homelessness and services available to the homeless, emergency rent/mortgage/utility assistance programs, case management, and mediation to address problems with a landlord or lender.

### 5. Develop Mental Health Courts

San Diego should consider using the power of the courts to address chronically homelessness individuals who have been diagnosed with mental disabilities. The County Grand Jury and the County CAO's Office should formally study these processes for the feasibility of developing an LPS Mental Health (Conservatorship) Court. The current law governing commitment, called the Lanterman-Petris-Short (LPS) Act, provides only for inpatient commitment and



stipulates that individuals can be involuntarily hospitalized if they pose an immediate danger to themselves or others. Individuals can also be involuntarily hospitalized if they are judged by the court to be "gravely disabled," a legal term meaning they do not have the ability to care for themselves.

An LPS Mental Health Court study should outline potential county budget savings which may be realized due to the number of deeply mentally disabled homeless persons who could be stabilized into housing. These efforts should be largely funded by new federal SSI dollars. The program should be modeled after those in Kern and San Mateo Counties that are reported to have saved millions by stabilizing their populations of gravely disabled individuals by shifting payment for them to the Federal government's SSI program[31].

The Justice Committee also recommends a feasibility study to develop a "Mental Health Court" using one of several available models that does not focus on conservatorship issues. This Mental Health Court could be established by expanding a local model (SIP) that has been successful with chronic inebriates. The "expanded" Mental Health Court would focus on the deeply mentally ill homeless, who are not chronic inebriates.

# IMPLEMENTATION PLAN

Achieving the long-term goals outlined in this Plan will require additional organizing, research, and analysis prior to implementation. One of the underlying principles is the need for systems (paradigm) shifts that will result in new and/or expanded systems of care along with the development of new housing solutions. These worthy goals require ongoing planning, community building and consensus building. The first step is to launch an Implementation Plan in 2007 that will provide a framework for leaders, planners, and providers to monitor progress on 10 Key Performance Measures.

## Implementation Plan

| Action | Milestone | Committee Work Plan Reference* |
|---|---|---|
| **I. Develop Governance Structure** | 1.a. Formation of governing body. | DA, SPA, I |
| | 1.b. Regional representation / involvement of San Diego County's 18 incorporated cities and unincorporated communities. | |
| | 1.c. Develop first annual Action Plan to reduce the number of persons living in chronic homelessness. | |
| **II. Establish Data & Outcomes Implementation Team** | 2.a. Establish outcome indicators. | DA, SPA |
| | 2.b. Establish baseline statistics for outcome indicators and benchmark goals to be used for comparison. | |
| **III. Establish Resources Implementation Team** | 3.a. Conduct a comparative analysis of existing facilities and regional housing needs assessment. | CHS, ES, MR, SPA, I |
| | 3.b. Create development plan to secure resources. | |
| | 3.c. Research the availability of federal, state, county and city land. | |
| | 3.d. Draft Resource Guide inventorying mainstream and other resources available to address chronic homelessness in San Diego County. | |
| **IV. Establish Intervention, Outreach & Case Management Implementation Team** | 4.a. Develop plan with recommendations and timeline to establish web based data system, outreach/intervention/case management teams and Regional Centers. | DA, ES, OIE, SPA |
| | 4.b. Identify barriers and make recommendations to improve homeless individuals' ability to secure and retain a job. | |

| Action | Milestone | Committee Work Plan Reference* |
|---|---|---|
| **V. Establish Discharge Planning Implementation Team** | 5.a. Conduct analysis of discharge policies and protocols (both locally and from other communities) to help identify best practices, gaps and challenges.<br><br>5.b. Develop recommendations to strengthen and close gaps in discharge planning policies/protocols | DP, JS |
| **VI. Establish Justice Systems Implementation Team** | 7.a. Feasibility study of developing an LPS Mental Health (Conservatorship) Court and Mental Health Court based on the "SIP" model. | JS |

## 10 Key Performance Measures

Progress toward eliminating chronic homelessness will be measured each year. As the implementation group works toward developing their plan(s), it is anticipated that some of the performance measures may be revised or new ones added.

| | Performance Measure | Committee Work Plan Reference* |
|---|---|---|
| 1. | Annual reduction in the number of chronically homeless people in the region. | All |
| 2. | The number of new housing opportunities developed to include drop-in centers (goal: 200), stabilization/treatment centers (goal: 200), transitional facilities (goal: TBD), and permanent supportive housing (goal: 1600). | CHS |
| 3. | Progress in implementing comprehensive Housing Plus wrap-around model. | All |
| 4. | Progress in establishing a centralized web-based data system that can be used to strengthen intervention, outreach, case management, and evaluation activities. | DA, OIE |
| 5. | Number of outreach teams created. | OIE, |
| 6. | Number of individuals within each geographic region that are able to access appropriate services. | DP, ES, OIE, SPA |
| 7. | Progress in establishing institutional discharge planning protocols. | DP |
| 8. | Number of chronically homeless who find and maintain employment. | ES |
| 9. | Progress in establishing Mental Health Courts. | JS |
| 10. | Increase in amount of available State, Federal, private and corporate funding. | ES, MR |

*Committees: CHS = Creative Housing Solutions, DA = Data Advisory, DP = Discharge Planning, ES = Employment Strategies, I = Implementation, JS = Justice Systems, MR = Mainstream Resources, OIE = Outreach/Intervention/Engagement, SPA = Service/Program Analysis. Committee Work Plans can be found on the United Way of San Diego's website (http://www.uwsd.org/matters/homeless_outreach.asp)



# FOOTNOTES

1. Regional Task Force on the Homeless (2004), *Regional Homeless Profile July 2004*, (http://www.rtfhsd.org/index_profile.html).

2. Regional Task Force on the Homeless (2004), *Regional Homeless Profile July 2004*, (http://www.rtfhsd.org/index_profile.html).

3. San Diego County Medical Examiner (2004), *2004 Statistics*, (http://www.co.san-diego.ca.us/cnty/cntydepts/safety/medical/stat/index.html).

4. Regional Task Force on the Homeless (2004), *Regional Homeless Profile July 2004*, (http://www.rtfhsd.org/index_profile.html)

5. The Urban Institute (2004), *Strategies for Reducing Chronic Street Homelessness*

6. Regional Task Force on the Homeless (August 2005), *Distribution of Public Funds and Cash Assistance in San Diego County*, (http://www.rtfhsd.org/index_funds.html).

7. SAMSHA (2003), *Blueprint for Change: Ending Chronic Homelessness for Persons with Serious Mental Illnesses and Co-Occurring Substance Use Disorders*

8. Center for Mental Health Policy and Services Research University of Pennsylvania (May 2001), *The Impact of Supportive Housing for Homeless Persons with Severe Mental Illness on the Utilization of the Public Health, Corrections and Emergency Shelter Systems: The New York/New York Initiative.*

9. California State Library (August 2003), *Addressing Long-Term Homelessness: Permanent Supportive Housing*

10. The Urban Institute (2004), *Strategies for Reducing Chronic Street Homelessness*

11. Regional Task Force on the Homeless (October 2003), *Homeless Services Profile*, http://www.rtfhsd.org/index_homeless_services.html

12. United States Interagency Council on Homelessness (2004), *The 10-Year Planning Process to End Chronic Homelessness in Your Community, A Step-by-Step Guide*

13. U.S. Department of Health and Human Services (2003) *Ending Chronic Homelessness: Strategies for Action, Report from the Secretary's Work Group on Ending Chronic Homelessness.*

14. United States Interagency Council on Homelessness, Innovative Initiatives, *Collaboration: SIP Saves Lives and Public Funds*, http://www.ich.gov/innovations/

15. The Urban Institute (2004), *Strategies for Reducing Chronic Street Homelessness*

16. The National Alliance to End Homelessness (2003), *Toolkit for Ending Homelessness*, Washington, D.C.

17. *Notice of Funding Availability for the Collaborative Initiative to Help End Chronic Homelessness/Federal Register, Vol. 68, No. 17/Monday, January 27, 2003, 4019.* This definition is shared by the U.S. Department of Housing and Urban Development, the U.S. Department of Health and Human Services, and the U.S. Department of Veterans Affairs.

18. U.S. Census 2000

19. National Resource Center on Homelessness and Mental Illness, (2004), (http://www.nrchmi.samhsa.gov/facts/default.asp)

20. Justice Systems Committee estimate based on "best estimate" of Senior Parole Agents

21. San Diego Housing Commission (2005): *San Diego's Housing Crisis – Statistics and Quotes*, (http://www.sdhc.net/giaboutus2.shtml)

22. The Technical Assistance Collaborative (2005), *Priced Out in 2004*

23. National Alliance to End Homelessness (2001), *How to End Homelessness in 10 years.*

24. HUD Press Release: HUD 01-070

25. HUD Press Release: HUD No. 03-068

26. Veterans Village of San Diego, Inc. has been cited by the National Coalition of Homeless Veterans as a successful program. (http://www.nchv.org/member_profiles.cfm#CA)

27. The Association for Community Housing Solutions (TACHS) won first place in the 2004 MetLife Foundation Awards for Excellence in Affordable Housing for Del Mar Apartments that provide permanent housing for homeless people with severe mental illness.

28. The National Alliance to End Homelessness (2003), *Toolkit for Ending Homelessness, Washington, D.C.*

29. San Diego Union-Tribune (April 22, 2005), *Failed Prisons: Governor's Reform Efforts Merit Support.*

30. National Coalition for the Homeless (February 1999), *Employment and Homelessness, NCH Fact Sheet #4*

31. From the Justice Committee Work Plan (http://www.uwsd.org/matters/homeless_outreach.asp)

32. The United States Interagency Council on Homelessness (August 11, 2005), *Representing the Needs and Interest of Homeless Veterans in State, County, and City 10-Year Plans to End Chronic Homelessness*, ICH e-newsletter,

33. National Alliance to End Homelessness, Best Practices & Profiles: HomeStart Boston, Massachusetts, http://www.endhomelessness.org/best/homestart.htm

# Exhibit 6

# HOMELESS IN SAN DIEGO

## PURPOSE OF THE STUDY

This study was initiated to examine some of the resources currently available to aid in the rehabilitation of San Diego's homeless and to determine if these programs need change or expansion.

## SUMMARY

To assess current programs for the rehabilitation of San Diego's homeless, the 2004-2005 San Diego Grand Jury visited facilities, interviewed people involved, and reviewed documents.

This study finds that all the elements for success are now available to achieve significant progress in better managing the problem of homelessness.

Housing is an important part of the rehabilitation process. Though necessary in itself, it is not enough because most homeless people demonstrate significant dysfunction and require more structure in their daily lives. It is essential that appropriate incentives and leverage be in place and coordinated to achieve change.

## RECOMMENDATIONS

Based on what was learned it is recommended that the San Diego County Board of Supervisors:

- Develop within the Sheriff's Department Central Jail an assessment team (similar to the Serial Inebriate Program) to evaluate the homeless who are in custody.

- Encourage the Public Defenders and Public Guardians to more actively use the provisions of the Conservatorship Program for the dysfunctional and gravely disabled homeless.

- Encourage the county officers of the Arraignment Courts to more actively utilize the leverage provided to them to require that conditions of probation include rehabilitation programs.

It is recommended that the San Diego City Council:

- Enact ordinances to ensure a process for the rehabilitation of the homeless.

- Provide funding to support the on-going efforts of the San Diego Regional Task Force to End Chronic Homelessness empowered in January 2004.

## DISCUSSION

In January 2004 the San Diego City Council formed the San Diego Regional Task Force to End Chronic Homelessness (Task Force). Los Angeles (in 2003) and San Francisco (in June 2004) announced plans to end chronic homelessness. Philadelphia, New York City and Atlanta have passed appropriate legislation to implement rehabilitation programs to address chronic homelessness. The Bush administration is encouraging the development of 10-year plans to nationally address chronic homelessness. By mid-2004 more than 120 cities had committed to such 10-year plans. At the time of this report almost all the cities in San Diego County have signed covenants to this effect (see Appendix A). An encouraging progress report from the Task Force was presented at an interagency meeting in January 2005.

How did this chronic homeless problem come about? The big cities had some people living on the street, but they were usually small in number and largely invisible. Most experts agree that the current mushrooming problem of the homeless began in the '70s. For California the passage of the Lanterman-Petris-Short Act (LPS) did much to empty the state psychiatric hospitals and released the patients to the streets. There was difficulty in these patients accessing voluntary, outpatient treatment. The LPS Act required that dysfunctional individuals could not be hospitalized unless they were "a danger to themselves or others or were gravely disabled." (Essentially suicidal or homicidal.) The reality was that this narrow definition represented a very small percentage of those housed in the state hospitals prior to 1965.

Homelessness has a solution. The solution is to provide a way out. There are socially appropriate leverages already in place; e.g., police, courts, social agencies and private facilities. There are useful incentives available that can lead to useful rehabilitation.

Do the City and County of San Diego have a problem with the homeless? Depending on whom you ask this is a question that has surprisingly divergent answers.

Common public perceptions of the homeless are:
- All are ordinary people who have only had a bit of misfortune.
- Advocates help the homeless.

2  6-2

- All they need is housing
- Courts and police criminalize the homeless.
- Education and concern will eventually solve the problem.
- Some choose this lifestyle.

We now know that most homeless have significant dysfunctions developed over time such as drug and alcohol abuse, mental illness, bad health habits and poor social/work/living skills. Their dysfunction prevents their re-entry into society without significant structure, training, rules and a safe haven over time to achieve rehabilitation. It is true that some homeless choose this nomadic lifestyle.

Advocates for the homeless population in San Diego County (currently estimated by the Task Force to be 9,600 of which 4,400 are in the downtown area of the City of San Diego) center their beliefs around the rights of those who are living on the street and whose liberties need to be protected. Those who favor rehabilitation believe that very few would choose to remain on the street if there was a way out.

The findings, as presented in this report, recognize that many homeless demonstrate significant dysfunction and require more structure in their daily lives. Therefore, it is essential that appropriate incentives and leverages be in place and coordinated to achieve change. Court involvement in conservatorships (the legal process whereby the assets and rights of a person are protected) for the homeless is not sufficiently responsive in this area. This would greatly assist local agencies who feel they could more effectively address the problems of most homeless they serve.

Appropriate leverages will direct the homeless into a program of rehabilitation. The current attempts to provide shelters only gives temporary help. The lack of rules, structure, and opportunity to participate in their own recovery can often support their dependency and helplessness. Findings by the Grand Jury suggest that the private agencies, which provide assistance in all the necessary rehabilitation functions, are important. The primary leverage to get the homeless into a program is through our court system. Successful cities have utilized an assessment team in the field that gives the homeless person the option of accepting a rehabilitation program or incarceration.

The collaboration of our City Council, local social agencies, the police, the courts, and private rehabilitation programs can be successful. All who are involved need to step up to the plate.

The people working in the field are knowledgeable about homeless issues: the Homeless Outreach Team (HOT), the Serial Inebriate Program (SIP) workers, and the police. They offer the best assessment of the problem and the remedy.

Experts in the field describe the origins of this problem as:

- Economic, work, and family disruption
- Drug and alcohol related situations
- Mental illness
- Dysfunctional, sociopathic, predatory, and exploitive type individuals
- The Dropouts - Usually related to chronic social hostility associated with family or workplace grudges. It seems to be their personal choice.

The Homeless Outreach Team provides outreach and engagement services throughout the City of San Diego. They are the City's initial point of contact with both the chronic homeless and the chronic inebriates living on the street. Each Homeless Outreach Team is comprised of police officers and County Mental Health clinicians. The Teams seek out and engage chronically homeless persons and, for those who are willing, place them into housing linked with appropriate services.

The Serial Inebriate Program is offered to chronically homeless, substance dependent people who have been arrested. The program offers offenders an opportunity to participate in treatment and sober living environments as an alternative to incarceration as well as access to emergency room care, transitional housing or long term care. The San Diego City Police Physician reports that chronic alcoholics cost the City and County tremendous expense for medical and hospital care.

There's a dilemma to all of this, though. There are many resources to deal with the causes of homelessness, whether they are economic, psychological, substance abuse, lack of job training, or other problems. It is a simple matter to offer those who willingly recognize their limitations and voluntarily seek rehabilitation an opportunity to do so. But what of those who do not? There's the rub. The court system could be used to funnel them into a remedial program, but homeless advocates are hesitant to "criminalize" the homeless. Is there any other way to access them? Education, encouragement, soap boxes, housing them into shelters, political posturing, dismissing charges and warrants -- none of these seems to be helping. We need to make available to them a program and a clear path that is achievable.

There is currently no way to access some of the homeless population. It is important to respect their privileges to be at liberty to live a nomadic life in our culture without demeaning their choice. As long as they do not break any laws, do not endanger the health of others, are not a danger to themselves or others, and are not gravely disabled we, therefore, should protect their right to live their life as they choose.

Discussions with many experts have led the Grand Jury to conclude that there are solutions to the problem of homelessness. With appropriate legislation the

4   6-4

Courts will have the leverage to require conditions of probation that are rehabilitative. The Courts should not dismiss any charges or warrants unless the person charged is demonstrating continued progress in a rehabilitation program.

The use of conservatorships has declined in the past 15 years. For the sake of some homeless people the Conservatorship Courts should be utilized more often.

Central Jail can develop an assessment team (similar to the Serial Inebriate Program) to evaluate the homeless who are in custody. A simple, streamlined database can easily be established to provide tracking. The Probation Department would be notified of all those on probation, especially when early releases are being considered. Pre-arraignment assessment can be given to the Court. In the long run this program could easily simplify the process and save much money by reducing the current revolving door of the Arraignment Court.

In conclusion, the Grand Jury is convinced that all concerned with the homeless can accomplish much more working as a team collaborating to meet the challenge. The Grand Jury feels the City of San Diego must take the helm and work towards its own 10-year plan to help the homeless in San Diego.

## PROCEDURES EMPLOYED

The Grand Jury visited and evaluated the following facilities and agencies.

- St. Vincent de Paul Villages
- Joan Kroc Center
- Alpha Project, Salvation Army
- Superior Court, Dept 11
- Homeless Court (conducted at various rehabilitation facilities)
- Superior Court, Dept 45
- Father Joe's Villages
- Central Jail
- Neil Good Day Center
- San Diego Mental Health Association
- YMCA, Broadway Facility

The Grand Jury interviewed the following people.

- San Diego City Director of the 10 Year Program for Homeless
- Former Councilman & Judge
- Executive San Diego City Police Chief
- San Diego County Chief Administrative Officer
- Legislative Analyst, LPS Act 1975

5

6-5

- Chairman of Leadership Committee of the San Diego Regional Task Force to End Chronic Homelessness
- Managing Director of Philadelphia Story on Homelessness
- Chairman of Atlanta Commission on Homelessness
- HUD White House Homeless Interagency Executive Director
- President of the California Grand Jurors Association

The Grand Jury attended the following specialized programs.

- Homeless Outreach Team
- Serial Inebriate Program
- Volunteers of America, Sobriety Program

The Grand Jury reviewed the literature listed in Appendix B.

## FACTS AND FINDINGS

### Facts

- In 2001, the Bush Administration established a national goal to end chronic homelessness in 10 years.

- Philadelphia, New York City and Atlanta have passed appropriate legislation to implement successful rehabilitation programs.

- Plans have been announced in Los Angeles (2003) and San Francisco (June 2004) to end chronic homelessness.

- In January 2004 the San Diego City Council formed the San Diego Regional Task Force to End Chronic Homelessness.

### Finding

- The effort is underway to address the chronic homeless problem in San Diego County, the State of California and the nation.

### Facts

- Almost all the cities within the County of San Diego have at this time signed a Covenant of Partnership to End Chronic Homelessness.

- A progress report from the San Diego Regional Task Force to End Chronic Homelessness was presented at an interagency meeting in January 2005.

**Finding**

- The San Diego Regional Task Force to End Chronic Homelessness continues to make progress on a regional plan.

**Fact**

- The San Diego Regional Task Force to End Chronic Homelessness estimates are that there are 9,600 homeless in San Diego County and 4,400 in downtown San Diego.

**Finding**

- The need for services clearly exists.

**Fact**

- Much has been theorized in the past about how to solve the problem, only recently have several cities employed practical solutions.

**Finding**

- San Diego is not one of them.

**Fact**

- Urging and educating the homeless has done little to bring about change.

**Finding**

- Legislation is necessary to provide leverage to effect a response.

**Facts**

- Central Jail does not individually assess the homeless.

- Homeless are cycled through the Police-Jail-Courts and back to the streets.

- Arraignment Court does not receive rehabilitation plans for inclusion in the probation requirements.

**Finding**

- A more effective process is required.

**Facts**

- Most homeless have significant dysfunction, which they have developed over time.

- Dysfunctional homeless need assistance in managing their personal and financial affairs.

- A conservatorship is the legal process whereby the assets and rights of a homeless person are protected.

- The use of conservatorships has declined in the past 15 years.

**Finding**

- Conservatorships are beneficial to the homeless and could be more effectively utilized.

**Fact**

- Private programs that require behavioral rules have been proven to be effective for rehabilitation.

**Finding**

- City and County run shelters are not allowed to use these behavioral rules because of legislative constraint.

**Fact**

- Homeless Court is a Superior Court function that holds hearings at homeless facilities.

**Finding**

- Homeless Court supports the rehabilitation process by dismissing warrants and charges after evidence of continuing rehabilitation efforts.

**Facts**

- The City of San Diego Homeless Outreach Team deals interactively with homeless on the street.

- The Homeless Outreach Team places willing homeless into housing with rehabilitation services.

**Finding**

- The Homeless Outreach Team is effective in dealing with those homeless willing to improve their situation.

**Fact**

- The Serial Inebriate Program is a legislated requirement that specifies an appropriate rehabilitation program for chronic alcoholics.

**Finding**

- The Serial Inebriate Program reduces the revolving door and the large associated expense for medical care.

## COMMENDATIONS

The City of San Diego Homeless Outreach Team is to be commended for the compassionate, constructive work it does in helping the homeless to voluntarily access a rehabilitation program.

The Serial Inebriate Program for chronic alcoholics is to be commended for its work with the homeless.

## RECOMMENDATIONS

**The San Diego County Grand Jury recommends the San Diego County Board of Supervisors:**

05-36:     Develop within the San Diego County Sheriff's Department Central Jail an assessment team (similar to the Serial Inebriate Program) to evaluate the homeless who are in custody.

05-37:     Encourage the Public Defenders and Public Guardians to more actively use the provisions of the Conservatorship Program for the dysfunctional and gravely disabled homeless.

05-38:     Encourage the county officers of the Arraignment Courts to more actively utilize the leverage provided to them to require that conditions of probation include rehabilitation programs.

**The San Diego County Grand Jury recommends the San Diego City Council:**

**05-39:** Enact ordinances to ensure a process for the rehabilitation of the homeless.

**05-40:** Provide funding to support the on-going efforts of the San Diego Regional Task Force to End Chronic Homelessness empowered January 2004.

## REQUIREMENTS AND INSTRUCTIONS

The California Penal Code §933(c) requires any public agency which the Grand Jury has reviewed, and about which it has issued a final report, to comment to the Presiding Judge of the Superior Court on the findings and recommendations pertaining to matters under the control of the agency. Such comment shall be made *no later than 90 days* after the Grand Jury publishes its report (filed with the Clerk of the Court); except that in the case of a report containing findings and recommendations pertaining to a department or agency headed by an elected County official (e.g. District Attorney, Sheriff, etc.), such comment shall be *within 60 days* to the Presiding Judge with an information copy sent to the Board of Supervisors.

Furthermore, California Penal Code §933.05(a), (b), (c), details, as follows, the manner in which such comment(s) are to be made:

    (a)    As to each grand jury finding, the responding person or entity shall indicate one of the following:

        (1)    The respondent agrees with the finding

        (2)    The respondent disagrees wholly or partially with the finding, in which case the response shall specify the portion of the finding that is disputed and shall include an explanation of the reasons therefor.

    (b)    As to each grand jury recommendation, the responding person or entity shall report one of the following actions:

        (1)    The recommendation has been implemented, with a summary regarding the implemented action.

        (2)    The recommendation has not yet been implemented, but will be implemented in the future, with a time frame for implementation.

        (3)    The recommendation requires further analysis, with an explanation and the scope and parameters of an analysis or study, and a time frame for the matter to be prepared for discussion by the officer or head of the agency or department being investigated or reviewed, including the governing body of the public agency when applicable. This time frame shall not

10

6-10

exceed six months from the date of publication of the grand jury report.

    (4)    The recommendation will not be implemented because it is not warranted or is not reasonable, with an explanation therefor.

(c)    If a finding or recommendation of the grand jury addresses budgetary or personnel matters of a county agency or department headed by an elected officer, both the agency or department head and the Board of Supervisors shall respond if requested by the grand jury, but the response of the Board of Supervisors shall address only those budgetary or personnel matters over which it has some decision making authority. The response of the elected agency or department head shall address all aspects of the findings or recommendations affecting his or her agency or department.

Comments to the Presiding Judge of the Superior Court in compliance with the Penal Code §933.05 are required by the date indicated from:

| RESPONDING AGENCY | RECOMMENDATIONS | DATE |
|---|---|---|
| **San Diego County Board Of Supervisors** | **05-36 through 05-38** | **09/12/05** |
| **San Diego City Council** | **05-39 through 05-40** | **09/12/05** |

# APPENDIX A

## A COVENANT OF PARTNERSHIP TO END CHRONIC HOMELESSNESS
### (Covenant of the City Council Commission – March 2005)

As Mayors of cities across our country, we have committed ourselves and our cities in partnership with the United States Interagency Council on Homelessness to end chronic homelessness in the United States within ten years. In our local communities, we have invited a diverse array of stakeholders including the public, private, non-profit and faith-based sectors, and homeless people themselves, to collaborate with us and one another to create plans to achieve this urgent goal.

Now, as leaders in this national initiative to end chronic homelessness, we declare our intention to collaborate with one another in this effort. As a group of cities varying in size and geography, we will explore and implement strategies that will create a visible, measurable and quantifiable reduction of chronic homelessness on our streets and in our shelters with the intent of ending this national disgrace.

*Our objective is to hasten the achievement of our collective goal by establishing successful, replicable practices that lead to ending chronic homelessness nationwide.*

*Initially, we will pursue in common efforts to reduce chronic street homelessness in our cities.*

- We will be guided by research and data, results and performance.
- We will seek the most innovative initiatives in cities across our country and the world, including those in Philadelphia, San Francisco, and London, to achieve this goal.
- We will serve as leaders for other cities that seek to follow our example.
- We will commit to creating strategies to reduce deaths of homeless people on the streets of our cities.
- We will ensure that homeless veterans are prioritized in our individual and collective efforts.

*To advance these efforts, we covenant with one another:*

- To design a common methodology for conducting repetitive counts of street homelessness, to establish a baseline number, to monitor results, and to share that information with each other.
- To establish in each of our communities a central, cross-agency record of persons experiencing chronic homelessness and their involvement with government and not for profit organizations to identify resources and relationships that can assist with housing replacement.
- To share with each other on a regular basis our progress in placing persons experiencing chronic homelessness into housing.
- To test and advance new messages to reframe the issue of homelessness in our communities through a coordinated public education/communications campaign.
- To meet regularly to review our progress in achieving our goal and to study together the latest developments that will support our direction and commitment.

We further covenant to assist each other in implementing these measures; to report openly on our learning and progress; to explore other complementary and replicable strategies to prevent and end chronic homelessness; and to welcome additional cities into our collaboration.

*We commit together to end chronic homelessness.*

12

6-12

## APPENDIX B

- A Street is Not a Home by the Honorable Robert C. Coates
- New York Press Release, 6-23-04, "Ending Homelessness in New York City"
- "Hunger & Homeless Survey", US Mayors Conf Report, 12/04
- San Diego Mental Health Association
- "Healthy Attitudes re. Homeless", UCSD Medical Staff Report
- Escondido Homeless Conference – 11-9-04
- "Hunger Strike for Homeless", *San Diego Union Tribune*, 1-23-04
- "Pity vs. Compassion" article, Dharma Seed Tape Library, 12-28-04
- San Diego Housing Commission, Internet, 12-2-04
- Father Joe Village News, 12-04
- HUD Report, University of Illinois Homeless Report, 5-04
- Father Joe's Villages Web Site, 12-7-04
- "Lawsuit Challenges HomelessTicketing", *San Diego Union Tribune* 11-19-04
- "City Winter Shelters", *San Diego Union Tribune*, 11-10-04
- Article re. Homeless, *Catholic Press Association*, San Diego, 12-2-04
- NY Pathways Program, *San Francisco Chronicle*, 6-14-04
- Public Toilets Report, 6/6/01, Public Sanitation Subcommittee, San Diego
- California Grand Jurors Journal, 12-04
- "San Diego Court Helps Homeless", 11-28-04 *San Diego Union Tribune*
- San Diego Directory of Social Services, 3-04
- San Diego Grand Jury '03-'04 – "Should HOT Teams be Expanded?"
- Covenant of the City Council Commission - March 2005

6-13



## THE CITY OF SAN DIEGO

**RECEIVED**
SEP 15 2005
SAN DIEGO
COUNTY GRAND JURY

September 2, 2005

Honorable John S. Einhorn
Presiding Judge
San Diego County Superior Court
Main Courthouse, Third Floor
220 W. Broadway
San Diego, CA 92101

Dear Judge Einhorn,

In the 2004 – 2005 Grand Jury Report on the issue of homelessness in San Diego, two recommendations were directed to the City of San Diego:

**Recommendation 1.** Enact ordinances to ensure a process for the rehabilitation of the homeless.

The City's primary focus for assisting homeless off the street is the creation of "permanent supportive" and "affordable" housing. The City will continue to review and consider all available methods to address the problem of homelessness, including changes to the municipal code as applicable. At this time there is no specific municipal code change related to homelessness that is under review for implementation.

**Recommendation 2.** Provide funding to support the on-going efforts of the San Diego Regional Task Force to End Chronic Homelessness empowered in January 2004.

The City is an active partner in the development of the Plan to End Chronic Homelessness. The San Diego Regional Task Force to End Homelessness is considering all fiscal resources to help meet that objective. Additionally, the City, County and other local jurisdictions will continue to pursue all federal and state grant opportunities, as well as local housing funding to address the problem. The most promising funding source at this point in time is funding from State Proposition 63, which brings millions of dollars to San Diego to address the problem of mental illness.



Thank you for your interest in needs of both the chronic and temporarily homeless populations in our region. Please feel free to contact Ernie Linares at (619) 236-6719 if you have additional questions.

Sincerely,

P. Lamont Ewell
City Manager

EL/alj

cc: Ellen Oppenheim, Deputy City Manager
Debra Fischle-Faulk, Acting Director, Community & Economic Development
Ernie Linares, Deputy Director, Community Services Division
Sharon Johnson, Homeless Program Manager
San Diego County Grand Jury
Walter F. Ekard, Chief Administrative Officer, San Diego County

6-15



THE CITY OF SAN DIEGO

September 20, 2005

Honorable John S. Einhorn
Presiding Judge
San Diego County Superior Court
Main Courthouse, Third Floor
220 W. Broadway
San Diego, CA 92101

Dear Judge Einhorn:

Subject: 2004-2005 Grand Jury Report entitled Homeless in San Diego

Pursuant to California Penal Code Section 933.05(a), (b), and (c), the City of San Diego provides the following responses to the findings and recommendations in the above-entitled Grand Jury Report:

Finding 1: The effort is underway to address the chronic homeless problem in San Diego County, the State of California and the nation.

    **Agree.**

Finding 2: The San Diego Regional Task Force to End Chronic Homelessness continues to make progress on a regional plan.

    **Agree.**

Finding 3: The need for services clearly exists.

    **Agree.**

Finding 4: San Diego is not one of them.

    **Disagree.** The City of San Diego has implemented effective programs for the homeless, including: The Winter Shelter Program; the Neil Good Day Center; and the Year-Round Family Center on Cortez Hill.

Finding 5: Legislation is necessary to provide leverage to effect a response.

    **Not Applicable.** The facts cited do not apply to programs in the City's jurisdiction.



**Office of the City Manager**
202 C Street, MS 9A • San Diego, CA 92101-3869
Tel (619) 236-6363    Fax (619) 236-6067

6-16

Finding 6:  A more effective process is required.

**Disagree.**  While it is always possible to improve services with additional resources, the current process addresses all legal requirements.

Finding 7:  Conservatorships are beneficial to the homeless and could be more effectively utilized.

**Disagree.**  Conservatorship is an involuntary legal process whereby the person and his or her assets can be protected only through the removal of certain rights and liberties.  Conservatorships may be beneficial to some limited number of gravely disabled homeless persons.

Finding 8:  City and County run shelters are not allowed to use these behavioral rules because of legislative constraint.

**Disagree.**  The City's Winter Shelter Program implements behavioral rules as deemed appropriate.  For example, the City has the discretion to refuse entrance to a person who is obviously intoxicated.

Finding 9:  Homeless Court supports the rehabilitation process by dismissing warrants and charges after evidence of continuing rehabilitation efforts.

**Agree.**

Finding 10:  The Homeless Outreach Team is effective in dealing with those homeless willing to improve their situation.

**Agree.**

Finding 11:  The Serial Inebriate Program reduces the revolving door and the large associated expense for medical care.

**Agree.**

**Recommendation 05-39:**  Enact ordinances to ensure a process for the rehabilitation of the homeless.

**Response:**  This response will not be implemented.  The City does not contemplate the adoption of an ordinance for the rehabilitation of the homeless at this time.  However, the City will consider, and adopt if deemed beneficial, future ordinances that could further the cause of reducing homelessness.  The City's primary focus for assisting homeless off the street is the creation of "permanent supportive" and "affordable" housing.

6-17

**Recommendation 05-40:** Provide funding to support the on-going efforts of the San Diego Regional Task Force to End Chronic Homelessness empowered in January 2004.

**Response:** This recommendation has been implemented. The City is an active partner in the development of the Plan to End Chronic Homelessness. To this end, the City provided approximately $17,000 towards the consultant hired to coordinate the plan. The San Diego Regional Task Force to End Homelessness is considering all fiscal resources to help meet that objective. Additionally, the City, County and other local jurisdictions will continue to pursue all federal and state grant opportunities, as well as local housing funding to address the problem. The most promising funding source at this point in time is funding from State Proposition 63, which brings millions of dollars to San Diego to address the problem of mental illness. Based on our ability we will continue to provide funding.

Thank you for your interest in needs of both the chronic and temporarily homeless populations in our region. Please contact Ernie Linares at (619) 236-6719 if you have additional questions.

Sincerely,

*Ernie Oppenheim for*

P. Lamont Ewell
City Manager

EL/alj

cc: Ellen Oppenheim, Deputy City Manager
Debra Fischle-Faulk, Acting Director, Community & Economic Development
Ernie Linares, Deputy Director, Community Services Division
Sharon Johnson, Homeless Program Manager
Donna Cottingham, Citizens Assistance Manager
San Diego County Grand Jury
Walter F. Ekard, Chief Administrative Officer, San Diego County

6-18

# Exhibit 7

TAPE OF TESTIMONY OF ELLEN BECK, M.D.

Re:  Spencer v. City of San Diego

Transcribed by: Monica B. Cosio



CERTIFIED COPY

PARK WEST TRANSCRIPTIONS
1228 Madison Avenue
San Diego, California 92116
619.239.0087; fax 619.239.0206

7-1

7

TAPE OF TESTIMONY OF DR. ELLEN BECK

1

2     THE COURT:  Next witness?

3     MS. TREIU:  Your Honor, the defense would like

4 to call Dr. Ellen Beck.

5     UNIDENTIFIED SPEAKER:  Okay.

6     UNIDENTIFIED SPEAKER:  Raise your right hand.

7     UNIDENTIFIED SPEAKER:  You do solemnly state

8 that the evidence you shall give in this matter, shall

9 be the truth, the whole truth, and the nothing but the

10 truth so help you God?

11     THE WITNESS:  I do.

12     UNIDENTIFIED SPEAKER:  Thanks.  Please be

13 seated at the witness stand.

14                   DIRECT EXAMINATION

15 BY MS. TREIU:

16     Q.   Please state your full name, and spell your

17 last name for the record.

18     A.   Ellen Beck, B-e-c-k.

19     Q.   Thank you.  Good afternoon, Dr. Beck.

20     A.   Hello.

21     Q.   Thank you for being here.

22     A.   You're welcome.

23     Q.   Dr. Beck, where did you go to medical school?

24     A.   McGill University in Montreal, Canada.

25     Q.   And when did you graduate?

2

A.   1976.

Q.   What did you do after you graduated from McGill University?

A.   Well, I completed a residency there, as well, in family medicine.  And then I worked in some remote areas for awhile, came back to Montreal and was a director of a medical health program, sort of for planning, for the City of Montreal, and then I went to work for McGill University and was a clinician at a community health center and directed a program for medical students -- teaching them to work with underserved communities -- it's called a clerkship -- in the third and fourth year of medical school.  And then about 17, 18 years ago, I came here.

Q.   And when you say "here" --

A.   San Diego, United States -- to the University of California, San Diego.  And I've been there for all this time.

Do you want me to tell you what I do or --

Q.   And what is the position at the University of California?

A.   I'm the director of community education for the department -- well, the division of family medicine within the department of family and preventive medicine.  So in that role, I direct UCSD student-run, free clinic

3

73

project. We run three free clinics around the city.

And I also direct a national program called "Addressing the Needs of the Underserved," which trains doctors from around the country to work with underserved communities. And then one day a week, I'm a physician at a community health center, regular doc, seeing patients, kind of all over the world.

One thing I need to say, though, before we continue, is that whatever I'm saying, I'm here as a family physician, but I'm not here as a representative of UCSD in any way. And -- but I am a family physician in the community, board certified, and I'm happy to witness -- you -- for you, but I'm not here as a representative of the University.

Q. Okay. Now, Dr. Beck, are you familiar with the effect of sleep deprivation on the human body?

A. Yes, to a certain --

Q. And have you read any studies on the effects of sleep deprivation?

A. Yes.

Q. And what kind of studies have you read?

A. Well, there's two main -- three or four actual areas. Most of the studies on sleep deprivation have looked at the situation for several groups. One group are shift workers, who are often deprived of sleep or

4

7.4

have interrupted sleep. Another group are the military, who sleep must -- might be off -- often interrupted, and also other groups where sleep deprivation occurs, like truck drivers, interns at hospitals. So there's groups of people where sleep deprivation has occurred, and there's two -- the studies speak to three areas where sleep deprivation occurs.

Q. And what are these areas?

A. Well, one area is the area of the immune system, like, in other words, our capacity to combat infection or to get colds or other infection. And there's a study from many years ago, actually, that looked at people who are sleep deprived and compared them to people who aren't sleep deprived and to see if you exposed all these folks to cold viruses, who is much more likely to get them. And the people who are sleep deprived were much more likely to get sick in a situation in which they'd be exposed to cold or whatever than -- than the people who weren't sleep deprived.

And then they went onto study like as things in the blood that show that the immune system is not the same as a person who isn't sleep deprived. Then the second big area is the area of our functioning from day-to-day -- what's called our "coagulate functioning," our ability to make decisions, to solve problems, to

5

7-5

multitask, to -- the speed at which we can answer questions, and those are all effected significantly by sleep deprivation.

And in the third area -- those two are pretty well known. The third area, which is less well identified by the hypothesized, or thought about as the area -- does it affect our -- things like diabetes, liver disease, and that -- that work has been done in shift workers. And in shift workers they're much more likely to have GI distress and abdominal pain and, you know, other chronic symptoms, and there's a question of whether or not that's due to sleep deprivation.

Q. And how -- in your medical opinion, how important is it for the body to sleep?

A. Well, the body needs to sleep. I mean, the body is -- it's part of the natural, functioning -- to sleep. I mean, sleep is part of the health of the body, and if the body can't sleep, it's going to do everything it can to sleep. So it will constantly want to be falling asleep. So what we see in people who are sleep deprived is like -- little what they call "micronapping" all day long. You know, in other words, the body is just trying very, very hard to sleep, even if it can't.

MS. TREIU: Thank you.

No further questions, Your Honor.

6

7-6

```
 1          UNIDENTIFIED SPEAKER:   (Inaudible.)

 2          THE COURT:  Do the People have any questions at

 3   this time?

 4          UNIDENTIFIED SPEAKER:   (Inaudible.)

 5          UNIDENTIFIED SPEAKER:   May the witness be

 6   excused.

 7          UNIDENTIFIED SPEAKER:   Yes.

 8          UNIDENTIFIED SPEAKER:   Thank you.

 9

10                        *  *  *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

INDEX

7

COUNTY OF SAN DIEGO,    )

STATE OF CALIFORNIA,    )


    I, Monica B. Cosio, that the tape was reported by me and was thereafter transcribed with Computer-Aided Transcription; that the foregoing is a full, complete, and true record of said proceeding.

    I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing proceeding and caption named or in any way interested in the outcome of the cause in said caption.

    The dismantling, unsealing, or unbinding of the original transcript will render the reporter's certificates null and void.

    In witness whereof, I have hereunto set my hand this day:  October 31, 2006


_Monica B. Cosio_

MONICA B. COSIO

8

7-8

# Exhibit 8

TAPE OF TESTIMONY OF SARA MATTA

Re: Spencer v. City of San Diego

Transcribed by: Monica B. Cosio

**CERTIFIED COPY**



**PARK WEST TRANSCRIPTIONS**
1228 Madison Avenue
San Diego, California 92116
619.239.0087; fax 619.239.0206

8-1
8

1

2      MS. TREIU:  Your Honor, the defense would like

3  to call Sara Matta, who is outside of the courtroom.

4  Can we get her?

5      THE COURT:  Uh-huh.

6      UNIDENTIFIED SPEAKER:  Raise your right hand to

7  be sworn.

8      UNIDENTIFIED SPEAKER:  You do solemnly state

9  that the evidence you shall give in this matter, shall

10  be the truth, the whole truth, and nothing but the

11  truth, so help you God?

12      THE WITNESS:  I do.

13      UNIDENTIFIED SPEAKER:  Please be seated.

14                    DIRECT EXAMINATION

15  BY MS. TREIU:

16      Q.   Please state your full name, and spell your

17  last name for the record.

18      A.   My name is Sara Matta.  My last name is

19  spelled, M-a-t-t-a.

20      Q.   Thank you.  Good afternoon, Ms. Matta.

21      A.   Hello.

22      Q.   How are you doing?

23      A.   I'm doing good.  Thank you.

24      Q.   Thank you for being here.

25      A.   You're welcome.

2

1          UNIDENTIFIED SPEAKER:   Is this on?

2          UNIDENTIFIED SPEAKER:   Yeah.   Okay.

3     BY MS. TREIU:

4          Q.   Ms. Matta, what is your occupation?

5          A.   I'm the executive director of Info Line of

6     San Diego County.

7          Q.   And how long have you had this occupation?

8          A.   I have been involved with Info Line for 18 and

9     a half years and been the executive director for 17.

10         Q.   And what exactly is Info Line?

11         A.   Info Line is information central for health and

12    human services in San Diego County.  It's a nonprofit

13    organization that is used by agencies and people in need

14    to find the most up-to-date and comprehensive

15    information about what is available in the way of

16    community services in San Diego County.

17         Q.   And when you say "people in need," what

18    services are you covering for those people in need?

19         A.   We cover everything, basically.  No matter what

20    kind of need you have, you can call us, and we have

21    information on our comprehensive database about

22    everything in the community.  There are a few services

23    where they're specialized information referral agencies

24    that keep that information, such as child care centers

25    and family day care homes, and other community care

                                                      3

8-3

facilities for the (inaudible) and the disabled. Apart from those, though, we have primarily the source of information.

Q. The reality is that the majority of people who call us are people who are in need of what we call "basic needs," emergency food, emergency shelter, help with their utility bills, how to get by until the next check comes.

Q. And as an executive director of Info Line, what are your exact duties?

A. I manage the staff of what is now a little over 30 people. About half of them are information and referral specialists who answer the phone, and the other half are other support personnel for that function. We also manage a comprehensive website that makes this information available online to agencies and other people in the community who have access to the web.

Q. When you mention "information," as a part of your services, do you provide any services to those who are homeless?

A. Yes. Approximately 10 percent of the people that call us are calling because they're homeless, and they're in need of shelter and other related facilities.

Q. And when they call, what kind of services does Info Line provide for them?

4

8-4

1    A.   We keep very current information about the --

2   the availability of shelter beds and how to access them.

3   My staff calls all of the emergency shelters every

4   morning before 9:00 o'clock to check and see how many

5   beds they have available for referral that day.  That

6   information is then put onto our website so that other

7   agencies can access it, but the reality is mostly it's

8   our staff that (inaudible) that information and

9   basically refer people who call us who are eligible for

10   those beds -- refer them to those agencies that have

11   beds, or we tell them that there isn't anything

12   available today.

13    Q.   Okay.  And can you testify to the procedures

14   that a person who needs a shelter must go through?

15    A.   Yes, each shelter has its own procedures,

16   basically, and they do all also vary from time to time,

17   but our staff keep -- keeps that information up-to-date

18   so that they're aware of it, if, for example, a shelter

19   is temporarily closed for three or four days or there

20   might be an outbreak of something or whatever.  We keep

21   that information current.

22    Q.   Okay.  Now, what kind of procedures would --

23   I'm sorry.  That's the wrong question.

24    How many shelters are downtown?

25    A.   For emergency, there are currently only four

5

shelters, St. Vincent de Paul, the Alpha Project, the
Veterans -- Vietnam Vets, and then the Interfaith
Shelter Network, which has different locations, and
sometimes they'll have a facility, not really downtown,
but in the general area that might be accessible from
downtown. That's for, you know, the emergency --
emergency shelter facilities for the general population.
They're obviously domestic violence shelters, and so on,
that we don't tell people where they are.

Q. Now, when people are interested in shelters, do
they go and just walk into the shelter or do they need
to sign up? What exactly are the procedures?

A. Well, this is what's difficult because I think
they don't often know what to do, and so very often, for
example, people will assume that Father Joe's you can
just walk-up and get in, and that's not the case.

In fact, St. Vincent de Paul doesn't accept any
referrals direct. And so you have to go through a case
management agency, church, or some other organization to
get into shelter at St. Vincent.

The seasonal shelters, basically, have a walk
up intake system, and they each have their own, but it's
basically you need to go there at 8:00 o'clock at night
and see if there's a bed.

Q. Okay. And we spoke earlier about the fact that

6

your staff keeps an almost daily log of the availability
of shelters. Can you tell us how -- what shelters had
available beds in the month of January 2005?

A.    I can tell you very little, very little was
available, except for the seasonal shelters. The
Interfaith Shelter Network from day-to-day has different
shelter availability, but basically that is not the kind
of shelter that is available usually for single men.
They prefer to take families. You have to go through a
screening process to get in.

     And so from time to time there will be
available beds through the Interfaith Shelter Network at
different locations. That one runs at a little lower
occupancy, so to speak, than the others, but the
others -- the basic ones for single men have been
running at just about a hundred percent occupancy
since -- well, all through the month of January and --
since they were open, basically, in December.

     MS. TREIU:  Thank you.  No further questions.

     THE COURT:  (Inaudible.)

                CROSS-EXAMINATION

BY MS. RAHLFS:

Q.    Good afternoon.  I just want to clear up a few
things.  There are four emergency shelters, and there
are also seasonal shelters.

A.    Actually, they are the same thing.

Q.    They are?

A.    The seasonal shelters are seasonal emergency shelters.  The distinction would be like St. Vincent de Paul is available year-round, but the seasonal shelters are only available during the cold weather season.

Q.    I mean the four that you mentioned by name St. Vincent de Paul, Alpha Project, Veterans, and Interfaith, are they the ones that are available all year or are these seasonal?

A.    No.  St. Vincent is available all year.  The Alpha Project and Vietnam Vets are seasonal shelters. And the Interfaith Shelter Network is also seasonal.

Q.    And when mentioning that the daily occupancy (inaudible) operating at one hundred percent occupancy; is that true?

A.    Right.

Q.    And do you have any information with you today about the specific occupancy on January 12 (inaudible) January 11 of 2005?

A.    I don't, unfortunately, because we post the availability every morning on our website, and then basically we replace it the next day, so we don't have a snapshot of that day, unfortunately.

Q.    So you have no actual evidence of any

8

availability or lack of availability on that particular night; is that correct?

A.   Nothing concrete, no.

MS. RAHLFS:  Thank you.  No further questions at this time.

REDIRECT EXAMINATION

BY MS. TREIU:

Q.   Ms. Matta, the Vietnam Veteran Shelter is that available to everybody?

A.   No, just for Vietnam vets.

Q.   Okay.  And based on your own recollection as to January, the month of January, do you remember whether or not the beds were available during January 9th, 10th, and 11th, during that period.  How full the shelters were at that time?

UNIDENTIFIED SPEAKER:  Objection.  Calls for speculation.

THE WITNESS:  What I can tell you is that my supervisor on the Info Line phone service contacts the managers of the emergency shelters on a very regular basis at least once a week, in addition to what my staff do every morning to identify how many beds are available.

It is from his discussions, which are, as I say, weekly with the manager of the Alpha Project that I

9

can tell you that the Alpha Project was running at a hundred percent occupancy all the month of January. There wasn't a particular day when all of a sudden it had available beds.

I know too that we refer somewhere between about 7 and 12 single men a night to the Alpha Project, and I know that it's a rare occasion when they're able to get in at 8:00 o'clock.

UNIDENTIFIED SPEAKER:  Thank you, Ms. Matta.

UNIDENTIFIED SPEAKER:  Anything else?

UNIDENTIFIED SPEAKER:  People have no further questions.

UNIDENTIFIED SPEAKER:  May the witness be excused?

UNIDENTIFIED SPEAKER:  Yes, Your Honor.

UNIDENTIFIED SPEAKER:  Oh, are there any questions from the jury?  I see none.

Thank you very much, Ms. Matta.

THE WITNESS:  Thank you.

* * *

10

8-10

COUNTY OF SAN DIEGO,   )

STATE OF CALIFORNIA,   )


    I, Monica B. Cosio, that the tape was reported by me and was thereafter transcribed with Computer-Aided Transcription; that the foregoing is a full, complete, and true record of said proceeding.

    I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing proceeding and caption named or in any way interested in the outcome of the cause in said caption.

    The dismantling, unsealing, or unbinding of the original transcript will render the reporter's certificates null and void.

    In witness whereof, I have hereunto set my hand this day:  October 31, 2006


                    _Monica B. Cosio_

                   MONICA B. COSIO

11

## A

able 10:7
about 3:15,21 4:12 5:1 6:25 7:16 8:19 10:6
accept 6:17
access 4:17 5:2,7
accessible 6:5
actual 8:25
Actually 8:1
addition 9:21
afternoon 2:20 7:23
agencies 3:13,23 4:16 5:7,10
agency 6:19
almost 7:1
Alpha 6:1 8:8,12 9:25 10:1,6
answer 4:13
anything 5:11 10:10
Apart 4:1
Approximately 4:21
area 6:5
assume 6:15
attorney 11:9
availability 5:2 7:1,7 8:22 9:1,1
available 3:15 4:16 5:5 5:12 7:3,5,8,12 8:5,6 8:9,11 9:9,13,23 10:4
aware 5:18

## B

B 1:12 11:4,18
based 9:11
basic 4:6 7:15
basically 3:19 5:9,16 6:21,23 7:7,18 8:23
basis 9:21
bed 6:24
beds 5:2,5,10,11 7:3,12 9:13,22 10:4
before 5:4
being 2:24
between 10:5
bills 4:7

## C

CALIFORNIA 11:2
call 2:3 3:20 4:5,5,22,24 5:9
calling 4:22
calls 5:3 9:16
caption 11:10,11
care 3:24,25,25

case 6:16,18
cause 11:11
centers 3:24
central 3:11
certificates 11:14
certify 11:8
check 4:8 5:4
child 3:24
church 6:19
City 1:3
clear 7:23
closed 5:19
cold 8:6
comes 4:8
community 3:16,22,25 4:17
complete 11:6
comprehensive 3:14,21 4:15
Computer-Aided 11:5
concrete 9:3
contacts 9:19
correct 9:2
Cosio 1:12 11:4,18
counsel 11:8
County 3:6,12,16 11:1
COURT 2:5 7:20
courtroom 2:3
cover 3:19
covering 3:18
CROSS-EXAMINA... 7:21
current 5:1,21
currently 5:25

## D

daily 7:1 8:14
database 3:21
day 3:25 5:5 8:23,24 10:3 11:16
days 5:19
day-to-day 7:6
de 6:1,17 8:4,8
December 7:18
defense 2:2
Diego 1:3 3:6,12,16 11:1
different 6:3 7:6,13
difficult 6:13
direct 2:14 6:18
director 3:5,9 4:9
disabled 4:1
discussions 9:24
dismantling 11:12
distinction 8:4

doing 2:22,23
domestic 6:8
downtown 5:24 6:4,6
during 8:6 9:13,14
duties 4:10

## E

each 5:15 6:22
earlier 6:25
either 11:9
eligible 5:9
emergency 4:6,6 5:3,25 6:6,7 7:24 8:3 9:20
every 5:3 8:22 9:22
everybody 9:9
everything 3:19,22
evidence 2:9 8:25
exact 4:10
exactly 3:10 6:12
EXAMINATION 2:14 9:6
example 5:18 6:15
except 7:5
excused 10:14
executive 3:5,9 4:9

## F

facilities 4:1,23 6:7
facility 6:4
fact 6:17,25
families 7:9
family 3:25
Father 6:15
few 3:22 7:23
find 3:14
food 4:6
foregoing 11:6,10
four 5:19,25 7:24 8:7
from 4:2 5:16 6:5 7:6 7:11 9:24 10:17
full 2:16 9:14 11:6
function 4:14
further 7:19 9:4 10:11 11:8

## G

general 6:5,7
give 2:9
go 5:14 6:11,18,23 7:9
God 2:11
good 2:20,23 7:23

## H

half 3:9 4:12,14
hand 2:6 11:15

health 3:11
Hello 2:21
help 2:11 4:6
her 2:4
hereunto 11:15
homeless 4:20,22
homes 3:25
Honor 2:2 10:15
human 3:12
hundred 7:16 8:15 10:2

## I

identify 9:22
inaudible 4:1 5:8 7:20 8:15,19
Info 3:5,8,10,11 4:9,25 9:19
information 3:11,15,21 3:23,24 4:3,12,16,18 5:1,6,8,17,21 8:18
intake 6:22
interested 6:10 11:11
Interfaith 6:2 7:6,12 8:9,13
involved 3:8

## J

January 7:3,17 8:19,20 9:12,12,13 10:2
Joe's 6:15
jury 10:17
just 6:11,16 7:16,23 9:10

## K

keep 3:24 5:1,17,20
keeps 5:17 7:1
kind 3:20 4:24 5:22 7:7
know 6:6,14 10:5,7

## L

lack 9:1
last 2:17,18
least 9:21
like 2:2 8:4
Line 3:5,8,10,11 4:9,25 9:19
little 4:11 7:4,4,13
locations 6:3 7:13
log 7:1
long 3:7
lower 7:13

## M

majority 4:4

makes 4:15
manage 4:11,15
management 6:19
manager 9:25
managers 9:20
many 5:4,24 9:22
Matta 1:1 2:1,3,18,20 3:4 9:8 10:9,18
matter 2:9 3:19
May 10:13
mean 8:7
men 7:8,15 10:6
mention 4:18
mentioned 8:7
mentioning 8:14
might 5:20 6:5
Monica 1:12 11:4,18
month 7:3,17 9:12 10:2
morning 5:4 8:22 9:22
most 3:14
mostly 5:7
much 10:18
must 5:14
M-a-t-t-a 2:19

## N

name 2:16,17,18,18 8:8
named 11:10
need 3:13,17,18,20 4:5 4:23 6:11,23
needs 4:6 5:14
Network 6:3 7:6,12 8:13
next 4:7 8:23
night 6:23 9:2 10:6
none 10:17
nonprofit 3:12
nothing 2:10 9:3
null 11:14

## O

Objection 9:16
obviously 6:8
occasion 10:7
occupancy 7:14,16 8:14 8:15,19 10:2
occupation 3:4,7
October 11:16
often 6:14,14
Oh 10:16
Okay 3:2 5:13,22 6:25 9:11
once 9:21
one 7:13 8:15
ones 7:15 8:9

online 4:16
only 5:25 8:6
onto 5:6
open 7:18
operating 8:15
organization 3:13 6:19
original 11:13
other 3:25 4:13,14,16
   4:23 5:6 6:19
others 7:14,15
outbreak 5:20
outcome 11:11
outside 2:3
over 4:11
own 5:15 6:22 9:11
o'clock 5:4 6:23 10:8

**P**

part 4;18
particular 9:1 10:3
parties 11:9
Paul 6:1,17 8:5,8
people 3:13,17,18 4:4,5
   4:12,17,21 5:9 6:9,10
   6:15 10:11
percent 4:21 7:16 8:15
   10:2
period 9:14
person 5:14
personnel 4:14
phone 4:13 9:19
Please 2:13,16
population 6:7
post 8:21
prefer 7:9
primarily 4:2
procedures 5:13,15,22
   6:12
proceeding 11:7,10
process 7:10
Project 6:1 8:8,12 9:25
   10:1,6
provide 4:19,25
put 5:6

**Q**

question 5:23
questions 7:19 9:4
   10:12,17

**R**

RAHLFS 7:22 9:4
Raise 2:6
rare 10:7
Re 1:3

reality 4:4 5:7
really 6:4
recollection 9:11
record 2:17 11:7
REDIRECT 9:6
refer 5:9,10 10:5
referral 3:23 4:13 5:5
referrals 6:18
regular 9:20
related 4:23
remember 9:12
render 11:13
replace 8:23
reported 11:4
reporter's 11:13
right 2:6 8:17
running 7:16 10:1
runs 7:13

**S**

same 8:1
San 1:3 3:6,12,16 11:1
Sara 1:1 2:1,3,18
screening 7:10
season 8:6
seasonal 6:21 7:5,25
   8:3,3,5,10,12,13
seated 2:13
see 5:4 6:24 10:17
service 9:19
services 3:12,16,18,22
   4:19,19,24
set 11:15
shelter 4:6,23 5:2,14,15
   5:18 6:3,7,11,20 7:6,7
   7:8,12 8:13 9:8
shelters 5:3,24 6:1,8,10
   6:21 7:2,2,5,24,25 8:3
   8:4,5,12 9:14,20
sign 6:12
since 7:17,18
single 7:8,15 10:6
snapshot 8:24
solemnly 2:8
some 6:19
something 5:20
sometimes 6:4
somewhere 10:5
sorry 5:23
source 4:2
speak 7:14
SPEAKER 2:6,8,13 3:1
   3:2 9:16 10:9,10,11
   10:13,15,16
specialists 4:13

specialized 3:23
specific 8:19
speculation 9:17
spell 2:16
spelled 2:19
Spencer 1:3
spoke 6:25
St 6:1,17,20 8:4,8,11
staff 4:11,5:3,8,17 7:1
   9:21
state 2:8,16 11:2
sudden 10:3
supervisor 9:19
support 4:14
sworn 2:7
system 6:22

**T**

take 7:9
tape 1:1 2:1 11:4
tell 5:11 6:9 7:2,4 9:18
   10:1
temporarily 5:19
testify 5:13
TESTIMONY 1:1 2:1
Thank 2:20,23,24 7:19
   9:4 10:9,18,19
their 4:7 6:22
thing 8:1
things 7:24
think 6:13
though 4:2
three 5:19
through 5:14 6:18 7:9
   7:12,17
time 5:16,16 7:11,11
   9:5,15
today 5:12 8:18
transcribed 1:12 11:5
transcript 11:13
Transcription 11:6
TREIU 2:2,15 3:3 7:19
   9:7
true 8:16 11:7
truth 2:10,10,11

**U**

Uh-huh 2:5
unbinding 11:12
unfortunately 8:21,24
UNIDENTIFIED 2:6,8
   2:13 3:1,2 9:16 10:9
   10:10,11,13,15,16
unsealing 11:12
until 4:7

up-to-date 3:14 5:17
used 3:13
usually 7:8
utility 4:7

**V**

v 1:3
vary 5:16
very 5:1 6:14 7:4,4 9:20
   10:18
Veteran 9:8
Veterans 6:2 8:8
vets 6:2 8:12 9:10
Vietnam 6:2 8:12 9:8
   9:10
Vincent 6:1,17,20 8:4,8
   8:11
violence 6:8
void 11:14

**W**

walk 6:11,21
walk-up 6:16
want 7:23
wasn't 10:3
way 3:15 11:10
weather 8:6
web 4:17
website 4:15 5:6 8:22
week 9:21
weekly 9:25
welcome 2:25
well 6:13 7:17
were 7:18 9:13,15
whereof 11:15
whole 2:10
witness 2:12 9:18 10:13
   10:19 11:15
wrong 5:23

**Y**

Yeah 3:2
year 8:10,11
years 3:9
year-round 8:5

**1**

10 4:21
10th 9:13
11 8:20
11th 9:14
12 8:19 10:6
17 3:9
18 3:8

**2**

2005 7:3 8:20
2006 11:16

**3**

30 4:12
31 11:16

**7**

7 10:6

**8**

8:00 6:23 10:8

**9**

9th 9:13
9:00 5:4

**Exhibit 9**



# THE CITY OF SAN DIEGO

IN REPLYING
PLEASE GIVE
OUR REF. NO.

June 28, 2006

Noel Estergren
5845 Friars Road #1101
San Diego, CA 92110

RE:     *Public Records Request re. PC647(j) arrests and citations*

Dear Mr. Estergren,

Please find enclosed the statistical information you requested from the San Diego Police Department (SDPD) in your letter dated June 19, 2006. Specifically, you requested information on all citations and arrests for violations of Penal Code 647(j) from January 2003 to the present. When we spoke by telephone on June 20, 2006, you indicated that the information you were requesting was limited to statistical information only. SDPD Crime Analysis Unit has run a search for the pertinent information which is provided with this letter. The chart provided has the statistical information broken down by council districts on an annual basis. This constitutes all the information responsive to your request.

Sincerely,

Melissa Summerhays
Deputy City Attorney
Police Legal Advisor

## Illegal Lodging (647(J)) Arrests and Cites
## January 1, 2003 - May 31, 2006

Illegal lodging as highest charge only*

| COUNCIL | 2003 | 2004 | 2005 | Jan-May 2006 |
|---|---|---|---|---|
| UNKNOWN | 28 | 72 | 16 | 6 |
| DISTRICT 1 | 13 | 9 | 5 | 1 |
| DISTRICT 2 | 1893 | 2163 | 1840 | 599 |
| DISTRICT 3 | 367 | 650 | 259 | 114 |
| DISTRICT 4 | 2 | 21 | 19 | 2 |
| DISTRICT 5 | 4 | 6 | 1 | 1 |
| DISTRICT 6 | 207 | 356 | 121 | 63 |
| DISTRICT 7 | 26 | 47 | 36 | 25 |
| DISTRICT 8 | 384 | 761 | 500 | 139 |
| TOTAL | 2724 | 4085 | 2797 | 950 |

All charges not just highest charge**

| COUNCIL | 2003 | 2004 | 2005 | Jan-May 2006 |
|---|---|---|---|---|
| UNKNOWN | 29 | 72 | 18 | 7 |
| DISTRICT 1 | 14 | 10 | 7 | 1 |
| DISTRICT 2 | 1737 | 2295 | 2004 | 679 |
| DISTRICT 3 | 376 | 706 | 308 | 130 |
| DISTRICT 4 | 3 | 24 | 25 | 2 |
| DISTRICT 5 | 4 | 7 | 4 | 1 |
| DISTRICT 6 | 235 | 409 | 162 | 69 |
| DISTRICT 7 | 33 | 56 | 43 | 27 |
| DISTRICT 8 | 391 | 806 | 552 | 168 |
| TOTAL | 2822 | 4385 | 3123 | 1084 |

* Arrests and cites where other violations may or may not have
been charged and 647(J) was a highest charge.

* Arrests and cites where other violations may or may not have
been charged and 647(J) may or may not have been the

9-2

# 647(J) ARRESTS AND CITATIONS
## CITY WIDE

### SUMMARY

| YEAR | ARRESTS | CITATIONS | TOTAL |
|---|---|---|---|
| 2003* | 374 | 1775 | 2149 |
| 2004 | 1038 | 3031 | 4069 |
| 2005 | 691 | 2087 | 2778 |
| TOTAL | 2103 | 6893 | 8997 |

### ARRESTS AND CITATIONS

| MONTH | 2003* | 2004 | 2005 | TOTAL |
|---|---|---|---|---|
| JANUARY | | 399 | 419 | 818 |
| FEBRUARY | | 289 | 286 | 575 |
| MARCH | | 280 | 243 | 523 |
| APRIL | 207 | 276 | 302 | 785 |
| MAY | 194 | 230 | 243 | 667 |
| JUNE | 188 | 365 | 184 | 737 |
| JULY | 203 | 350 | 206 | 759 |
| AUGUST | 209 | 369 | 200 | 778 |
| SEPTEMBER | 284 | 301 | 198 | 783 |
| OCTOBER | 314 | 477 | 215 | 1006 |
| NOVEMBER | 277 | 457 | 160 | 894 |
| DECEMBER | 273 | 276 | 122 | 671 |
| TOTAL | 2149 | 4069 | 2778 | 8997 |

### CITATIONS

| MONTH | 2003* | 2004 | 2005 | TOTAL |
|---|---|---|---|---|
| JANUARY | | 322 | 335 | 657 |
| FEBRUARY | | 218 | 209 | 427 |
| MARCH | | 196 | 189 | 385 |
| APRIL | 172 | 217 | 230 | 619 |
| MAY | 173 | 179 | 162 | 514 |
| JUNE | 146 | 284 | 126 | 556 |
| JULY | 164 | 271 | 145 | 580 |
| AUGUST | 171 | 297 | 154 | 622 |
| SEPTEMBER | 241 | 204 | 159 | 604 |
| OCTOBER | 271 | 336 | 180 | 787 |
| NOVEMBER | 224 | 316 | 122 | 662 |
| DECEMBER | 213 | 191 | 76 | 480 |
| Grand Total | 1775 | 3031 | 2087 | 6893 |

### ARRESTS

| MONTH | 2003* | 2004 | 2005 | TOTAL |
|---|---|---|---|---|
| JANUARY | | 77 | 84 | 161 |
| FEBRUARY | | 71 | 77 | 148 |
| MARCH | | 84 | 54 | 138 |
| APRIL | 35 | 59 | 72 | 166 |
| MAY | 21 | 51 | 81 | 153 |
| JUNE | 42 | 81 | 58 | 181 |
| JULY | 39 | 79 | 61 | 179 |
| AUGUST | 38 | 72 | 46 | 156 |
| SEPTEMBER | 43 | 97 | 39 | 179 |
| OCTOBER | 43 | 141 | 35 | 219 |
| NOVEMBER | 53 | 141 | 38 | 232 |
| DECEMBER | 60 | 85 | 46 | 191 |
| Grand Total | 374 | 1038 | 691 | 2103 |

* April - December 2003

1

# Exhibit 10

# 2-1-1 San Diego

## Shelter Report July 2005 through June 2006

| Call Statistics | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | YTD Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total shelter calls detailed below | 714 | 783 | 547 | 708 | 621 | 565 | 475 | 300 | 258 | 406 | 443 | 214 | 6,034 |
| **Cases "Referred To" Seasonal Shelters\*** | | | | | | | | | | | | | |
| East County Winter Shelter | | | | | | | 6 | 1 | | | | | 7 |
| Escondido Seasonal Shelter | | | | | | | | | | | | | - |
| San Diego Single seasonal shelter | | 1 | 1 | | | | | | | | | | |
| Seasonal shelter-name not listed | | | | | 21 | 229 | 279 | 151 | 114 | 56 | 15 | | 865 |
| Family overflow shelter | | | | | 7 | 22 | 13 | 20 | 3 | 16 | 3 | | 86 |
| Family seasonal shelter | | | | | | | 64 | | | 7 | | | 71 |
| Inclement weather shelter | | | | | | 7 | | 29 | 37 | | 8 | | 81 |
| **Subtotal - Seasonal "Referrals"** | **0** | **1** | **1** | **0** | **28** | **258** | **362** | **201** | **154** | **79** | **26** | **0** | **1,110** |
| Hidden Valley House/CCS | | | | | | | | | | | | | - |
| Martha Ann Mary's Shelter | | | | | | | | 1 | 1 | | | | 2 |
| Nueva Vida | | | | | | | | | | | | | - |
| Other-Not Seasonal Shelter | 10 | | | 3 | 23 | 28 | 10 | 4 | 1 | 39 | 35 | | 140 |
| Rachel's Night Shelter | 1 | | 3 | 1 | 1 | 12 | 13 | 11 | 10 | 13 | 13 | | 73 |
| Salv Army Emerg Lodge (SAEL) | | | | | | | | | | | | | - |
| Salv Army Men's Shelter (SAMs) | | | | | | | | 1 | 1 | | | | 20 |
| Salvation Army Van | | 5 | | | | | | | | | | | 5 |
| San Diego Life Ministries (SDLM) | | | 1 | | | | | | | | | | 1 |
| SVDP Paul Mirabile Cnt (PMC) | 30 | 9 | 42 | 17 | 21 | 13 | 43 | 28 | 23 | 28 | 39 | 8 | 301 |
| United States Mission (USM) | | | | | | | 6 | | | | | | 6 |
| Vietnam Veteran's winter shelter | | | | | | 8 | 2 | 2 | 4 | | | | 25 |
| Vista Winter shelter | | | | | | | | | | | | | 2 |
| Volunteers of America (VOA) Luhman | | | | | 3 | 6 | 2 | 9 | 6 | 12 | 18 | | 56 |
| **Total referred to shelters (excl. seasonal)** | **41** | **14** | **49** | **21** | **49** | **67** | **76** | **63** | **46** | **92** | **105** | **8** | **631** |
| **Cases Unable to Aid** | | | | | | | | | | | | | |
| Client hung up | 6 | | 1 | 5 | 5 | | | | | 1 | 1 | | 20 |
| Client ineligible/rejected | 2 | 2 | 3 | | 2 | 2 | 2 | | | 1 | | | 9 |
| Client refused referral | 25 | 15 | 8 | 14 | 8 | 8 | 8 | 8 | 8 | 5 | 11 | 4 | 132 |
| No transportation | | | 1 | | 1 | | | | | 1 | 1 | | 6 |
| Other | 10 | | 3 | | | 1 | | 1 | | | 2 | | 29 |
| Shelter is full | 630 | 751 | 481 | 668 | 518 | 229 | 27 | 27 | 50 | 227 | 287 | 202 | 4,097 |
| **Total cases unable to aid** | **673** | **768** | **497** | **687** | **544** | **240** | **37** | **36** | **58** | **235** | **312** | **206** | **4,293** |

**Exhibit 11**

| Call Statistics | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | YTD Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total shelter calls* | 802 | 858 | 755 | 748 | 631 | 587 | 728 | 573 | 759 | 787 | 769 | 686 | 8,683 |
| **Area** | | | | | | | | | | | | | |
| District 1 (Gregory Cox) | 392 | 405 | 422 | 375 | 339 | 284 | 360 | 289 | 365 | 434 | 424 | 334 | 4,423 |
| District 2 (Dianne Jacob) | 212 | 197 | 129 | 132 | 120 | 111 | 125 | 101 | 169 | 136 | 135 | 134 | 1,701 |
| District 3 (Pam Slater) | 18 | 21 | 17 | 15 | 19 | 16 | 19 | 10 | 12 | 18 | 21 | 21 | 207 |
| District 4 (Ron Roberts) | 107 | 159 | 124 | 152 | 106 | 120 | 158 | 124 | 155 | 141 | 134 | 126 | 1,606 |
| District 5 (Bill Horn) | 69 | 71 | 55 | 66 | 40 | 51 | 60 | 46 | 49 | 54 | 45 | 66 | 672 |
| Other and Unknown | 4 | 5 | 8 | 8 | 7 | 5 | 6 | 3 | 9 | 4 | 10 | 5 | 74 |
| Total by district | 802 | 858 | 755 | 748 | 631 | 587 | 728 | 573 | 759 | 787 | 769 | 686 | 8,683 |
| **Cases Referred To** | | | | | | | | | | | | | |
| Total referred to shelters | 91 | 87 | 76 | 81 | 71 | 238 | 629 | 501 | 648 | 345 | 189 | 235 | 3,191 |
| INFO LINE-Call Back | - | 1 | - | - | - | - | | | | | | | 1 |
| **Cases Unable to Aid** | | | | | | | | | | | | | |
| Client hung up | 2 | 6 | 5 | 10 | 5 | 7 | 10 | 2 | 2 | 1 | - | 4 | 54 |
| Client ineligible/rejected | - | 2 | 5 | 4 | 2 | 3 | 8 | 3 | 2 | 5 | 1 | - | 35 |
| Client refused referral | 9 | 19 | 18 | 20 | 18 | 15 | 27 | 24 | 31 | 13 | 1 | 5 | 200 |
| No transportation | - | - | - | 15 | 1 | 1 | 1 | 1 | 1 | 1 | - | - | 18 |
| Other | - | 3 | 1 | - | 4 | 1 | 7 | 7 | 5 | 1 | - | 5 | 35 |
| Shelter is full | 699 | 741 | 648 | 620 | 543 | 326 | 50 | 18 | 48 | 454 | 589 | 470 | 5,206 |
| Total cases unable to aid | 710 | 771 | 677 | 669 | 573 | 352 | 102 | 55 | 89 | 474 | 592 | 484 | 5,548 |

\* Note: Total shelter calls = Monthly total for shelter calls from the shelter database.

# Exhibit 12

# INFO LINE of San Diego County

## Shelter Report July 2003 through June 2004

| Call Statistics | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | YTD Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total shelter calls* | 606 | 643 | 627 | 680 | 600 | 678 | 716 | 621 | 697 | 626 | 0 | 0 | 6,169 |
| **Area** | | | | | | | | | | | | | |
| District 1 (Gregory Cox) | 254 | 335 | 296 | 297 | 311 | 311 | 368 | 298 | 374 | 285 | | | 3,142 |
| District 2 (Dianne-Jacob) | 107 | 113 | 127 | 132 | 112 | 144 | 139 | 80 | 135 | 102 | | | 1,191 |
| District 3 (Pam Slater) | 10 | 14 | 14 | 19 | 20 | 23 | 21 | 0 | 18 | 16 | | | 160 |
| District 4 (Ron Roberts) | 81 | 140 | 132 | 139 | 99 | 139 | 161 | 105 | 128 | 83 | | | 1,195 |
| District 5 (Bill Horn) | 49 | 38 | 56 | 82 | 57 | 54 | 31 | 28 | 43 | 27 | | | 446 |
| Other and Unknown | 4 | 2 | - | 1 | - | 5 | 5 | 2 | 3 | 3 | | | 26 |
| Total by district | 606 | 643 | 627 | 680 | 600 | 678 | 716 | 521 | 697 | 526 | 0 | 0 | 6,169 |
| **Cases Referred To** | | | | | | | | | | | | | |
| East County Winter Shelter | 0 | 0 | 0 | 3 | 0 | 0 | 0 | | | | | | 3 |
| Escondido Seasonal Shelter | 0 | 0 | 0 | 0 | 81 | 81 | | | | | | | 81 |
| Family overflow shelter | 0 | 0 | 0 | 1 | 6 | 6 | | | | | | | 7 |
| Family seasonal shelter | 0 | 0 | 0 | 0 | 0 | 20 | | | | | | | 21 |
| Hidden Valley House/CCS | 0 | 0 | 0 | 0 | 2 | 1 | | | | | | | 3 |
| Inclement weather shelter | 0 | 0 | 0 | 0 | 0 | 3 | | | | | | | 3 |
| Martha Ann Mtry's Shelter | 2 | 0 | 0 | 1 | 0 | 0 | | | | | | | 3 |
| Nueva Vida | 0 | 10 | 6 | 3 | 4 | 10 | | | | | | | 27 |
| Other-Hot Seasonal Shelter | 4 | 9 | 13 | 21 | 0 | 7 | | | | | | | 60 |
| Rachel's Night Shelter | 1 | 1 | 0 | 0 | 0 | 0 | | | | | | | 2 |
| Salv Army Emerg Lodge (SAEL) | 0 | 5 | 0 | 0 | 0 | 0 | | | | | | | 5 |
| Salv Army Mexto Shelter (SAMW) | 0 | 0 | 0 | 0 | 0 | 0 | | | | | | | 1 |
| Salvation Army Van | 7 | 0 | 0 | 0 | 8 | 6 | | | | | | | 49 |
| San Diego Life Ministion (SDLM) | 0 | 10 | 0 | 0 | 0 | 0 | | | | | | | - |
| Seasonal shelter-name not listed | 0 | 0 | 1 | 2 | 0 | 4 | | | | | | | 7 |
| Single seasonal shelter | 0 | 0 | 0 | 3 | 3 | 213 | | | | | | | 216 |
| SVDP Paul Mirabile Cnt (PMC) | 48 | 69 | 47 | 79 | 45 | 45 | | | | | | | 334 |
| United States Mission (USM) | 0 | 1 | 0 | 0 | 0 | 0 | | | | | | | 1 |
| Vietnam Veteran's Winter shelter | 0 | 0 | 0 | 0 | 0 | 0 | | | | | | | 6 |
| Vista Winter shelter | 0 | 0 | 0 | 0 | 0 | 0 | | | | | | | - |
| Volunteers of America (VOA)-Lohman | 32 | 38 | 28 | 24 | 17 | 20 | | | | | | | 157 |
| Total referred to shelters | 92 | 140 | 101 | 116 | 116 | 422 | 0 | 0 | 0 | 0 | 0 | 0 | 985 |
| **INFO LINE-Client told to call back** | 2 | 1 | 1 | 10 | 1 | 2 | | | | | | | 7 |
| **Cases Unable to Aid** | | | | | | | | | | | | | |
| Client hung up | 7 | 2 | 4 | 7 | 5 | 5 | | | | | | | 30 |
| Client ineligible/rejected | 1 | 5 | 0 | 7 | 9 | 5 | | | | | | | 27 |
| Client referral refused | 23 | 19 | 7 | 2 | 2 | 11 | | | | | | | 71 |
| No transportation | 3 | 0 | 1 | 1 | 1 | 0 | | | | | | | 6 |
| Other | 10 | 7 | 6 | 5 | 5 | 2 | | | | | | | 35 |
| Shelter is full | 357 | 469 | 498 | 498 | 463 | 228 | | | | | | | 2,632 |
| Total cases unable to aid | 411 | 502 | 524 | 528 | 488 | 282 | 0 | 0 | 0 | 0 | 0 | 0 | 2,700 |
| **PEOPLE STATISTICS** | | | | | | | | | | | | | |
| Total People | 820 | 907 | 988 | 910 | 810 | 1016 | | | | | | | 5,699 |
| People Aided Total | 116 | 101 | 114 | 128 | 128 | 574 | | | | | | | 1,269 |
| People Unable to Aid | 704 | 792 | 873 | 784 | 734 | 441 | | | | | | | 4,424 |
| Sum aided and unaided | 820 | 893 | 987 | 910 | 1008 | 1016 | 0 | 0 | 0 | 0 | 0 | 0 | 6,593 |
| People Calling Back | 16 | 14 | 14 | 8 | 16 | 40 | | | | | | | 105 |

* Note: Total shelter calls = monthly total for shelter calls from the shelter database.

# Exhibit 13

**SAN DIEGO POLICE DEPARTMENT**
**NOTICE TO APPEAR**

☐ MISDEMEANOR   DEFENDANT'S COPY
☐ Traffic   ☐ Nontraffic   **Y 010775**

| Date of Violation | Time | ☐ AM ☐ PM | Day of Week S M T W T F S | Case No. |
|---|---|---|---|---|
| 11, 18, 04 | 10:18 | | | |

Name (First, Middle, Last)   ☐ Owner's Responsibility (Veh. Code, § 40001)
MARGARET HAZEL ARMSTRONG

Address 299 17TH ST

| City | State | ZIP Code |
|---|---|---|
| SAN DIEGO | CA | 92101 |

| Driver Lic. No. | State | Class | Age | Birth Date |
|---|---|---|---|---|
| N0970079 | CA | D | 54 | 8,21,52 |

| Sex | Hair | Eyes | Height | Weight | Race | ☐ Const. Zone | ☐ School Zone |
|---|---|---|---|---|---|---|---|
| F | BLK | BRN | 5-7 | 210 | 13 | | |

| Veh. Lic. No. or VIN | State | ☐ COMMERCIAL VEHICLE (Veh. Code, § 15210(b)) |
|---|---|---|
| SSN 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 | | |

| Yr. of Veh. | Make | Model | Body Style | Color | ☐ HAZARDOUS MATERIAL (Veh. Code, § 353) |
|---|---|---|---|---|---|

Evidence of Financial Responsibility

Registered Owner of Lessee   ☐ Same as Driver
DEP

Address   ☐ Same as Driver

| City | State | ZIP Code |
|---|---|---|

Correctable Violation (Veh. Code, § 40610)   ☐ Booking Required

| Yes | No | Code and Section | Description | Misdemeanor or Infraction (Circle) |
|---|---|---|---|---|
| ☐ | ☒ | 647 (J) PC - ILLEGAL LODGING | | (M) I |
| ☐ | ☐ | | | M I |
| ☐ | ☐ | | | M I |
| ☐ | ☐ | | | M I |

| Speed Approx. | P.F./Max Spd. | Veh. Lmt. | Safe | Radar | ☐ Continuation Form Issued | N |
|---|---|---|---|---|---|---|

Location of Violation(s)
at SCL 1900 COMMERCIAL   W   E

COMMENTS: (Weather, Road & Traffic Conditions)   ☐ COLLISION   S
CLR  CLDY  FOG  RAIN  DRY  SLIPPERY  HVY.  MED.  LIGHT

☐ Violations not committed in my presence, declared on information and belief.
I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

| Z. A. SUETA | 5527 CE7 | 521 |
|---|---|---|
| Arresting or Citing Officer | I.D. No.  Command/Shift | Beat |

| | | |
|---|---|---|
| Date | Name of Arresting Officer, if different from Citing Officer | I.D. No.  Command/Shift  Beat |

WITHOUT ADMITTING GUILT, I PROMISE TO APPEAR AT THE TIME AND PLACE INDICATED BELOW.

X Signature _Margaret Armstrong_

WHEN: ON OR BEFORE THIS DATE: 1, 9, 05   TIME: 0800 ☒ AM ☐ PM
WHAT TO DO: FOLLOW THE INSTRUCTIONS ON THE REVERSE

WHERE:
☐ JUVENILE COURT, DEPT. A
   2901 MEADOWLARK DRIVE
   SAN DIEGO, CA 92123   (858) 694-4201

☒ MISDEMEANOR ARRAIGNMENT DEPT.
   220 W. BROADWAY
   SAN DIEGO, CA 92101   (619) 531-3040

☐ SAN DIEGO TRAFFIC COURT
   8950 CLAIREMONT MESA BOULEVARD
   SAN DIEGO, CA 92123   (858) 565-1006
   NIGHT COURT - MON - FRI - 5:00 PM

☐ SOUTH BAY COURT
   500 3RD AVENUE
   CHULA VISTA, CA 91910   (619) 691-4726
   NIGHT COURT THURSDAY - 5:30 PM

APPEAR AT:
☐

☐ To be notified

☐ YOU MUST APPEAR AT THE SAN DIEGO POLICE DEPARTMENT FOR FINGERPRINTING PRIOR TO YOUR COURT APPEARANCE.

Notice to Appear form approved by the Judicial Council of California.
PD-177(B) (5-04)   (Veh. Code, §§ 40500(b), 40513(b), 40522, 40600; Pen. Code, § 853.9)

SEE REVERSE
TR-130

13-1

13

SAN DIEGO POLICE DEPARTMENT

NOTICE TO APPEAR

□ MISDEMEANOR ☑ Traffic □ Nontraffic

DEFENDANT'S COPY

Y 035830

| Date of Violation | Time | ☑ AM □ PM | Day of Week S M T W T F S | Case No. |
|---|---|---|---|---|
| 10/77, 04 | 0700 | | | |

Name (First, Middle, Last)    □ Owner's Responsibility (Veh. Code, § 40001)

Margaret Armstrong

Address

Transient

City                          State                          ZIP Code

| Driver Lic. No. | State | Class | Age | Birth Date |
|---|---|---|---|---|
| | | CA | 8 | 1/21/52 |

| Sex | Hair | Eyes | Height | Weight | Race |
|---|---|---|---|---|---|
| F | BL | BL | 5-0 | 215 | B |

□ Const. Zone    □ School Zone

Veh. Lic. No. or VIN                    State

☑ COMMERCIAL VEHICLE (Veh. Code, § 15210(b))

| Yr. of Veh. | Make | Model | Body Style | Color |
|---|---|---|---|---|
| | | | | |

□ HAZARDOUS MATERIAL (Veh. Code, § 353)

Evidence of Financial Responsibility

Registered Owner of Lessee                    □ Same as Driver

Address                                        □ Same as Driver

City                          State                          ZIP Code

Correctable Violation (Veh. Code, § 406(f))    □ Booking Required    Misdemeanor or Infraction (Circle)

| Yes | No | Code and Section | Description | |
|---|---|---|---|---|
| □ | ☑ | 647(j) PC | ILLEGAL LODGING | M I |
| □ | □ | | | M I |
| □ | □ | | | M I |
| □ | □ | | | M I |

| Speed Approx. | P.F./Max Spd. | Veh. Lmt. | Safe | Radar | □ Continuation Form Issued | N |
|---|---|---|---|---|---|---|

Location of Violation(s)    1980 Commercial

W    E

at

COMMENTS: (Weather, Road & Traffic Conditions)    □ COLLISION

CLR. CLDY. FOG / RAIN DRY SLIPPERY HVY. MED. LIGHT

S

☑ Violations not committed in my presence, declared on information and belief.
I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct.

SANTIAGO                219 C5

Arresting or Citing Officer    I.D. No.    Command/Shift    Beat

| / / | | | | |
|---|---|---|---|---|
| Date | Name of Arresting Officer, if different from Citing Officer | I.D. No. | Command/Shift | Beat |

WITHOUT ADMITTING GUILT, I PROMISE TO APPEAR AT THE TIME AND PLACE INDICATED BELOW.

X Signature    Margaret Armstrong

WHEN: ON OR BEFORE THIS DATE: 01/10/05    TIME: 0830    □ AM □ PM

WHAT TO DO: FOLLOW THE INSTRUCTIONS ON THE REVERSE

WHERE:
□ JUVENILE COURT, DEPT. A
  2901 MEADOWLARK DRIVE
  SAN DIEGO, CA 92123  (858) 694-4201

□ MISDEMEANOR ARRAIGNMENT DEPT.
  220 W. BROADWAY
  SAN DIEGO, CA 92101  (619) 531-3040

□ SAN DIEGO TRAFFIC COURT
  8950 CLAIREMONT MESA BOULEVARD
  SAN DIEGO, CA 92123  (858) 565-1006
  NIGHT COURT · MON - FRI · 5:00 PM

□ SOUTH BAY COURT
  500 3RD AVENUE
  CHULA VISTA, CA 91910  (619) 691-4726
  NIGHT COURT THURSDAY · 5:30 PM

APPEAR AT:
□

□ To be notified

□ YOU MUST APPEAR AT THE SAN DIEGO POLICE DEPARTMENT FOR FINGERPRINTING PRIOR TO YOUR COURT APPEARANCE.

Notice to Appear form approved by the Judicial Council of California:
PD-177(B) (5-04)    (Veh. Code, §§ 40500(b), 40513(b), 40522, 40600; Pen. Code, § 853.9)

SEE REVERSE
TR-130

13-2

# SAN DIEGO POLICE DEPARTMENT
## NOTICE TO APPEAR

☐ MISDEMEANOR ☐ DEFENDANT'S COPY

☐ Traffic ☐ Nontraffic **Y 010767**

| Date of Violation | Time | ☐ AM ☐ PM | Day of Week S M T W T F S | Case No. |
|---|---|---|---|---|
| 10 20 04 | 0610 | | | |

Name (First, Middle, Last) ☐ Owner's Responsibility (V.C. Code, § 40001)
**MARGARET HAZEL ARMSTRONG**

Address
**799 17TH ST**

| City | State | ZIP Code |
|---|---|---|
| SAN DIEGO | CA | 92101 |

| Driver Lic. No. | State | Class | Age | Birth Date |
|---|---|---|---|---|
| N6970079 | CA | D | 54 | 8, 21, 52 |

| Sex | Hair | Eyes | Height | Weight | Race | ☐ Const. Zone ☐ School Zone |
|---|---|---|---|---|---|---|
| | BN | BRN | 5-7 | 210 | B | |

| Veh. Lic. No. or VIN | State | ☐ COMMERCIAL VEHICLE (Veh. Code, § 15210(b)) |
|---|---|---|
| SSN 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 | | |

| Yr. of Veh. | Make | Model | Body Style | Color | ☐ HAZARDOUS MATERIAL (Veh. Code, § 353) |
|---|---|---|---|---|---|

Evidence of Financial Responsibility

Registered Owner or Lessee ☐ Same as Driver
**PED**

Address ☐ Same as Driver

City | State | ZIP Code

Correctable Violation (Veh. Code, § 40610) ☐ Booking Required | Misdemeanor or Infraction (Circle)

| Yes | No | Code and Section | Description | |
|---|---|---|---|---|
| ☐ | ☒ | 647 (J) PC - ILLEGAL LODGING | | Ⓜ I |
| ☐ | ☐ | | | M I |
| ☐ | ☐ | | | M I |
| ☐ | ☐ | | | M I |

| Speed Approx. | P.F./Max Spd. | Veh. Lmt. | Safe | Radar | ☐ Continuation Form Issued | N |
|---|---|---|---|---|---|---|

Location of Violation(s)
at **AT 1800 COMMERCIAL** W E

COMMENTS: (Weather, Road & Traffic Conditions) ☐ COLLISION
CLR CLDY FOG RAIN DRY SLIPPERY HWY. MED. LIGHT

S

☐ Violations not committed in my presence, declared on information and belief.
I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct.

**ZASUETH** 5527 C E 7 521

Arresting or Citing Officer | I.D. No. | Command/Shift | Beat

Date | Name of Arresting Officer, if different from Citing Officer | I.D. No. | Command/Shift | Beat

WITHOUT ADMITTING GUILT, I PROMISE TO APPEAR AT THE TIME AND PLACE INDICATED BELOW.

X Signature **Margaret Armstrong**

WHEN: ON OR BEFORE THIS DATE: **12.23.04** TIME: **0800** ☐ AM ☐ PM

WHAT TO DO: FOLLOW THE INSTRUCTIONS ON THE REVERSE

WHERE:
☐ JUVENILE COURT, DEPT. A
2901 MEADOWLARK DRIVE
SAN DIEGO, CA 92123 (858) 694-4201

☐ MISDEMEANOR ARRAIGNMENT DEPT.
220 W. BROADWAY
SAN DIEGO, CA 92101 (619) 531-3040

☐ SAN DIEGO TRAFFIC COURT
8950 CLAIREMONT MESA BOULEVARD
SAN DIEGO, CA 92123 (858) 565-1006
NIGHT COURT - MON - FRI - 5:00 PM

☐ SOUTH BAY COURT
500 3RD AVENUE
CHULA VISTA, CA 91910 (619) 691-4726
NIGHT COURT THURSDAY - 5:30 PM

APPEAR AT:
☐

☐ To be notified

☐ YOU MUST APPEAR AT THE SAN DIEGO POLICE DEPARTMENT FOR FINGERPRINTING PRIOR TO YOUR COURT APPEARANCE.

Notice to Appear form approved by the Judicial Council of California.
PD-177(B) (5-04) (Veh. Codes, §§ 40500(b), 40513(b), 40522, 40600; Pen. Code, § 853.9)

SEE REVERSE
TR-130

13-3

| Date of Violation | Time | ☐ AM ☐ PM | Day of Week | Case No. |
|---|---|---|---|---|
| 10 17 04 | 0620 | | S M T W T F S | |

Name (First, Middle, Last)
MARGARET   ARMSTRONG

Address
299   17TH   ST

| City | State | ZIP Code |
|---|---|---|
| S D | CA | 92101 |

| Driver Lic. No. | State | Class | Age | Birth Date |
|---|---|---|---|---|
| 369 422931 | CA | | 52 | 08 21 52 |

| Sex | Hair | Eyes | Height | Weight | Race | ☐ Const. Zone | ☐ School Zone |
|---|---|---|---|---|---|---|---|
| F | Bu | Bro | 56 | 210 | B | | |

| Veh. Lic. No. or VIN | State | ☐ COMMERCIAL VEHICLE (Veh. Code, § 15210(b)) |
|---|---|---|

| Yr. of Veh. | Make | Model | Body Style | Color | ☐ HAZARDOUS MATERIAL (Veh. Code, § 353) |
|---|---|---|---|---|---|

Evidence of Financial Responsibility   PO

Registered Owner or Lessee   ☐ Same as Driver

Address   ☐ Same as Driver

City   State   ZIP Code

Correctable Violation (Veh. Code, § 40610)   ☐ Booking Required   Misdemeanor or Infraction (Circle)

| Yes | No | Code and Section | Description | | |
|---|---|---|---|---|---|
| ☐ | ☒ | 647 J PC | ILLEGAL LODGING | M | I |
| ☐ | ☐ | | | M | I |
| ☐ | ☐ | | | M | I |
| ☐ | ☐ | | | M | I |

| Speed Approx. | P.F./Max Spd. | Veh. Lmt. | Safe | Radar | ☐ Continuation Form Issued | N |
|---|---|---|---|---|---|---|
| > | | | | | | |

Location of Violation(s)
at   1200 COMMERCIAL (ST)   W   E

COMMENTS: (Weather, Road & Traffic Conditions)   ☐ COLLISION   S
CLR  CLDY  FOG  RAIN  DRY  SLIPPERY  HVY.  MED.  LIGHT

☐ Violations not committed in my presence, declared on information and belief.
I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

T. BURNS   4808 CHRT 52
Arresting or Citing Officer   I.D. No.   Command/Shift   Beat

Date   Name of Arresting Officer, if different from Citing Officer   I.D. No.   Command/Shift   Beat

WITHOUT ADMITTING GUILT, I PROMISE TO APPEAR AT THE TIME AND PLACE INDICATED BELOW.
X Signature   Margaret Armstrong

WHEN: ON OR BEFORE THIS DATE: 12 22 04   TIME: 8:00 ☐ AM ☐ PM
WHAT TO DO: FOLLOW THE INSTRUCTIONS ON THE REVERSE

WHERE:
☐ JUVENILE COURT, DEPT. A
2901 MEADOWLARK DRIVE
SAN DIEGO, CA 92123   (858) 694-4201

☐ MISDEMEANOR ARRAIGNMENT DEPT.
220 W. Broadway
SAN DIEGO, CA 92101   (619) 531-3040

☐ SAN DIEGO TRAFFIC COURT
8950 CLAIREMONT MESA BOULEVARD
SAN DIEGO, CA 92123   (858) 565-1006
NIGHT COURT - MON - FRI - 5:00 PM

☐ SOUTH BAY COURT
500 3RD AVENUE
CHULA VISTA, CA 91910   (619) 691-4726
NIGHT COURT THURSDAY - 5:30 PM

APPEAR AT:
☐

☐ To be notified

☐ YOU MUST APPEAR AT THE SAN DIEGO POLICE DEPARTMENT FOR FINGERPRINTING PRIOR TO YOUR COURT APPEARANCE.

Notice to Appear form approved by the Judicial Council of California.
PD-177(B) (5-04)   (Veh. Code, §§ 40500(b), 40513(b), 40522, 40600; Pen. Code, § 853.9)   SEE REVERSE   TR-130

13-4

# SAN DIEGO POLICE DEPARTMENT
## NOTICE TO APPEAR

☐ MISDEMEANOR  DEFENDANT'S COPY

☐ Traffic  ☐ Nontraffic  **Y023979**

| Date of Violation | Time | Day of Week | Case No. |
|---|---|---|---|
| 10/11/04 | 1075 ☐ AM ☐ PM | S (M) T W T F S | |

☐ Owner's Responsibility (Veh. Code, § 40001)

**Name** *(First, Middle, Last)*
Gregory Spencer

**Address**
Transient

**City** _____ **State** _____ **ZIP Code**

| Driver Lic. No. | State | Class | Age | Birth Date |
|---|---|---|---|---|
| Q06.62.5849 | | | | 09/05/67 |

| Sex | Hair | Eyes | Height | Weight | Race |
|---|---|---|---|---|---|
| M | BR | HZ | 6-1 | 240 | W |

☐ Const. Zone  ☐ School Zone

**Veh. Lic. No. or VIN**   5157PYC

☐ **COMMERCIAL VEHICLE** (Veh. Code, § 15210(b))

| Yr. of Veh. | Make | Model | Body Style | Color |
|---|---|---|---|---|

**Evidence of Financial Responsibility**

☐ **HAZARDOUS MATERIAL** (Veh. Code, § 353)

**Registered Owner or Lessee**   ☐ Same as Driver

**Address**   ☐ Same as Driver

**City** _____ **State** _____ **ZIP Code**

**Correctable Violation** (Veh. Code, § 40610)   ☐ Booking Required

| Yes | No | Code and Section | Description | Misdemeanor or Infraction (Circle) |
|---|---|---|---|---|
| ☐ | ☒ | 647(i) PC | Illegal Lodging | (M) I |
| ☐ | ☐ | | | M I |
| ☐ | ☐ | | | M I |
| ☐ | ☐ | | | M I |

| Speed Approx. | P.F./Max Spd. | Veh. Lmt. | Safe | Radar | ☐ Continuation Form Issued |
|---|---|---|---|---|---|

**Location of Violation(s)**
at  1200 K St

**COMMENTS:** (Weather, Road & Traffic Conditions)
CLR CLDY FOG RAIN DRY SLIPPERY HVY. MED. LIGHT   ☐ COLLISION

☐ Violations not committed in my presence, declared on information and belief.
I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct.

| Arresting or Citing Officer | I.D. No. | Command/Shift | Beat |
|---|---|---|---|
| C Santino | 5114 ( ) | 531 |

| Date | Name of Arresting Officer, if different from Citing Officer | I.D. No. | Command/Shift | Beat |
|---|---|---|---|---|

WITHOUT ADMITTING GUILT, I PROMISE TO APPEAR AT THE TIME AND PLACE INDICATED BELOW.

X Signature

**WHEN:** ON OR BEFORE THIS DATE: 11/29/04  **TIME** 0800 ☐ AM ☐ PM

**WHAT TO DO:** FOLLOW THE INSTRUCTIONS ON THE REVERSE

**WHERE:**

☐ JUVENILE COURT, DEPT. A
2901 MEADOWLARK DRIVE
SAN DIEGO, CA 92123  (858) 694-4201

☐ MISDEMEANOR ARRAIGNMENT DEPT.
220 W. Broadway
SAN DIEGO, CA 92101  (619) 531-3040

☐ SAN DIEGO TRAFFIC COURT
8950 CLAIREMONT MESA BOULEVARD
SAN DIEGO, CA 92123  (858) 565-1006
NIGHT COURT · MON · FRI · 5:00 PM

☐ SOUTH BAY COURT
500 3RD AVENUE
CHULA VISTA, CA 91910  (619) 691-4726
NIGHT COURT THURSDAY · 5:30 PM

APPEAR AT:
☐

☐ To be notified

☐ YOU MUST APPEAR AT THE SAN DIEGO POLICE DEPARTMENT FOR FINGERPRINTING PRIOR TO YOUR COURT APPEARANCE.

Notice to Appear form approved by the Judicial Council of California.
PD-177(B) (5-04)   (Veh. Code, §§ 40500(b), 40513(b), 40522, 40600; Pen. Code, § 853.9)

SEE REVERSE
TR-130

13-5

# SAN DIEGO POLICE DEPARTMENT
## NOTICE TO APPEAR

☐ MISDEMEANOR    DEFENDANT'S COPY
☐ Traffic  ☑ Nontraffic    **Y 035365**

| Date of Violation | Time | Day of Week | Case No. |
|---|---|---|---|
| 11,09,04 | 1245 ☐AM ☑PM | S M T W T F S | |

**Name (First, Middle, Last)**
GREGORY M SPENGER

**Address**
299 17TH ST

| City | State | ZIP Code |
|---|---|---|
| S.D | CA | 92101 |

| Driver Lic. No. | State | Class | Age | Birth Date |
|---|---|---|---|---|
| 813230709 | NY | A | 37 | 09,05,67 |

| Sex | Hair | Eyes | Height | Weight | Race | ☐ Const. Zone | ☐ School Zone |
|---|---|---|---|---|---|---|---|
| M | BRO | BLK | 6.1 | 200 | W | | |

**Veh. Lic. No. or VIN**                     State

| Yr. of Veh. | Make | Model | Body Style | Color | ☐ COMMERCIAL VEHICLE (Veh. Code, § 15210(b)) |
|---|---|---|---|---|---|

Evidence of Financial Responsibility    PFD    ☐ HAZARDOUS MATERIAL (Veh. Code, § 353)

Registered Owner or Lessee    ☐ Same as Driver

Address    ☐ Same as Driver

City                     State                     ZIP Code

**Correctable Violation (Veh. Code, § 40610)**    ☐ Booking Required

| Yes | No | Code and Section | Description | Misdemeanor or Infraction (Circle) |
|---|---|---|---|---|
| ☐ | ☑ | 647J PC | ILLEGAL LODGING | M Ⓜ I |
| ☐ | ☐ | | | M I |
| ☐ | ☐ | | | M I |
| ☐ | ☐ | | | M I |

| Speed Approx. | P.F./Max Spd. | Veh. Lmt. | Safe | Radar | ☐ Continuation Form Issued |
|---|---|---|---|---|---|
| > | | | | | |

Location of Violation(s)
at 1200 K ST (PARKING LOT)

COMMENTS: (Weather, Road & Traffic Conditions)
CLR CLDY FOG RAIN DRY SLIPPERY HVY. MED. LIGHT    ☐ COLLISION

☑ Violations not committed in my presence, declared on information and belief.
I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct.

T. BURNS

| Arresting or Citing Officer | I.D. No. | Command/Shift | Beat |
|---|---|---|---|
| | 4808 | CHRT 571 | |

L. SANTIAGO    5119

| Date | Name of Arresting Officer, if different from Citing Officer | I.D. No. | Command/Shift | Beat |
|---|---|---|---|---|

WITHOUT ADMITTING GUILT, I PROMISE TO APPEAR AT THE TIME AND PLACE INDICATED BELOW.

X Signature

WHEN: ON OR BEFORE THIS DATE: **01,07,05**    TIME: **8.00** ☑AM ☐PM
WHAT TO DO: FOLLOW THE INSTRUCTIONS ON THE REVERSE
WHERE:
☐ JUVENILE COURT, DEPT. A
2901 MEADOWLARK DRIVE
SAN DIEGO, CA 92123    (858) 694-4201

☐ MISDEMEANOR ARRAIGNMENT DEPT.
220 W. BROADWAY
SAN DIEGO, CA 92101  (619) 531-3040

☐ SAN DIEGO TRAFFIC COURT
8950 CLAIREMONT MESA BOULEVARD
SAN DIEGO, CA 92123    (858) 565-1006
NIGHT COURT - MON - FRI - 5:00 PM

☐ SOUTH BAY COURT
500 3RD AVENUE
CHULA VISTA, CA 91910  (619) 691-4726
NIGHT COURT THURSDAY - 5:30 PM

APPEAR AT:

☐ To be notified

☐ YOU MUST APPEAR AT THE SAN DIEGO POLICE DEPARTMENT FOR FINGERPRINTING PRIOR TO YOUR COURT APPEARANCE.

Notice to Appear form approved by the Judicial Council of California.
PD-177(B) (5-04)    (Veh. Code, §§ 40500(b), 40513(b), 40522, 40600; Pen. Code, § 853.9)

SEE REVERSE
TR-130

130

# SAN DIEGO POLICE DEPARTMENT
## NOTICE TO APPEAR

☒ MISDEMEANOR — DEFENDANT'S COPY

☐ Traffic ☐ Nontraffic

**A941235**

| Date of Violation | Time | ☒ AM ☐ PM | Day of Week S M T W T F S | Case No. |
|---|---|---|---|---|
| 7-14-04 | 0545 | | | |

☐ Owner's Responsibility (Veh. Code, § 40001)

Name (First, Middle, Last): **SYLVIA LIEVANOS**

Address: **299 17TH STREET**

| City | State | ZIP Code |
|---|---|---|
| SD | CA | 92101 |

| Driver Lic. No. | State | Class | Age | Birth Date |
|---|---|---|---|---|
| | | | | 7-24-51 |

| Sex | Hair | Eyes | Height | Weight | Race | ☐ Const. Zone ☐ School Zone |
|---|---|---|---|---|---|---|
| F | BR | BR | 4'11 | 190 | H | |

| Veh. Lic. No. or VIN | State |
|---|---|
| | |

| Yr. of Veh. | Make | Model | Body Style | Color |
|---|---|---|---|---|
| | | | | |

☐ COMMERCIAL VEHICLE (Veh. Code, § 15210(b))

Evidence of Financial Responsibility

☐ HAZARDOUS MATERIAL (Veh. Code, § 353)

Registered Owner of Lessee: **SLEEPER** ☐ Same as Driver

Address: ☐ Same as Driver

| City | State | ZIP Code |
|---|---|---|
| | | |

Correctable Violation (Veh. Code, § 40610)

| Yes | No | Code and Section | Description | Misdemeanor or Infraction (Circle) |
|---|---|---|---|---|
| ☐ | ☐ | 647(J) PC—ILLEGAL LODGING | | Ⓜ I |
| ☐ | ☐ | | | M I |
| ☐ | ☐ | | | M I |
| ☐ | ☐ | | | M I |

| Speed Approx. | P.F./Max Spd. | Veh. Lmt. | Safe | Radar | ☐ Continuation Form Issued | N |
|---|---|---|---|---|---|---|

Location of Violation(s)
At: **500 COMMERCIAL** W E

COMMENTS: (Weather, Road & Traffic Conditions) ☐ COLLISION
CLR CLDY FOG RAIN DRY SLIPPERY HVY MED LIGHT S

☐ Violations not committed in my presence, declared on information and belief.
I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct.

| Arresting or Citing Officer | I.D. No. | Command/Shift | Beat |
|---|---|---|---|
| KERN | 5810? | | 51 |
| FLORES | 5498C1 | | 51 |

| Date | Name of Arresting Officer, if different from Citing Officer | I.D. No. | Command/Shift | Beat |
|---|---|---|---|---|

WITHOUT ADMITTING GUILT, I PROMISE TO APPEAR AT THE TIME AND PLACE INDICATED BELOW.

X Signature

**WHEN:** ON OR BEFORE THIS DATE **9-28-04** TIME **0800** ☒ AM ☐ PM

**WHAT TO DO:** FOLLOW THE INSTRUCTIONS ON THE REVERSE

**WHERE:**

| | | | MISDEMEANOR ARRAIGNMENT DEPT. |
|---|---|---|---|
| ☐ | JUVENILE COURT, DEPT. A 2901 MEADOWLARK DRIVE SAN DIEGO, CA 92123 (858) 694-4201 | ☒ | 220 W. BROADWAY SAN DIEGO, CA 92101 (619) 531-3040 |
| ☐ | SAN DIEGO TRAFFIC COURT 8950 CLAIREMONT MESA BOULEVARD SAN DIEGO, CA 92123 (858) 565-1006 NIGHT COURT - MON -FRI - 5:00 PM | ☐ | SOUTH BAY COURT 500 3rd AVENUE CHULA VISTA, CA 91910 (619) 691-4726 NIGHT COURT THURSDAY - 5:30 PM |

APPEAR AT: ☐

☐ To be notified

☐ YOU MUST APPEAR AT THE SAN DIEGO POLICE DEPARTMENT FOR FINGERPRINTING PRIOR TO YOUR COURT APPEARANCE.

Notice to Appear form approved by the Judicial Council of California.
PD-177(B) (12-02) (Veh. Code, §§ 40500(b), 40513(b), 40522, 40600; Pen. Code, § 853.9)

**SEE REVERSE** · TR-130

13-7

# SAN DIEGO POLICE DEPARTMENT
## NOTICE TO APPEAR

☑ MISDEMEANOR   DEFENDANT'S COPY
☐ Traffic   ☐ Nontraffic

**Y 035820**

| Date of Violation | Time | | Day of Week | Case No. |
|---|---|---|---|---|
| 10.27.04 | 0630 ☐ AM ☐ PM | S M T W T F S | |

Name (First, Middle, Last)
ROBERT DAVID YBARRA   ☐ Owner's Responsibility (Veh. Code, § 40001)

Address
299 17TH ST

| City | State | ZIP Code |
|---|---|---|
| S.D. | CA | 92101 |

| Driver Lic. No. | State | Class | Age | Birth Date |
|---|---|---|---|---|
| C0449633 | CA | | 48 | 04.17.56 |

| Sex | Hair | Eyes | Height | Weight | Race | ☐ Const. Zone ☐ School Zone |
|---|---|---|---|---|---|---|
| M | BLK | BRO | 5.9 | 160 | H | |

Veh. Lic. No. or VIN _____ State _____

| Yr. of Veh. | Make | Model | Body Style | Color | ☐ COMMERCIAL VEHICLE (Veh. Code, § 15210(b)) |
|---|---|---|---|---|---|

Evidence of Financial Responsibility   NONE   ☐ HAZARDOUS MATERIAL (Veh. Code, § 353)

Registered Owner of Lessee   ☐ Same as Driver

Address

City _____ State _____ ZIP Code _____   ☐ Same as Driver

Correctable Violation (Veh. Code, § 40610)

| Yes | No | Code and Section | Description | ☐ Booking Required | Misdemeanor or Infraction (Circle) |
|---|---|---|---|---|---|
| ☐ | ☑ | 647J PC | ILLEGAL LODGING | | Ⓜ I |
| ☐ | ☐ | | | | M I |
| ☐ | ☐ | | | | M I |
| ☐ | ☐ | | | | M I |

| Speed Approx. | P.F./Max Spd. | Veh. Lmt. | Safe | Radar | ☐ Continuation Form Issued | N |
|---|---|---|---|---|---|---|

Location of Violation(s)   1700 IMPERIAL (SJCC)

COMMENTS: (Weather, Road & Traffic Conditions)   W — E
CLR CLDY FOG RAIN DRY SLIPPERY HVY. MED. LIGHT   ☐ COLLISION   S
☐ Violations not committed in my presence, declared on information and belief.
I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct.

| T. BURNS | | 4888 CHP+ 521 | |
|---|---|---|---|
| Arresting or Citing Officer | | I.D. No.   Command/Shift | Beat |

Date _____ Name of Arresting Officer, if different from Citing Officer   I.D. No.   Command/Shift   Beat

WITHOUT ADMITTING GUILT, I PROMISE TO APPEAR AT THE TIME AND PLACE INDICATED BELOW.

X Signature _Robert Ybarra_

WHEN: ON OR BEFORE THIS DATE: **12.29.04**   TIME: **8:00** ☐ AM ☐ PM
WHAT TO DO: FOLLOW THE INSTRUCTIONS ON THE REVERSE
WHERE:
☐ JUVENILE COURT, DEPT. A
2901 MEADOWLARK DRIVE
SAN DIEGO, CA 92123   (858) 694-4201

☐ MISDEMEANOR ARRAIGNMENT DEPT.
220 W. BROADWAY
SAN DIEGO, CA 92101   (619) 531-3040

☐ SAN DIEGO TRAFFIC COURT
8950 CLAIREMONT MESA BOULEVARD
SAN DIEGO, CA 92123   (858) 565-1008
NIGHT COURT · MON · FRI · 5:00 PM

☐ SOUTH BAY COURT
500 3rd AVENUE
CHULA VISTA, CA 91910   (619) 691-4726
NIGHT COURT THURSDAY · 5:30 PM

APPEAR AT:
☐

☐ To be notified

☐ YOU MUST APPEAR AT THE SAN DIEGO POLICE DEPARTMENT FOR FINGERPRINTING PRIOR TO YOUR COURT APPEARANCE.

Notice to Appear form approved by the Judicial Council of California.
PD-177(B) (5-04)   (Veh. Code, §§ 40500(b), 40513(b), 40522, 40600; Pen. Code, § 853.9)   SEE REVERSE   TR-130

13-8

SAN DIEGO POLICE DEPARTMENT

☒ MISDEMEANOR  DEFENDANT'S COPY

NOTICE TO APPEAR  ☐ Nontraffic  **Y 009888**

| Date of Violation | Time | ☒ AM ☐ PM | Day of Week S M T W T F S | Case No. |
|---|---|---|---|---|
| 10,17,04 | 1725 | | | |

Name (First, Middle, Last)  Jeffrey H Miles  ☐ Owner's Responsibility (Veh. Code, § 40001)

Address  3930 Louisiana #1

| City | State | ZIP Code |
|---|---|---|
| San Diego | CA | 92104 |

| Driver Lic. No. | State | Class | Age | Birth Date |
|---|---|---|---|---|
| B9895058 | CA X | | 51 | 9,13,53 |

| Sex | Hair | Eyes | Height | Weight | Race | ☐ Const. Zone ☐ School Zone |
|---|---|---|---|---|---|---|
| M | Brn | Blu | 6-1 | 160 | W | |

Veh. Lic. No. or VIN  State

☐ **COMMERCIAL VEHICLE** (Veh. Code, §.15210(b))

| Yr. of Veh. | Make | Model | Body Style | Color |
|---|---|---|---|---|

☐ **HAZARDOUS MATERIAL** (Veh. Code, § 353)

Evidence of Financial Responsibility

Registered Owner of Lessee  ☐ Same as Driver

Address  ☐ Same as Driver

| City | State | ZIP Code |
|---|---|---|

Correctable Violation (Veh. Code, § 40610)  ☐ Booking Required

| Yes | No | Code and Section | Description | Misdemeanor or Infraction (Circle) |
|---|---|---|---|---|
| ☐ | ☒ | 647 (i) P.C. | Illegal lodging | Ⓜ I |
| ☐ | ☐ | | | M I |
| ☐ | ☐ | | | M I |
| ☐ | ☐ | | | M I |

| Speed Approx. | P.F./Max Spd. | Veh. Lmt. | Safe | Radar | ☐ Continuation Form Issued | N |
|---|---|---|---|---|---|---|

Location of Violation(s)

at  S/A F5 @ 17TH

COMMENTS: (Weather, Road & Traffic Conditions)  ☐ COLLISION

CLR  CLDY  FOG  RAIN  DRY  SLIPPERY  HVY  MED  LIGHT

☐ Violations not committed in my presence, declared on information and belief.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct.

| R. GRUBE | 4886 | Moll | 521 |
|---|---|---|---|
| Arresting or Citing Officer | I.D. No. | Command/Shift | Beat |

| Date | Name of Arresting Officer, if different from Citing Officer | I.D. No. | Command/Shift | Beat |
|---|---|---|---|---|

WITHOUT ADMITTING GUILT, I PROMISE TO APPEAR AT THE TIME AND PLACE INDICATED BELOW.

X Signature  Jeff Miles

WHEN: ON OR BEFORE THIS DATE: 12,14,04  TIME: 0815 ☐AM ☐ PM

WHAT TO DO: FOLLOW THE INSTRUCTIONS ON THE REVERSE

WHERE:

☐ JUVENILE COURT, DEPT. A
2901 MEADOWLARK DRIVE
SAN DIEGO, CA 92123  (858) 694-4201

☐ MISDEMEANOR ARRAIGNMENT DEPT.
220 W. BROADWAY
SAN DIEGO, CA 92101  (619) 531-3040

☐ SAN DIEGO TRAFFIC COURT
8950 CLAIREMONT MESA BOULEVARD
SAN DIEGO, CA 92123  (858) 565-1006
NIGHT COURT - MON - FRI - 5:00 PM

☐ SOUTH BAY COURT
500 3RD AVENUE
CHULA VISTA, CA 91910  (619) 691-4726
NIGHT COURT THURSDAY - 5:30 PM

APPEAR AT:
☐

☐ To be notified

☐ YOU MUST APPEAR AT THE SAN DIEGO POLICE DEPARTMENT FOR FINGERPRINTING PRIOR TO YOUR COURT APPEARANCE.

Notice to Appear form approved by the Judicial Council of California.
PD-177(B) (5-04)  (Veh. Code, §§ 40500(b), 40513(b), 40522, 40600; Pen. Code, § 853.9)

SEE REVERSE
TR-130

13-9

# SAN DIEGO POLICE DEPARTMENT
☒ MISDEMEANOR  DEFENDANT'S COPY
## NOTICE TO APPEAR
☐ Traffic  ☐ Nontraffic  **A978464**

| Date of Violation | Time | ☒ AM ☐ PM | Day of Week S M T W T (F) S | Case No. |
|---|---|---|---|---|
| 10-101 2004 | 0710 | | | |

Name (First, Middle, Last): STEVEN WAYNE GREER   ☐ Owner's Responsibility (Veh. Code, § 40001)

Address: 299 17th ST

| City | State | ZIP Code |
|---|---|---|
| San Diego | CA | 92101 |

| Driver Lic. No. | State | Class | Age | Birth Date |
|---|---|---|---|---|
| D54626 | CA | C | 44 | 09 10 1960 |

| Sex | Hair | Eyes | Height | Weight | Race | ☐ Const. Zone ☐ School Zone |
|---|---|---|---|---|---|---|
| M | BLK | BRO | 602 | 192 | B | |

| Veh. Lic. No. or VIN | State | ☐ COMMERCIAL VEHICLE (Veh. Code, § 16210(b)) |
|---|---|---|
| 53123 2473 | | |

| Yr. of Veh. | Make | Model | Body Style | Color | ☐ HAZARDOUS MATERIAL (Veh. Code, § 353) |
|---|---|---|---|---|---|

Evidence of Financial Responsibility:

Registered Owner or Lessee: PED   ☐ Same as Driver

Address: ☐ Same as Driver

| City | State | ZIP Code |
|---|---|---|

Correctable Violation (Veh. Code, § 40610)  ☐ Booking Required   Misdemeanor or Infraction (Circle)

| Yes | No | Code and Sections | Description | |
|---|---|---|---|---|
| ☐ | ☐ | 647(i) PC | Illegal | (M) I |
| ☐ | ☐ | Lodging | | M I |
| ☐ | ☐ | | | M I |
| ☐ | ☐ | | | M I |

| Speed Approx. | P.F./Max Spd. | Veh. Lmt. | Safe | Radar | ☐ Continuation Form issued | N |
|---|---|---|---|---|---|---|

Location of Violation(s)
At: 2100 Marlea F n CA   W — E

COMMENTS: (Weather, Road & Traffic Conditions)   ☐ COLLISION   S
CLR · CLDY · FOG · RAIN · DRY · SLIPPERY · HVY. · MED. · LIGHT

☐ Violations not committed in my presence, declared on information and belief.
I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct.

| ADAMS IH | 5149 | P-1 | 531 |
|---|---|---|---|
| Arresting or Citing Officer | I.D. No. | Command/Shift | Beat |

| Date | Name of Arresting Officer, if different from Citing Officer | I.D. No. | Command/Shift | Beat |
|---|---|---|---|---|

WITHOUT ADMITTING GUILT, I PROMISE TO APPEAR AT THE TIME AND PLACE INDICATED BELOW.

X Signature

**WHEN:** ON OR BEFORE THIS DATE DEC 7 2004   TIME: 8:00  ☒ AM ☐ PM

**WHAT TO DO:** FOLLOW THE INSTRUCTIONS ON THE REVERSE

**WHERE:**
☐ JUVENILE COURT, DEPT. A
2901 MEADOWLARK DRIVE
SAN DIEGO, CA 92123 · (858) 694-4201

☐ SAN DIEGO TRAFFIC COURT
8950 CLAIREMONT MESA BOULEVARD
SAN DIEGO, CA 92123
NIGHT COURT · MON · FRI · 5:00 PM

☒ MISDEMEANOR ARRAIGNMENT DEPT.
220 W. Broadway
SAN DIEGO, CA 92101  (619) 531-3040

☐ SOUTH BAY COURT
500 3RD AVENUE
CHULA VISTA, CA 91910  (619) 691-4726
NIGHT COURT THURSDAY · 5:30 PM

APPEAR AT:
☐

☐ To be notified

☐ YOU MUST APPEAR AT THE SAN DIEGO POLICE DEPARTMENT FOR FINGERPRINTING PRIOR TO YOUR COURT APPEARANCE.

Notice to Appear form approved by the Judicial Council of California.
PD-177(B) (12-02)   (Veh. Code, §§ 40500(b), 40513(b), 40522, 40600; Pen. Code, § 853.9)   SEE REVERSE
TR-130

13-10

# SAN DIEGO POLICE DEPARTMENT

☐ MISDEMEANOR · DEFENDANT'S COPY

## NOTICE TO APPEAR

☐ Traffic   ☐ Nontraffic

**Y 010556**

| Date of Violation | Time | Day of Week | Case No. |
|---|---|---|---|
| 10/27/04 | 0630 ☐AM ☐PM | S M T W T F S | |

Name (First, Middle, Last)
JUAN ARMANDO NIETO

☐ Owner's Responsibility (Veh. Code, § 40001)

Address
299 17TH STREET

| City | State | ZIP Code |
|---|---|---|
| SD | CA | 92101 |

| Driver Lic. No. | State | Class | Age | Birth Date |
|---|---|---|---|---|
| D5352748 | CA | | | 3/15/67 |

| Sex | Hair | Eyes | Height | Weight | Race |
|---|---|---|---|---|---|
| M | BLK | HZL | 5600 | | H |

☐ Const. Zone   ☐ School Zone

| Veh. Lic. No. or VIN | | State |
|---|---|---|

☐ COMMERCIAL VEHICLE (Veh. Code, § 15210(b))

| Yr. of Veh. | Make | Model | Body Style | Color |
|---|---|---|---|---|

☐ HAZARDOUS MATERIAL (Veh. Code, § 353)

Evidence of Financial Responsibility

Registered Owner of Lessee   SLEEPER   ☐ Same as Driver

Address   ☐ Same as Driver

| City | State | ZIP Code |
|---|---|---|

Correctable Violation (Veh. Code, § 40610)   ☐ Booking Required   Misdemeanor or Infraction (Circle)

| Yes | No | Code and Section | Description | | |
|---|---|---|---|---|---|
| ☐ | ☒ | 647(J)P.C. | ILLEGAL | | |
| ☐ | ☐ | | LODGING | M | I |
| ☐ | ☐ | | | M | I |
| ☐ | ☐ | | | M | I |

| Speed Approx. | P.F./Max Spd. | Veh. Lmt. | Safe | Radar | ☐ Continuation Form Issued | N |
|---|---|---|---|---|---|---|

Location of Violation(s)
at 800 COMMERCIAL

☐ COLLISION

W   E

COMMENTS: (Weather, Road & Traffic Conditions)
CLR  CLDY  FOG  RAIN  DRY  SLIPPERY  HVY.  MED.  LIGHT

S

☐ Violations not committed in my presence, declared on information and belief.
I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct.

| KFAN | 5891 | 521 |
|---|---|---|
| Arresting or Citing Officer | I.D. No. | Command/Shift | Beat |

| Date | Name of Arresting Officer, if different from Citing Officer | I.D. No. | Command/Shift | Beat |
|---|---|---|---|---|

WITHOUT ADMITTING GUILT, I PROMISE TO APPEAR AT THE TIME AND PLACE INDICATED BELOW.

X Signature

WHEN: ON OR BEFORE THIS DATE: 11/29/04   TIME: 0800 ☐ AM ☐ PM

WHAT TO DO: FOLLOW THE INSTRUCTIONS ON THE REVERSE

WHERE:
☐ JUVENILE COURT, DEPT. A
2901 MEADOWLARK DRIVE
SAN DIEGO, CA 92123  (858) 694-4201

☐ MISDEMEANOR ARRAIGNMENT DEPT.
220 W. BROADWAY
SAN DIEGO, CA 92101  (619) 531-3040

☐ SAN DIEGO TRAFFIC COURT
8950 CLAIREMONT MESA BOULEVARD
SAN DIEGO, CA 92123  (858) 565-1006
NIGHT COURT - MON - FRI - 5:00 PM

☐ SOUTH BAY COURT
500 3RD AVENUE
CHULA VISTA, CA 91910  (619) 691-4726
NIGHT COURT THURSDAY - 5:30 PM

APPEAR AT:

☐ To be notified

☐ YOU MUST APPEAR AT THE SAN DIEGO POLICE DEPARTMENT FOR FINGERPRINTING PRIOR TO YOUR COURT APPEARANCE.

Notice to Appear form approved by the Judicial Council of California.
(PD-177(B) (5-04)   (Veh. Code, §§ 40500(b), 40513(b), 40522, 40600; Pen. Code, § 853.9)

SEE REVERSE
TR-130

13-11

# SAN DIEGO POLICE DEPARTMENT
## NOTICE TO APPEAR

☒ MISDEMEANOR  DEFENDANT'S COPY

☐ Traffic  ☒ Nontraffic  **Y 010533**

| Date of Violation | Time | | Day of Week | Case No. |
|---|---|---|---|---|
| 09 28 04 | 0800 | ☒AM ☐PM | S M ⓉW T F S | |

Name (First, Middle, Last): **LANDAL JAMAL FRENCH**

Owner's Responsibility (Veh. Code, § 40001)

Address: **1501 IMPERIAL AVE**

| City | State | ZIP Code |
|---|---|---|
| SD | CA | 92101 |

| Driver. Lic. No. | State | Class | Age | Birth Date |
|---|---|---|---|---|
| B 4360043 | CA | 10 | 34 | 08 28 70 |

| Sex | Hair | Eyes | Height | Weight | Race | ☐ Const. Zone ☐ School Zone |
|---|---|---|---|---|---|---|
| M | BLK | BRO | 5 7 | 160 | BLK | |

Veh. Lic. No. or VIN:                      State

| Yr. of Veh. | Make | Model | Body Style | Color | ☐ COMMERCIAL VEHICLE (Veh. Code, § 15210(b)) |
|---|---|---|---|---|---|

Evidence of Financial Responsibility  ☐ HAZARDOUS MATERIAL (Veh. Code, § 353)

Registered Owner of Lessee: **SLEEPER**

Address                                    ☐ Same as Driver

City                            State         ☐ Same as Driver    ZIP Code

Correctable Violation (Veh. Code, § 40610)

| Yes | No | Code and Section | Description | ☐ Booking Required | Misdemeanor or Infraction (Circle) |
|---|---|---|---|---|---|
| ☐ | ☒ | 647 (J) PC = ILLEGAL LODGING | | | Ⓜ I |
| ☐ | ☐ | | | | M I |
| ☐ | ☐ | | | | M I |
| ☐ | ☐ | | | | M I |

| Speed Approx. | P.F./Max Spd. | Veh. Lmt. | Safe | Radar | ☐ Continuation Form Issued | N |
|---|---|---|---|---|---|---|

Location of Violation(s)

at **SEE 1400 ISLAND AVE**                                    W    E

COMMENTS: (Weather, Road & Traffic Conditions)

CLR  CLDY  FOG  RAIN  DRY  SLIPPERY  HVY.  MED.  LIGHT  ☐ COLLISION    S

☐ Violations not committed in my presence, declared on information and belief.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct.

| Arresting or Citing Officer | I.D. No. | Command/Shift |
|---|---|---|
| R. FLORES | 5478 | 54 |  521

| Date | Name of Arresting Officer, if different from Citing Officer | I.D. No. | Command/Shift | Beat |
|---|---|---|---|---|
| | KERN | 5585 | C-1 | 54 |

WITHOUT ADMITTING GUILT, I PROMISE TO APPEAR AT THE TIME AND PLACE INDICATED BELOW.

X Signature

WHEN: ON OR BEFORE THIS DATE: **11 23 04**  TIME: **0800**  ☐AM ☐ PM

WHAT TO DO: FOLLOW THE INSTRUCTIONS ON THE REVERSE

WHERE:

☐ JUVENILE COURT, DEPT. A
2801 MEADOWLARK DRIVE
SAN DIEGO, CA 92123  (858) 694-4201

☒ MISDEMEANOR ARRAIGNMENT DEPT.
220 W. Broadway
SAN DIEGO, CA 92101  (619) 531-3040

☐ SAN DIEGO TRAFFIC COURT
8950 CLAIREMONT MESA BOULEVARD
SAN DIEGO, CA 92123  (858) 565-1006
NIGHT COURT - MON - FRI - 5:00 PM

☐ SOUTH BAY COURT
500 3rd AVENUE
CHULA VISTA, CA 91910  (619) 691-4726
NIGHT COURT THURSDAY - 5:30 PM

☐ APPEAR AT:

☐ To be notified

☐ YOU MUST APPEAR AT THE SAN DIEGO POLICE DEPARTMENT FOR FINGERPRINTING PRIOR TO YOUR COURT APPEARANCE.

Central of California                        § 853.9)      SEE REVERSE
TR-130

13-12

# SAN DIEGO POLICE DEPARTMENT
## NOTICE TO APPEAR

☑ MISDEMEANOR    DEFENDANT'S COPY
☐ Traffic   ☐ Nontraffic   **Y 035838**

| Date of Violation | Time | ☐ AM ☐ PM | Day of Week | Case No. |
|---|---|---|---|---|
| 11,03,04 | 0715 | | S M T W T F S | |

Name (First, Middle, Last): PAUL ARTHUR ALIMARK

☐ Owner's Responsibility (Veh. Code, § 40001)

Address: 299 17TH ST

| City | State | ZIP Code |
|---|---|---|
| S.D | CA | 92101 |

| Driver Lic. No. | State | Class | Age | Birth Date |
|---|---|---|---|---|
| A3357554 | A | | 47 | 05,21,57 |

| Sex | Hair | Eyes | Height | Weight | Race | ☐ Const. Zone ☐ School Zone |
|---|---|---|---|---|---|---|
| M | BRO | BRO | 5 4 | 150 | W | |

| Veh. Lic. No. or VIN | State | ☐ COMMERCIAL VEHICLE (Veh. Code, § 15210(b)) |
|---|---|---|

| Yr. of Veh. | Make | Model | Body Style | Color | ☐ HAZARDOUS MATERIAL (Veh. Code, § 353) |
|---|---|---|---|---|---|

Evidence of Financial Responsibility

Registered Owner of Lessee    ☐ Same as Driver

Address    ☐ Same as Driver

| City | State | ZIP Code |
|---|---|---|

Correctable Violation (Veh. Code, § 40610)   ☐ Booking Required   Misdemeanor or Infraction (Circle)

| Yes | No | Code and Section | Description | |
|---|---|---|---|---|
| ☐ | ☑ | 647 J Pc | ILLEGAL LODGING | Ⓜ I |
| ☐ | ☐ | | | M I |
| ☐ | ☐ | | | M I |
| ☐ | ☐ | | | M I |

| Speed Approx. | P.F./Max Spd. | Veh. Lmt. | Safe | Radar | ☐ Continuation Form Issued | N |
|---|---|---|---|---|---|---|

Location of Violation(s)
at: 1200 K ST (NCL)

COMMENTS: (Weather, Road & Traffic Conditions)   ☐ COLLISION
CLR   CLDY   FOG   RAIN   DRY   SLIPPERY   HVY.   MED.   LIGHT

☐ Violations not committed in my presence, declared on information and belief.
I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct.

| T BURNS | 4808 | CHRT 531 |
|---|---|---|
| Arresting or Citing Officer | I.D. No. | Command/Shift   Beat |

| / / | | | |
|---|---|---|---|
| Date | Name of Arresting Officer, if different from Citing Officer | I.D. No.   Command/Shift | Beat |

WITHOUT ADMITTING GUILT, I PROMISE TO APPEAR AT THE TIME AND PLACE INDICATED BELOW.

X Signature

WHEN: ON OR BEFORE THIS DATE: 01,07,05   TIME: 8:00 ☐ AM ☐ PM

WHAT TO DO: FOLLOW THE INSTRUCTIONS ON THE REVERSE

WHERE:
☐ JUVENILE COURT, DEPT. A
   2901 MEADOWLARK DRIVE
   SAN DIEGO, CA 92123   (858) 694-4201

☐ MISDEMEANOR ARRAIGNMENT DEPT.
   220 W. BROADWAY
   SAN DIEGO, CA 92101   (619) 531-3040

☐ SAN DIEGO TRAFFIC COURT
   8950 CLAIREMONT MESA BOULEVARD
   SAN DIEGO, CA 92123   (858) 565-1006
   NIGHT COURT - MON - FRI - 5:00 PM

☐ SOUTH BAY COURT
   500 3rd AVENUE
   CHULA VISTA, CA 91910   (619) 691-4726
   NIGHT COURT THURSDAY - 5:30 PM

APPEAR AT:
☐

☐ To be notified

☐ YOU MUST APPEAR AT THE SAN DIEGO POLICE DEPARTMENT FOR FINGERPRINTING PRIOR TO YOUR COURT APPEARANCE.

Notice to Appear form approved by the Judicial Council of California.
PD-177(B) (5-04)    (Veh. Code, §§ 40500(b), 40513(b), 40522, 40600; Pen. Code, § 853.9)

SEE REVERSE
TR-130

13-13

# Exhibit 14

# Shelter Call Report

| Area | Count |
|------|-------|
| District 1 (Gregory Cox) | 11 |
| District 2 (Dianne Jacob) | 10 |
| District 4 (Ron Roberts) | 4 |
| District 5 (Bill Horn) | 2 |

| Cases Unable to Aid | Count |
|---------------------|-------|
| Shelter is Full | 24 |

| Cases Referred To | Count |
|-------------------|-------|
| Other-Not seasonal shelter | 1 |
| SAMS | 1 |
| USM | 1 |

| | |
|---|---|
| **Total Calls** | 27 * |
| **Total Cases Referred** | 3 ** |
| **Total Cases Unable to Aid** | 24 ** |

\* Total Calls may not include records that are reflected in the Cases Referred To or Cases Unable to Aid sections because of invalid zip codes.

\** This total may reflect duplicate information where calls have both a positive referral status AND a positive Unable to Aid status for the same call.

# Shelter Call Report

Report Period    10/1/2004  To  10/1/2004

| Area | Count | | Cases Unable to Aid | Count |
|------|-------|---|---------------------|-------|
| District 1 (Gregory Cox) | 15 | | Shelter is Full | 22 |
| District 2 (Dianne Jacob) | 3 | | | |
| District 4 (Ron Roberts) | 4 | | | |
| District 5 (Bill Horn) | 1 | | | |

| Cases Referred To | Count |
|-------------------|-------|
| Other-Not seasonal shelter | 2 |

| | | |
|---|---|---|
| **Total Calls** | **23** * | |
| **Total Cases Referred** | **2** ** | |
| **Total Cases Unable to Aid** | **22** ** | |

\* Total Calls may not include records that are reflected in the Cases Referred To or Cases Unable to Aid sections because of invalid zip codes.

\*\* This total may reflect duplicate information where calls have both a positive referral status AND a positive Unable to Aid status for the same call.

14-2

# Shelter Call Report

| Area | Count |
|------|-------|
| District 1 (Gregory Cox) | 15 |
| District 2 (Dianne Jacob) | 3 |
| District 4 (Ron Roberts) | 4 |
| District 5 (Bill Horn) | 1 |

| Cases Unable to Aid | Count |
|---------------------|-------|
| Shelter is Full | 22 |

| Cases Referred To | Count |
|-------------------|-------|
| Other-Not seasonal shelter | 2 |

**Total Calls**                          23 *

**Total Cases Referred**            2 **

**Total Cases Unable to Aid**    22 **

\* Total Calls may not include records that are reflected in the Cases Referred To or Cases Unable to Aid sections because of invalid zip codes.

\*\* This total may reflect duplicate information where calls have both a positive referral status AND a positive Unable to Aid status for the same call.

14-3

# Shelter Call Report

| Area | Count |
|------|-------|
| District 1 (Gregory Cox) | 17 |
| District 2 (Dianne Jacob) | 5 |
| District 3 (Pam Slater) | 1 |
| District 4 (Ron Roberts) | 7 |
| District 5 (Bill Horn) | 5 |

| Cases Unable to Aid | Count |
|---------------------|-------|
| Client refused referral | 2 |
| Shelter is Full | 33 |

| Cases Referred To | Count |
|-------------------|-------|
| Seasonal Shelter-Not Listed | 1 |

| | |
|---|---|
| **Total Calls** | 35 * |
| **Total Cases Referred** | 1 ** |
| **Total Cases Unable to Aid** | 35 ** |

\* Total Calls may not include records that are reflected in the Cases Referred To or Cases Unable to Aid sections because of invalid zip codes.

\*\* This total may reflect duplicate information where calls have both a positive referral status AND a positive Unable to Aid status for the same call.

14-4

# Shelter Call Report

| Area | Count |
|------|-------|
| District 1 (Gregory Cox) | 11 |
| District 4 (Ron Roberts) | 1 |

| Cases Unable to Aid | Count |
|---------------------|-------|
| Shelter is Full | 5 |

| Cases Referred To | Count |
|-------------------|-------|
| SVDP (PMC) | 7 |

| | |
|---|---|
| **Total Calls** | **12** * |
| **Total Cases Referred** | **7** ** |
| **Total Cases Unable to Aid** | **5** ** |

* Total Calls may not include records that are reflected in the Cases Referred To or Cases Unable to Aid sections because of invalid zip codes.

** This total may reflect duplicate information where calls have both a positive referral status AND a positive Unable to Aid status for the same call.

14-5

# Shelter Call Report

| Area | Count |
|------|-------|
| District 1 (Gregory Cox) | 15 |
| District 2 (Dianne Jacob) | 4 |
| District 4 (Ron Roberts) | 8 |
| District 5 (Bill Horn) | 8 |
| Other and Unknown | 1 |

| Cases Unable to Aid | Count |
|---------------------|-------|
| Client hung up | 1 |
| Client refused referral | 1 |
| Shelter is Full | 32 |

| Cases Referred To | Count |
|-------------------|-------|
| Other-Not seasonal shelter | 1 |

Total Calls    36 *

Total Cases Referred    1 **

Total Cases Unable to Aid    34 **

* Total Calls may not include records that are reflected in the Cases Referred To or Cases Unable to Aid sections because of invalid zip codes.

** This total may reflect duplicate information where calls have both a positive referral status AND a positive Unable to Aid status for the same call.

14-6

# Shelter Call Report

| Area | Count |
|------|-------|
| District 1 (Gregory Cox) | 8 |
| District 2 (Dianne Jacob) | 11 |
| District 3 (Pam Slater) | 1 |
| District 4 (Ron Roberts) | 5 |
| District 5 (Bill Horn) | 3 |

| Cases Unable to Aid | Count |
|---------------------|-------|
| Client refused referral | 1 |
| Shelter is Full | 25 |

| Cases Referred To | Count |
|-------------------|-------|
| Seasonal Shelter-Not Listed | 2 |

**Total Calls**                         28 *

**Total Cases Referred**              2 **

**Total Cases Unable to Aid**      26 **

\* Total Calls may not include records that are reflected in the Cases Referred To or Cases Unable to Aid sections because of invalid zip codes.

\*\* This total may reflect duplicate information where calls have both a positive referral status AND a positive Unable to Aid status for the same call.

14-7

# Shelter Call Report

| Area | Count |
|------|-------|
| District 1 (Gregory Cox) | 17 |
| District 2 (Dianne Jacob) | 8 |
| District 3 (Pam Slater) | 1 |
| District 4 (Ron Roberts) | 7 |
| District 5 (Bill Horn) | 3 |

| Cases Unable to Aid | Count |
|---------------------|-------|
| Client refused referral | 2 |
| Shelter is Full | 34 |

**Cases Referred To**      **Count**

| | |
|------|------|
| **Total Calls** | 36 * |
| **Total Cases Referred** | #Error ** |
| **Total Cases Unable to Aid** | 36 ** |

\* Total Calls may not include records that are reflected in the Cases Referred To or Cases Unable to Aid sections because of invalid zip codes.

\*\* This total may reflect duplicate information where calls have both a positive referral status AND a positive Unable to Aid status for the same call.

14-8

# Shelter Call Report

| Area | Count |
|---|---|
| District 1 (Gregory Cox) | 9 |
| District 2 (Dianne Jacob) | 6 |
| District 3 (Pam Slater) | 2 |
| District 4 (Ron Roberts) | 5 |
| District 5 (Bill Horn) | 4 |

| Cases Unable to Aid | Count |
|---|---|
| Client refused referral | 1 |
| Shelter is Full | 23 |

| Cases Referred To | Count |
|---|---|
| Seasonal Shelter-Not Listed | 2 |

| | |
|---|---|
| Total Calls | 26 * |
| Total Cases Referred | 2 ** |
| Total Cases Unable to Aid | 24 ** |

\* Total Calls may not include records that are reflected in the Cases Referred To or Cases Unable to Aid sections because of invalid zip codes.

\*\* This total may reflect duplicate information where calls have both a positive referral status AND a positive Unable to Aid status for the same call.

14-9

# Exhibit 15

RESOLUTION NUMBER R-_____

DATE OF FINAL PASSAGE _____

A RESOLUTION OF THE COUNCIL OF THE CITY OF SAN
DIEGO REGARDING THE FY 2007 HOMELESS
EMERGENCY SHELTER PROGRAM.

WHEREAS, in March 1985, the City, the County of San Diego, and the United Way of

San Diego, in a cooperative arrangement, created the Regional Task Force on the Homeless; and

WHEREAS, on June 12, 1995, the City Council adopted City Council Policy 000-51

(Comprehensive Homeless Policy), which has served as the City's framework for addressing

homeless issues; and

WHEREAS, City Council Policy 000-51 supports the operation of emergency shelters,

whereby the City, in coordination with businesses, social service agencies, community groups,

and other jurisdictions, assess needs and promote programs that restore homeless persons to their

optimum participation in the community; and

WHEREAS, on May 8, 2006, the City Council adopted Resolution No. R-301425, in

which the City Council approved, among other things, $145,000 in CDBG funds for the

operation of the Winter Shelter Program, but placed a $65,000 increase in CDBG funds for the

Winter Shelter Program in a reserve account, subject to future approval; and

WHEREAS, in October 2006, the Regional Task Force on the Homeless reported an

estimated 4,225 homeless individuals living in the City of San Diego, and of those, 1,980 are

sheltered year-round; and

WHEREAS, there remains a shortage of 2,245 shelter beds in the City; and

15-1

15

WHEREAS, the weather conditions during the cold weather season have the potential to affect the health and safety of individuals subjected to long-term or constant exposure to the elements; and

WHEREAS, the City of San Diego and others desire to respond to the needs of the homeless during the cold weather season of 2006-2007 by providing funding to initiate programs and services; and

WHEREAS, the FY 2007 Homeless Emergency Shelter Program (previously known as the Winter Shelter Program) will serve approximately 400 persons each day, providing the participants (staying at the Single Adult, Veteran, and Family Emergency Shelters) access to programmatic services 7 days a week; NOW, THEREFORE

BE IT RESOLVED, by the Council of the City of San Diego, as follows:

1. That the City Council hereby finds that a significant number of persons within the City of San Diego are without the ability to obtain shelter, and that the weather conditions during the cold weather season result in a threat to the health and safety of those persons.

2. That a homeless shelter crisis is declared to exist in the City of San Diego, in accordance with California Government Code section 8698.2(a)(1).

3. That the FY 2007 Homeless Emergency Shelter Program [Program] (previously known as the Winter Shelter Program), as described in Report to the City Council

No. _____, a copy of which is on file with the Office of the City Clerk as Document No. RR-_____, is hereby approved.

4. That the Mayor or his designee is authorized to enter into a Memorandum of Understanding between the San Diego Housing Commission [SDHC] and the City of San Diego

15-2

for FY 2007, under which the City shall receive a total of $445,000 from the SDHC for the operation of the Program.

5.  That the City Auditor and Comptroller is authorized to accept the $445,000 from the SDHC for the operation of the Program.

6.  That the $65,000 increase in Community Development Block Grant [CDBG] funds for the Program, which was previously placed in a reserve account subject to future approval (pursuant to Resolution No. R-301425), is hereby approved, thereby increasing the total funding allocation for the Program to $655,000, consisting of $445,000 from the SDHC and $210,000 in CDBG funds.

7.  That the Mayor or his designee is authorized to enter into agreements and any amendments thereto, to expend the $445,000 from the SDHC and the $210,000 in CDBG funds for the operation of the Program, contingent upon certification of funds availability by the City Auditor and Comptroller.

8.  That the City Auditor and Comptroller is authorized to appropriate and expend the $445,000 from the SDHC and the $210,000 in CDBG funds for the operation of the Program.

9.  That the City Auditor and Comptroller is authorized to accept, appropriate, and expend any and all additional contributions, private donations, interest earnings, and other City funds associated with the Program, for the operation of the Program.

15-3

10.    That the Mayor or his designee is authorized to enter into agreements, and any amendments thereto, to expend any and all additional contributions, private donations, interest earnings, and other City funds associated with the Program, for the operation of the Program, contingent upon certification of funds availability by the City Auditor and Comptroller.

APPROVED:  MICHAEL J. AGUIRRE, City Attorney

By    _____
         Michael D. Neumeyer
         Deputy City Attorney

MDN:als
10/10/06
Or.Dept:Comm.Services Div.
R-2007-405
MMS#3908

I hereby certify that the foregoing Resolution was passed by the Council of the City of San Diego, at this meeting of _____.

                                        ELIZABETH S. MALAND
                                        City Clerk

                                        By_____
                                        Deputy City Clerk

Approved: _____          _____
                  (date)                          JERRY SANDERS, Mayor

Vetoed: _____            _____
                  (date)                          JERRY SANDERS, Mayor

15-4

**AGENDA FOR THE
REGULAR COUNCIL MEETING OF
MONDAY, OCTOBER 23, 2006 AT 6:00 P.M.
POINT LOMA NAZARENE UNIVERSITY
3900 LOMALAND DRIVE
SAN DIEGO, CA 92106**

--------------------------

ITEM-1:            ROLL CALL.

ITEM-10:           INVOCATION.

ITEM-20:           PLEDGE OF ALLEGIANCE.

## NON-AGENDA PUBLIC COMMENT

Non-agenda public comment is taken on Tuesday pursuant to the San Diego Municipal Code Section 22.0101.5.

## MAYOR, COUNCIL, INDEPENDENT BUDGET ANALYST, CITY ATTORNEY COMMENT

## UPDATES ON PENDING LEGISLATION (MAYOR'S OFFICE)

## REQUESTS FOR CONTINUANCE

The Council will now consider requests to continue specific items.

15-5

=== **LEGISLATIVE SCHEDULE** ===

Adoption Agenda, Discussion, Other Legislative Items

ITEM-200:    In the Matter of the United Way's Plan to End Chronic Homelessness in
the San Diego Region.  (Citywide.)
PUBLIC SAFETY AND NEIGHBORHOOD SERVICES
COMMITTEE'S RECOMMENDATION:  On 6/14/2006, PSNS voted 4
to 0 to accept the draft plan and direct the United Way and the Leadership
Council to develop an implementation plan for presentation to the full City
Council in conjunction with the final Plan to End Chronic Homelessness.


ITEM-201:    Report of the City Attorney on the Issuance of Illegal Lodging Tickets to
Homeless Persons.
CITY ATTORNEY'S RECOMMENDATION:  Take the action.


ITEM-202:    Fiscal Year 2007 Homeless Emergency Shelter Program.  (Citywide.)
STAFF'S RECOMMENDATION:  Adopt the resolution.

## CLOSED SESSION NOTICES, DISCLOSURE, AND PUBLIC COMMENT

In accordance with the San Diego City Council Permanent Rule for Noticing and Conduct of Closed Session Meeting, adopted on February 28, 2005, this portion of the agenda is reserved for City Attorney comment, public comment, and City Council discussion of the content of the Closed Session Agenda. Public testimony on Closed Session items is taken in Open Session on Monday's, except when there is no Monday meeting. Public testimony on Closed Session items is always taken prior to the actual Closed Session. Closed Session may take place any time after public testimony, but is typically held on Tuesdays at 9:00 a.m. The Closed Session Agenda is separately available in the Office of the City Clerk and also posted at the same locations as the Open Session Agenda, including the City internet address.

**NOTE:**     Members of the public wishing to address the City Council on any item on the Closed Session Agenda should reference the closed session item number from the Closed Session Docket on the speaker slip. Speakers may speak "in favor" or "in opposition" to the subject.

### Information Item - No Action Required - The City Council shall:

1) Consider any oral report from the City Attorney or City negotiators; 2) Accept testimony from any member of the public wishing to address the City Council on any item appearing on the Closed Session Agenda; 3) Questions and discussion by Council Members, limited to the facts as disclosed by the City Attorney or City negotiators and the basis or justification for consideration of the matter in closed session 4) Refer matters discussed to closed session.

15-7

### === LEGISLATIVE SCHEDULE (Continued) ===

<u>Public Notices</u>

ITEM-250:         **Notice** of Pending Final Map Approval – Estelle Condominiums.

ITEM-251:         **Notice** of Pending Final Map Approval – 4328 McClintock Street.

ITEM-252:         **Notice** of Pending Final Map Approval – 4398 Delta Street
                  Condominiums.

<u>Non-Docket Items</u>

<u>Adjournment in Honor of Appropriate Parties</u>

<u>Adjournment</u>

15-8

=== EXPANDED CITY COUNCIL AGENDA ===

16-9

ADOPTION AGENDA, DISCUSSION, OTHER LEGISLATIVE ITEMS

ITEM-200:   In the Matter of the United Way's Plan to End Chronic Homelessness in the San Diego Region.

(See Report to the City Council No. 06-072; Draft September 2005 Plan to End Chronic Homelessness in the San Diego Region; Regional Continuum of Care Council's June 10, 2006 Recommendations; Tony Phillips' June 7, 2006 letter; Steven A. Escoboza's June 6, 2006 letter; Jonathan Hunter's June 2, 2006 letter; Honorable Robert C. Coates' June 2, 2006 letter; Theresa Quiroz's June 14, 2006 email; Lt. Colonel Doug O; Brien's, Jim Jackson's, Father Joe Carroll's, and Rosemary Johnston's June 13, 2006 letter; and Philip F. Mangano's June 12, 2006 letter. Citywide.)

**TODAY'S ACTION IS:**

Take the following actions:

A discussion and possible direction and action on the United Way's Plan to End Chronic Homelessness;

Directing the City Attorney to prepare the appropriate resolution in accordance with Charter Section 40.

**PUBLIC SAFETY AND NEIGHBORHOOD SERVICES COMMITTEE'S RECOMMENDATION:**

On 6/14/2006, PSNS voted 4 to 0 to accept the draft plan and direct the United Way and the Leadership Council to develop an implementation plan for presentation to the full City Council in conjunction with the final Plan to End Chronic Homelessness. (Council President Pro Tem Young, Councilmembers Faulconer, Maienschein, and Hueso voted yea.)

**SUPPORTING INFORMATION:**

The San Diego Regional Task Force on Homelessness estimates that San Diego County has more than 9,600 homeless people. A subgroup that tends to be the most visible and utilize a disproportionate amount of resources is a group of approximately 1,400 people who experience homelessness on a protracted or repeated basis. This subgroup, the chronically homeless, consists primarily of single male and female adults frequently experiencing schizophrenia or bipolar disorder, substance abuse, physical disabilities, and frequent prolonged homelessness.

In late 2003, the US Interagency Council on Homelessness on behalf of the Bush administration challenged 100 cities and counties to pass a plan to end chronic homeless. San Diego was one of those cities.

15-10

ADOPTION AGENDA, DISCUSSION, OTHER LEGISLATIVE ITEMS  (Continued)

ITEM-200:  (Continued)

## SUPPORTING INFORMATION:  (Continued)

In January 2004, the City of San Diego passed a resolution "that this Council hereby, in a joint effort with the County of San Diego, will actively collaborate to develop a 10-year Plan to End Chronic Homelessness for the region...... and implement the necessary policies to work toward the elimination of chronic homelessness." In June 2004, the County passed a similar resolution. In September 2004, both entities entered into a MOA with United Way San Diego to be the Convener of the Plan and develop a regional plan and carry it through the approval process.

The purpose of this report is to update the PS&NS Committee on the progress as requested by Resolution R-2004-721 and furthermore to request permission to move ahead with the development of an Implementation Plan to be included in the Final Chronic Plan.

A steering committee known as the Leadership Council was formed to provide oversight and executive leadership for the plan. Six committees and four sub-committees composed of service providers, business representatives, academia, legal experts, philanthropy, government participants and interested individuals met regularly for seven months to develop the core of the chronic plan. The San Diego Plan focuses on two key elements, Housing First/Housing Plus and Prevention.

**Housing First/Housing Plus Model:**  In cities across the United States, permanent Supportive housing has been shown to be an effective and efficient means to take the chronically homeless off the streets. Early research has shown that providing independent supportive housing, as the first step for the chronically homeless, may have a greater impact on reducing homelessness and improving quality of life than the more traditional sequence of placements from emergency shelters through transitional housing, and then on to supervised independent living.

The Plan recommends permanent supportive housing for chronically homeless individuals and families as the most productive means to end chronic homelessness in the San Diego region. In order to provide the number of units needed to accomplish this goal, it will be necessary to build permanent supportive housing, rehabilitate existing housing, maximize master leasing opportunities, adapt other buildings for use as permanent supportive housing, and address permitting requirements for each type of housing.

**Prevention Plan:** The second focus of the Plan is prevention. In order to end chronic homelessness, the Plan strongly urges renewed efforts be directed at preventing chronic homelessness. San Diego has approximately 200 agencies and programs that service the homeless. More often than not services are initiated after the state of homelessness is reached. It is recommended that a prevention plan be implemented in tandem with the Housing First/Housing Plus model.

15-11

ADOPTION AGENDA, DISCUSSION, OTHER LEGISLATIVE ITEMS (Continued)

ITEM-200: (Continued)

**SUPPORTING INFORMATION:** (Continued)

Both initiatives overlap in many areas and should be viewed as complimentary endeavors to ending chronic homelessness. The goal of the implementation plan will be to forestall and prevent homelessness for those at imminent risk by expanding the range and availability of prevention strategies, increasing their immediate accessibility, and improving their long-term effectiveness.

FISCAL CONSIDERATIONS:
None.

PREVIOUS COUNCIL and/or COMMITTEE ACTION:
In January 2004, the City of San Diego passed a resolution "that this Council hereby, in a joint effort with the County of San Diego, will actively collaborate to develop a 10-year Plan to End Chronic Homelessness for the region...... and implement the necessary policies to work toward the elimination of chronic homelessness". In June 2004, the County passed a similar resolution. In September 2004, both entities entered into a MOA with United Way San Diego to be the Convener of the Plan and develop a regional plan and carry it through the approval process.

COMMUNITY PARTICIPATION AND PUBLIC OUTREACH EFFORTS:
Appendix C pages C-1 through C-4 in the draft Plan lists the many individuals who participated in the development of the draft Plan. Numerous presentations were made to community groups, service providers, business groups, in private meetings and other cities. The Plan was widely distributed many times via e-mail to hundreds of individuals and agencies from the original working plan to the final draft Plan. The Plan is on the United Way San Diego web site and solicits comments.

KEY STAKEHOLDERS AND PROJECTED IMPACTS:
See attached list of the stakeholder organizations and elected officials to whom the draft report was mailed. Many positive comments were received and many recommendations will be incorporated into the final Plan.

Lansdowne/Olen

15-12

ADOPTION AGENDA, DISCUSSION, OTHER LEGISLATIVE ITEMS  (Continued)

ITEM-201:   Report of the City Attorney on the Issuance of Illegal Lodging Tickets to
            Homeless Persons.

            (See memorandums from the City Attorney dated 10/11/2006.)

## CITY ATTORNEY'S RECOMMENDATION:

Take the following action:

Accepting the City Attorney's Report.

15-13

Put in Request 11-3-06  25¢ per page
PMN Also will call 11-6-06

# ADOPTION AGENDA, DISCUSSION, OTHER LEGISLATIVE ITEMS

RESOLUTIONS:

ITEM-202:   Fiscal Year 2007 Homeless Emergency Shelter Program.

(See Report to the City Council No. 06-153. Citywide.)

## STAFF'S RECOMMENDATION:

Adopt the following resolution:

(R-2007-405)

Finding that a significant number of persons within the City of San Diego are without the ability to obtain shelter, and that the weather conditions during the cold weather season result in a threat to the health and safety of those persons;

Declaring a homeless shelter crisis to exist in the City of San Diego, in accordance with California Government Code Section 8698.2(a)(1);

Approving the FY 2007 Homeless Emergency Shelter Program (Program) (previously known as the Winter Shelter Program), as described in Report to the City Council No. 06-153;

Authorizing the Mayor, or his designee, to enter into a Memorandum of Understanding between the San Diego Housing Commission (SDHC) and the City of San Diego for FY 2007, under which the City shall receive a total of $445,000 from the SDHC for the operation of the Program;

Authorizing the City Auditor and Comptroller to accept the $445,000 from the SDHC for the operation of the Program;

Approving the $65,000 increase in Community Development Block Grant (CDBG) funds for the Program, which was previously placed in a reserve account subject to future approval (pursuant to Resolution No. R-301425), thereby increasing the total funding allocation for the Program to $655,000, consisting of $445,000 from the SDHC and $210,000 in CDBG funds;

Authorizing the Mayor, or his designee, to enter into agreements and any amendments thereto, to expend the $445,000 from the SDHC and the $210,000 in CDBG funds for the operation of the Program, contingent upon certification of funds availability by the City Auditor and Comptroller;

15-14

ADOPTION AGENDA, DISCUSSION, OTHER LEGISLATIVE ITEMS (Continued)

RESOLUTIONS: (Continued)

ITEM-202: (Continued)

Authorizing the City Auditor and Comptroller to appropriate and expend the $445,000 from the SDHC and the $210,000 in CDBG funds for the operation of the Program;

Authorizing the City Auditor and Comptroller to accept, appropriate, and expend any and all additional contributions, private donations, interest earnings, and other City funds associated with the Program, for the operation of the Program;

Authorizing the Mayor, or his designee, to enter into agreements, and any amendments thereto, to expend any and all additional contributions, private donations, interest earnings, and other City funds associated with the Program, for the operation of the Program, contingent upon certification of funds availability by the City Auditor and Comptroller.

**STAFF SUPPORTING INFORMATION:**

There are an estimated 4,225 homeless individuals living in the City of San Diego, and of those, 1,980 are sheltered year-round. Hence, there remains a shortage of 2,245 shelter beds in the City. The weather conditions during the cold weather season have the potential to affect the health and safety of individuals subjected to long-term or constant exposure to the elements. Given the existing shortage of available shelter beds, it is recommended that a homeless shelter crisis be declared in the City, and that the Program be adopted in an effort to address the crisis.

The Program consists of three separate programs: Single Adult Shelter, operated by Alpha Project for the Homeless; Veterans Shelter, operated by Veteran's Village of San Diego; and Family Emergency Shelter, administered by the County of San Diego. The Program adds 400 shelter beds, reducing the unmet need to 1,845 shelter beds during Program operations.

On May 8, 2006, the City Council, in Resolution No. R-301425, approved, among other things, $145,000 in CDBG funds for the operation of the Winter Shelter Program for a period of 100 days (from December 13, 2006 to March 22, 2007), but placed a $65,000 increase in CDBG funds for the Winter Shelter Program in a reserve account, subject to future approval. This action recommends approving the $65,000 in reserved CDBG funds to operate the Program for an additional twenty days, for a total of 120 days, from December 13, 2006 through April 11, 2007. In addition, Alpha Project for the Homeless has offered to raise additional funds to expand the Single Adult Shelter by 46 days to 166 days. The expanded periods will be from November 1 through December 12, 2006, and from April 12 through April 15, 2007.

15-15

ADOPTION AGENDA, DISCUSSION, OTHER LEGISLATIVE ITEMS (Continued)

RESOLUTIONS: (Continued)

ITEM-202: (Continued)

**STAFF SUPPORTING INFORMATION:** (Continued)

FISCAL IMPACT:
There is no net impact to the City's General Fund from this action. This action accepts $445,000 from the SDHC, and approves $65,000 in CDBG funds (in addition to the $145,000 in CDBG funds previously approved in Resolution No. R-301425), for the operation of the Program, for a total Program budget of $655,000. A summary of the Operational Budget for the Program is included in Exhibit A attached to the Report to the City Council.

It should be noted that the $445,000 from the SDHC may not be available for transfer to the City by December 13, 2006, the start of the City-funded portion of the Program. As a result, the City's General Fund may be needed to temporarily front funds to the Program until such time the $445,000 from the SDHC is transferred to the City.

PREVIOUS COUNCIL and/or COMMITTEE ACTION:
Resolution No. R-301425.

COMMUNITY PARTICIPATION AND PUBLIC OUTREACH EFFORTS:
None.

KEY STAKEHOLDERS AND PROJECTED IMPACTS:
Residents and business owners in the East Village community and Midway area. In addition, Program partners include the SDHC, the County of San Diego's Health and Human Services Agency (health care workers and case managers), and various non-profit and veteran agencies, who provide support services at no cost to the Program.

Linares/Martinez

Staff:  Ernie Linares - (619) 236-6719
        Michael D. Neumeyer - Deputy City Attorney

## CLOSED SESSION NOTICES, DISCLOSURE, AND PUBLIC COMMENT

In accordance with the San Diego City Council Permanent Rule for Noticing and Conduct of Closed Session Meeting, adopted on February 28, 2005, this portion of the agenda is reserved for City Attorney comment, public comment, and City Council discussion of the content of the Closed Session Agenda. Public testimony on Closed Session items is taken in Open Session on Monday's, except when there is no Monday meeting. Public testimony on Closed Session items is always taken prior to the actual Closed Session. Closed Session may take place any time after public testimony, but is typically held on Tuesdays at 9:00 a.m. The Closed Session Agenda is separately available in the Office of the City Clerk and also posted at the same locations as the Open Session Agenda, including the City internet address.

**NOTE:**    Members of the public wishing to address the City Council on any item on the Closed Session Agenda should reference the closed session item number from the Closed Session Docket on the speaker slip. Speakers may speak "in favor" or "in opposition" to the subject.

### Information Item - No Action Required - The City Council shall:

1) Consider any oral report from the City Attorney or City negotiators; 2) Accept testimony from any member of the public wishing to address the City Council on any item appearing on the Closed Session Agenda; 3) Questions and discussion by Council Members, limited to the facts as disclosed by the City Attorney or City negotiators and the basis or justification for consideration of the matter in closed session 4) Refer matters discussed to closed session.

15-19

PUBLIC NOTICES:
Items are listed under Public Notice as a matter of public record only. These items do not require Council action and there is no public testimony.

ITEM-250:   **Notice** of Pending Final Map Approval – Estelle Condominiums.

Notice is hereby given that the City Engineer has reviewed and will approve on this day the subdivision of land shown on that certain final map entitled "Estelle Condominiums" (T.M. No. 241227/PTS No. 93899), located on the west side of Cherokee Avenue between Wightman Street and Landis Street in the Mid-City: Normal Heights Community Plan Area in Council District 3, a copy of which is available for public viewing at the Office of the San Diego City Clerk. Specifically, the City Engineer has caused the map to be examined and has made the following findings:

(1) The map substantially conforms to the approved tentative map, and any approved alterations thereof and any conditions of approval imposed with said tentative map.

(2) The map complies with the provisions of the Subdivision Map Act and any local ordinances applicable at the time of approval of the tentative map.

(3) The map is technically correct.

Said map will be finalized and recorded unless a valid appeal is filed. Interested parties will have 10 calendar days from the date of this Council hearing to appeal the above findings of the City Engineer to the City Council. A valid appeal must be filed with the City Clerk no later than 2:00 p.m., 10 calendar days from the date of this Notice stating briefly which of the above findings made by the City Engineer was improper or incorrect and the basis for that conclusion. If you have questions about the approval findings or need additional information about the map or your appeal rights, please feel free to contact Deputy City Engineer Lee Hennes at (619) 446-5291.

15-18

PUBLIC NOTICES: (Continued)
Items are listed under Public Notice as a matter of public record only. These items do not require Council action and there is no public testimony.

ITEM-251: **Notice** of Pending Final Map Approval – 4328 McClintock Street.

Notice is hereby given that the City Engineer has reviewed and will approve on this day the subdivision of land shown on that certain final map entitled "4328 McClintock Street" (T.M. No. 75736/PTS No. 99716), located on the west side of McClintock Street between Meade Avenue and El Cajon Boulevard in the Mid-City: Normal Heights Community Plan Area in Council District 3, a copy of which is available for public viewing at the Office of the San Diego City Clerk. Specifically, the City Engineer has caused the map to be examined and has made the following findings:

(1) The map substantially conforms to the approved tentative map, and any approved alterations thereof and any conditions of approval imposed with said tentative map.

(2) The map complies with the provisions of the Subdivision Map Act and any local ordinances applicable at the time of approval of the tentative map.

(3) The map is technically correct.

Said map will be finalized and recorded unless a valid appeal is filed. Interested parties will have 10 calendar days from the date of this Council hearing to appeal the above findings of the City Engineer to the City Council. A valid appeal must be filed with the City Clerk no later than 2:00 p.m., 10 calendar days from the date of this Notice stating briefly which of the above findings made by the City Engineer was improper or incorrect and the basis for that conclusion. If you have questions about the approval findings or need additional information about the map or your appeal rights, please feel free to contact Deputy City Engineer Lee Hennes at (619) 446-5291.

15-19

## PUBLIC NOTICES: (Continued)

Items are listed under Public Notice as a matter of public record only. These items do not require Council action and there is no public testimony.

ITEM-252: **Notice** of Pending Final Map Approval – 4398 Delta Street Condominiums.

Notice is hereby given that the City Engineer has reviewed and will approve on this day the subdivision of land shown on that certain final map entitled "4398 Delta Street Condominiums" (T.M. No. 174184/PTS No. 98618), located on the north side of Delta Street east of 43rd Street in the Southeastern San Diego Community Plan Area in Council District 4, a copy of which is available for public viewing at the Office of the San Diego City Clerk. Specifically, the City Engineer has caused the map to be examined and has made the following findings:

(1) The map substantially conforms to the approved tentative map, and any approved alterations thereof and any conditions of approval imposed with said tentative map.

(2) The map complies with the provisions of the Subdivision Map Act and any local ordinances applicable at the time of approval of the tentative map.

(3) The map is technically correct.

Said map will be finalized and recorded unless a valid appeal is filed. Interested parties will have 10 calendar days from the date of this Council hearing to appeal the above findings of the City Engineer to the City Council. A valid appeal must be filed with the City Clerk no later than 2:00 p.m., 10 calendar days from the date of this Notice stating briefly which of the above findings made by the City Engineer was improper or incorrect and the basis for that conclusion. If you have questions about the approval findings or need additional information about the map or your appeal rights, please feel free to contact Deputy City Engineer Lee Hennes at (619) 446-5291.

## NON-DOCKET ITEMS

## ADJOURNMENT IN HONOR OF APPROPRIATE PARTIES

## ADJOURNMENT

15-20

# Exhibit 16

**SignOnSanDiego.com**
THE SAN DIEGO UNION-TRIBUNE

 **PRINTTHIS**

[🖨 Click to Print]     SAVE THIS | EMAIL THIS | Close

# Sanders, police chief criticize homeless plan

### Aguirre proposed setting aside areas to sleep without citations

**By Maureen Magee**
UNION-TRIBUNE STAFF WRITER

**September 22, 2006**

San Diego's mayor and police chief yesterday all but ruled out any notion that the city would establish downtown safe zones where the homeless could sleep without the threat of illegal-lodging citations.

At a hastily called news conference outside Petco Park, the two said they were blindsided by a proposal from City Attorney Michael Aguirre that would designate citation-free districts overnight as part of a settlement to a lawsuit that seeks to stop police from ticketing and arresting the homeless for sleeping in public.

Both Mayor Jerry Sanders and police Chief William Lansdowne called the proposal misguided and one that would welcome the homeless and invite crime.

"My most immediate concern is that this does nothing to solve the systemic problem of homelessness," Sanders said. "If anything, it sends the message that homelessness is an acceptable option. That we have given up – and so now, it's OK to sleep on the streets. That doesn't work for me."

EARNIE GRAFTON / Union-Tribune
Mayor Jerry Sanders and police Chief William Lansdowne spoke outside Petco Park.

Sanders urged the City Council to reject any plan to establish such zones and continue efforts to address the homeless problem. The proposed settlement to the suit was largely modeled after one that was shot down by the Los Angeles City Council on Tuesday. That plan had the support of the mayor and police chief.

Aguirre was undaunted by the mayor's sharp criticism of the homeless sleep zones. Aguirre said he would push ahead with his proposal while exploring other ways to settle the lawsuit.

"I have to reconcile what the mayor wants to do with what the courts want us to do as a matter of law," Aguirre said. "What we don't want is a court order that would come with a lot less flexibility."

The American Civil Liberties Union sued Los Angeles on behalf of several homeless individuals, and in April the 9th U.S. Circuit Court of Appeals, in a 2-1 decision, ruled that the city's ordinance barring

sleeping on public sidewalks was unconstitutional because there are more homeless people in Los Angeles County than shelter beds.

The San Diego lawsuit was filed in 2004 after nine homeless people were ticketed at a time when there was no shelter space. A judge rejected the city's request to dismiss the case, basing its decision on the U.S. Court of Appeals ruling in the Los Angeles case.

On Tuesday, the San Diego City Attorney's office told U.S. Magistrate Judge William McCurine Jr. that the city was entering into settlement negotiations with lawyers representing the homeless plaintiffs.

It was after that court appearance that lawyers aggressively began work on a compromise that would include zones where the homeless could sleep legally between 9 p.m. and 6 a.m. Heavy tourism areas could have been exempted from the proposal, which could have called for the city to dismiss outstanding illegal-lodging citations.

The plan also called for continued police enforcement, including issuing citations for drug use, vandalism and other offenses.

Sanders said he was unaware of Aguirre's intent to settle the case, adding that Aguirre's "heart was in the right place." It was another example of communication problems between City Hall and its chief counsel.

Councilman Kevin Faulconer, who represents much of downtown, said he firmly opposes the city attorney's proposal.

"I appreciate what the city attorney is trying to do, and I do not fault his motives," Faulconer said. "But I think (the proposal) sends the message that sleeping on the street is an acceptable option and it's not. Of course it's happening. All you have to do is drive downtown to see it."

Attorney Scott Drehr, who represents the homeless and who helped draft the controversial proposal, lashed out at the city yesterday for misleading the judge. He called off settlement negotiations and vowed to inform the court of the city's "bad faith actions and litigation delay tactics, and seek sanctions."

"It's just typical," Drehr said. "The city had a chance to do something, the right thing. True to form, they did nothing."

Even the locale of Sanders' news conference offended Drehr. Petco Park is in the heart of East Village, considered to be ground zero for the culture clash of homeless and new residents and business owners who flocked to the once-rundown area once the ballpark was built – with about $300 million in public money.

"Petco Park is a symbol that the city uses to pretend the homeless don't exist," Drehr said. "That project has moved them out."

Lansdowne stressed that police issue citations only as a last resort and after complaints are reported from the public. He also said that social services are available to many who sleep on the streets. Even so, he said citations are an effective tool needed to manage the city's homeless problem.

Perhaps no one disagrees more than Larry Milligan, who reluctantly ended a nine-day fast to protest

16-2

the practice of issuing illegal-lodging tickets yesterday at the urging of lawyers and doctors.

"Contrary to what the city says," Milligan said, "these homeless people are citizens and they deserve to be protected."

■Maureen Magee: (619) 293-1369; **maureen.magee@uniontrib.com**

**Find this article at:**
http://www.signonsandiego.com/news/metro/20060922-9999-1n22homeless.html

 Click to Print

☐ Check the box to include the list of links referenced in the article.

SAVE THIS | EMAIL THIS | Close

**Exhibit 17**



# San Diego City Attorney
# MICHAEL J. AGUIRRE

## NEWS RELEASE

**FOR IMMEDIATE RELEASE: SEPTEMBER 21, 2006**
Contact: Jeff Van Deerlin, Public Affairs Manager (619) 235-5725 (direct line & pager) mvelasquez@sandiego.gov

## CITY ATTORNEY STANDS BY LEGAL OBLIGATION TO PROPOSE HOMELESS SLEEPING SOLUTIONS

**San Diego, CA** – City Attorney Michael Aguirre today stood by the proposed ordinance being prepared by his Office regarding the City of San Diego ticketing violators of illegal lodging laws. The proposal is part of a comprehensive legal settlement in the *Spencer v. City of San Diego* lawsuit filed in federal court. The lawsuit is the twin of another case, *Jones v. City of Los Angeles*, based on the Eighth Amendment of the U.S. Constitution, citing jail as "cruel and unusual punishment" for sleeping on public property. In the L.A. case, the Ninth District Court of Appeals opined:

> *We do not suggest that Los Angeles adopt any particular social policy, plan, or law to care for the homeless...there is obviously a "homeless problem"...which the City is free to address in any way that it sees fit...all we hold is that, so long as there is a greater number of homeless individuals in Los Angeles than the number of available beds, the City may not enforce section 41.18(d) at all times and places throughout the City against homeless individuals for involuntarily sitting, lying, and sleeping in public. Appellants are entitled at a minimum to a narrowly tailored injunction against...enforcement...at certain times and/or places.*

In other words, the City of Los Angeles was told that it must provide certain times when or certain places where ticketing or jailing violators of the illegal lodging laws cannot take place. Those working to settle the cases in both cities are drafting proposed ordinances that comply with this ruling. City Attorney Aguirre noted that the City of San Diego is already subject to a series of outside injunctions and oversight proposals.

"We are now looking at the possibility of another injunction being issued against our current practice of treating homeless men, women and children asleep in our City as a criminals. Our challenge as a City is to find a time and/or a place where they are free to sleep."

Settlement talks in the *Spencer v. City of San Diego* case have resumed as of today and plans are being made for San Diego Deputy City Attorneys to meet with the Los Angeles City Attorney's Office next week with the aim of creating a consistent legal settlement that will have full review by Mayor Sanders and the San Diego City Council in the coming weeks.

### ###

17-1

# Exhibit 18



### The LEWIN GROUP

# Costs of Serving
# Homeless Individuals in Nine Cities

# CHART BOOK

*November 19, 2004*

Prepared for:

The Corporation for Supportive Housing

18·1

# Cost Estimates – High/Median/Low City



Source: The Lewin Group

# Atlanta Cost Estimates



Source: The Lewin Group

18·2

# Boston Cost Estimates



Source: The Lewin Group

# Chicago Cost Estimates



*Data not available. Estimate modeled based on the relationship of average shelter costs to costs in other settings among remaining cities, adjusted to reflect average service cost levels in Chicago.

Source: The Lewin Group

18·3

# Columbus Cost Estimates



Source: The Lewin Group

# Los Angeles Cost Estimates



Source: The Lewin Group

# New York Cost Estimates



Source: The Lewin Group

# Phoenix Cost Estimates



Source: The Lewin Group

18·5

# San Francisco Cost Estimates



Source: The Lewin Group

# Seattle Cost Estimates



Source: The Lewin Group

This chart book presents estimates of the costs of serving homeless individuals in six alternative settings in nine cities. In addition to the estimates, this document includes: definitions for each of the six service settings for which estimates are presented, indicating the types of services generally reflected in the cost estimates; a description of how a single point estimate was calculated for each setting for each city; and a listing of the organizations that provided the estimates used.

# SETTING DEFINITIONS

## SHELTER

- Shelters are defined as temporary housing available for the homeless over one night or several nights.

- Most cost estimates include the following services: food, administrative costs, case management, health care services or referrals, housing costs associated with rent, mortgage, or costs associated with the ownership of property.

- Some cost estimates also include additional services: employment assistance, dental care, vision care, laundry, support groups, showers, optional worship services, mental health care, telephone use, and legal assistance.

## JAIL

- Jails are defined as locally-operated correctional facilities.

- Most cost estimates include the following services: food, shelter and other housing costs, administrative costs, clothing, and security.

- Some cost estimates also include additional services: healthcare, laundry, and other supplies and services for inmates.

## PRISON

- Prisons are state-operated correctional facilities.

- Most cost estimates include the following services: operating and administrative cost, and all other prison services.

- Some cost estimates also include additional services: health care, dental care, and security.

- Some cost estimates do not include capital costs.

## HOSPITAL

- Hospitals are defined as general, short-term stay inpatient institutions providing medical care by professionals including doctors and nurses.

- Cost estimates were calculated according to the total inpatient cost per day.

18-7

## MENTAL HOSPITAL

- Mental Hospitals are hospital specializing in the treatment of patients with mental illness.
- Cost estimates were calculated according to the total inpatient cost per day.

## SUPPORTIVE HOUSING

- Supportive Housing is defined as housing that combines building features and personal services to enable people to remain living in the community as long as they are able and choose to do so.
- Most cost estimates include the following services: operating costs, housing, utilities, case management, employment services, staffing, administration of service, and capital costs.
- Some cost estimates also include additional services: food, occupancy costs, mental health or psychiatric services, physical/occupational/medical services, crisis intervention, support groups, conflict resolution and mediation, recovery readiness services, daily living skills assistance, recreational/socialization opportunities, personal money management, legal assistance, tenants' rights education, transportation and food/nutritional services, on-site preventive health and nursing services, 24 hour front desk or coverage, resource center with computer, and classrooms/meeting rooms.
- Some cost estimates do not include: administrative costs, health care, and capital costs.

19-8

# COST ESTIMATE METHODOLOGY

Cost estimates were derived from the best available data for each setting. Estimates represent the average cost of providing one day of service to an individual in each setting, and are meant to capture the underlying costs of providing services, as opposed to the payments received from various public payers.

## SHELTER

- Cost estimates by various sources were used.

- If sources gave multiple cost estimates, the weighted average of all estimates were used to calculate costs. The weighted average was calculated by dividing the total costs of services by the total amount of people served.

- For one city, Chicago, direct cost estimates were not available at time of publication. An estimated shelter cost was calculated based on the relationship of average shelter costs to costs in other settings among the remaining eight cities, adjusted to reflect average service cost levels in Chicago.

## JAIL

- Cost estimates were collected through personal communication with various stakeholders in each city.

## PRISON

- Cost estimates were collected through personal communication with various stakeholders in each city.

## HOSPITAL

- Cost estimates were derived from Medicare Cost Report data for FY 2002.

- Hospitals were defined as general, short term care hospitals only. Thus, specialized hospitals (e.g. heart, behavioral health, eye and ear) were excluded from the sample.

- Cost estimates (i.e. total inpatient costs per day) were calculated for each hospital by dividing the total inpatient costs by the total inpatient days, and the median value was used.

## MENTAL HOSPITAL

- Cost estimates were derived from Medicare Cost Report data for FY 2002.

- Cost estimates (i.e. total inpatient costs per day) were calculated for each hospital by dividing the total inpatient costs by the total inpatient days, and the median value was used.

- Mental hospitals were defined as specialized psychiatric service hospitals.


18-9

## SUPPORTIVE HOUSING

- Cost estimates were collected through personal communication with various stakeholders in each city.

- If sources gave multiple cost estimates, the weighted average of all estimates was used to calculate cost. The weighted average was calculated by dividing the total costs by the total amount of people served.

18-10

## CONTACTS AND SOURCES

### SHELTER

San Francisco, California – Episcopal Community Services, 2003-2004

Los Angeles (LA County), California – The Weingart Institute for Hunger and Homelessness

Atlanta, Georgia – Atlanta Union Mission

New York City (all 5 boroughs), NY – City of New York, Mayor's Management Report, FY 2004

Columbus, Ohio – Community Shelter Board, 2003 Program Evaluation

Chicago, Illinois

Seattle, Washington – Downtown Emergency Service Center

Phoenix, Arizona – Central Arizona Shelter Services

Boston, Massachusetts – Elizabeth Stone House

Boston, Massachusetts – Boston Public Health Commission, Long Island Shelter

Boston, Massachusetts – Shelter, Inc.

### JAIL

San Francisco, California – San Francisco Sheriff's Office

Los Angeles (LA County), California – Los Angeles Sheriff's Office, 2004

Atlanta, Georgia – Atlanta Department of Corrections

New York City (all 5 boroughs), NY – City of New York, Mayor's Management Report, FY 2004

Columbus, Ohio – Franklin County Sheriff's Office

Chicago, Illinois – Supportive Housing Providers Association, and Staff of Cook County Department of Corrections

Seattle, Washington – King County Auditors' Office, Special Study: King County Jails

Phoenix, Arizona – Maricopa County Jail Sheriff's Office, County Department of Budgets

Boston, Massachusetts – Suffolk County Jail Communications Department

### PRISON

San Francisco, California – California Department of Corrections

Los Angeles (LA County), California – California Department of Corrections

Atlanta, Georgia – Georgia Department of Corrections

New York City (all 5 boroughs), NY – New York State Department of Correctional Services

Columbus, Ohio – Ohio Department of Rehabilitation and Corrections

Chicago, Illinois – Illinois Department of Corrections, Financial Impact Statement

Seattle, Washington – Washington State FY 2004 Inactive Budget, and Washington State Department of Corrections, Office of Budget and Research

Phoenix, Arizona – Arizona Department of Corrections, Per capita cost for FY 2002

Boston, Massachusetts – Massachusetts Department of Corrections

## HOSPITAL

No interviews required. Costs for all nine cities were derived from Medicare Cost Reports for FY 2002

## MENTAL HOSPITAL

No interviews required. Costs for all nine cities were derived from Medicare Cost Reports for FY 2002

## SUPPORTIVE HOUSING

San Francisco, California – Episcopal Community Services, Baker Places, and Conard House

Los Angeles (LA County), California – Skid Row Housing Trust

Atlanta, Georgia – Georgia Department of Community Affairs, Homeless Act Plan to End Homelessness in Ten Years

New York City (all 5 boroughs), NY – Common Ground Community, Bowery Residents' Committee, Inc.

Columbus, Ohio – Community Shelter Board, 2003 Program Evaluation

Chicago, Illinois – Supportive Housing Providers Association

Seattle, Washington – Downtown Emergency Service Center

Phoenix, Arizona – Central Arizona Shelter Services, and Homeless Planning for Maricopa County

Boston, Massachusetts – Shelter, Inc., and St. Francis House

18-12

# Exhibit 19



SAN DIEGO
OUR PAMPERED Pets

Archives   Dining   Travel   Entertainment   Metro   Subscribe   Custom Publishing   Home

# Down and Out in Balboa Park

» Subscribe Now

*To investigate homelessness in San Diego, our author lived on the streets for two weeks, coming away with an arresting account of life as one of society's have-nots.*

By s.d. liddick | Photographs by Marta Prachar

**Your San Diego Guide**

-- Choose --

Search San Diego Magazine

Go!


Escape to paradise starting at $599



Terry "Bull" Lohman, veteran, father and one of San Diego's chronically homeless.

- **Advertising Center**
- **Subscriber Center**
- **Magazine Locations...**
- **Advance Copies**
- **About San Diego Mag**



Arrival Date:

September
31
Nights
1
Rooms
1

Search

more search options



**Casino Pauma**
Located just 12 miles east of HWY 15 off the 76. Click here to see our promotions:

**ON THE MORNING OF FEBRUARY 17,** I learned a cardinal street maxim the hard way: The homeless rise at dawn.

The jolting sounds of the daytime urban cacophony began not long after light started bleeding into the eastern sky. There was no hiding from the loud conversations of gathering construction workers, and I immediately discovered the instinctive feeling of insecurity that comes with sleeping in front of strangers —especially in the relative isolation of a patch of dirt beside a dilapidated building.

The day before, I had begun an investigation for San Diego Magazine into homelessness in San Diego. The idea was to live on the streets, ostensibly homeless, for two weeks. The first night I spent alongside a 16th Street warehouse. That area, populated by a community of largely African-American homeless, was active through the night, with shifty characters parading on street corners, socializing, smoking cigarettes and peddling their wares—most prominently crystal methamphetamine (I was approached twice by pushers offering the drug).

The second and third mornings found me sleeping behind bushes next to an antique store on Washington Street and Second Avenue. At 7 in the morning on the third day, an angry gardener chased me out. The experience—waking through hostility—was repugnant. It's the single greatest catalyst for the out-by-dawn maxim.

Night four I spent in the thickets of a Balboa Park canyon. Though I was able to sleep in—a real treat, and mitigation for my increasingly skittish mental bearing—my bike was stolen from a rack at the top of the hill. It was another hardknock lesson in street life: Anything of value has to remain on your person.

Whatever's not on your back, or hidden devilishly well, will be scavenged. It was an epiphany regarding all those cartpushing homeless who tramp side streets throughout the city.

The following morning, I was startled awake in Balboa Park—this time by the police. I was arrested at 6:30 a.m. for "illegal lodging"—misdemeanor 647j of the California Penal Code. All told, I spent three days in county stir for the high crime of sleeping in public. According to statistics from the sheriff 's office, the citizens of San Diego paid $261 to feed and lodge me for those three days. Considering the salaries of the arresting officers (six San Diego policemen and two park rangers), the public defender assigned to tell me the state had no case, the magistrate who judged me, and various others in supporting roles, I imagine society paid upwards of $500 to arrest and detain me for those 72 hours.

I was released at 2 a.m. Saturday from the central jail on Front Street with nowhere to go. The police property room was closed for the weekend, and so I was left with no sleeping bag, no jacket, no possessions and a trolley token for a mass transit system that had quit running two hours before. Behind me were 14 other released detainees—one of them a fellow denizen of the street who luckily had gear stashed in the canyon at Balboa Park. Other homeless, like me, would have to find a way to get through the night without accouterments; local shelters —already beyond capacity—were long since closed. Ironically, with nowhere to go, and realizing that sleeping in public is illegal, my sole option was to break the law again—a one-way ticket to recidivism.

The next morning began what would become a relatively fixed schedule. Invariably, I woke at dawn—after several hours of fitful sleep—and walked to the park (during the day, the police didn't bother me). Along


GRAND TORINA

19·1
19

with several other homeless men, I'd wait for the dew to dry off the grass before lying down with my sleeping bag and backpack. Normally, I'd sleep from about 10 in the morning until 2 in the afternoon.

**Bedrock Bull**
The day after my release, I sought out Bull—a bedrock figure in the park's homeless community who became my own de facto guru.

Bull's real name is Terry Lohman. At 53, he stands 5 foot 11 and resembles actor Willem Dafoe. His bull-like frame has diminished of late (down to around 240 pounds) as a result of the monkey on his back—a methamphetamine habit he can't quite kick.

In 1972, Lohman finished high school in the same Pennsylvania hills later immortalized in The Deer Hunter. He despised flying, and so joined the Navy the day he graduated. Vietnam was still hot, and he expected some point of his fouryear hitch to take him there. The Navy sent him to San Diego.

After three and a half torturous years of service in the back of a helicopter (he never made it to Vietnam), the government set him free. He'd found a steady girl—a Navy financial clerk from Vermont —and proposed marriage. Within a year, the young couple moved back to the East Coast, and she gave birth to a baby girl. By the time Tamara was a year old, the couple was estranged. Two years later, Lohman left.

"That was the last time I saw her— June 11, 1978," he says. After a series of twists and turns, life brought Lohman back to San Diego. By 1981, he was working the desk at a transient hotel downtown, a pre-redevelopment hotbed of gambling, prostitution and girlie bars. It was there, on a cool night in March, that a man named Simms changed his life.

To hear Bull tell the story, John Simms —or James Simms or George Simms, depending on the alias he was using— was a tall African-American with a mean stare, unusually long arms and a rap sheet even longer. The ex-con was asked to leave the hotel for refusing to register a female companion. There was an argument over a room refund, the police were called, and Simms was escorted out.

"This was 10:45. The manager gets off at 11," Bull says with a pause, "and I come on at 11. Ten minutes later, this guy [Simms] comes back up the stairs. [He] walks by the front desk, raps his knuckles on the counter [and continues] toward me. His third step he pulls open a knife blade [and] says, 'This ain't no game.' " Bull pauses. "That man stabbed me nine times before I got away," he says. "I took a [full-length] buck knife, to the hilt, three times [in the] chest.

"This one," he says, pointing to one of three large scars, "cut a hole through my liver. I had 15 feet of small intestines sticking out that I had my hand over, holding them in. That was his first shot," he says, showing a neat 2-inch length of shiny scar tissue. "This was his second; over [here] was his third. [It] left such a gaping hole in my side my left lung collapsed; I could barely breathe."

After a struggle, Lohman got away and called for help; Simms fled. Within minutes an ambulance crew was telling the veteran-turned-victim things didn't look good. "They told me I'd never make it to UCSD [Medical Center] in Hillcrest from Fifth and Market," he recalls, "and 25 years later, here I am."

From a worn camping chair next to a bench in Balboa Park, surrounded by four large bags that hold all his possessions, Bull recites this parable of his life as absolute, irrefutable proof God is looking out for him.

He is two years out from his last working stint, and he has no roof. He transports all of those worldly goods, every day, from the back of a Dumpster to locales along Sixth Avenue, before moving back "home" every night at sundown.

He has no car, no insurance, no wife, one overdrawn bank account and a daughter he's wanted to find for nearly three decades.

Still, he has no doubt God is watching over him.

Bull is a fixture in Balboa Park, a generous and well-liked figure in a transient and homeless community that—no matter how determinedly homeowning society looks past it—is an undeniable aspect of the area's landscape. For nearly 20 years, he's been an on-again, off-again denizen of the streets, checking into the mainstream population for intervals working in hotels before the bottom falls out again.

In the past several years, it's crystal meth that's put a chokehold on his finances and frustrated all earnest desires to get back into any kind of permanent housing. He passes most of his days sitting in the park, a prisoner of his assorted belongings, watching the time go by while smoking cigarette butts he's "sniped" from sidewalks. Though he disclaims knowledge of Camus—the French philosopher who talked about man's helplessness in the face of absurdity—Bull's on steady terms with the author's underlying tenets.



Bull, with all his worldly possessions, at the "home bench" at Sixth and Upas in Balboa Park.

He smiles wanly when confronted with examples of such fallout in his own life. He stoically accepts that tons of good food are thrown out every day while thousands don't eat; that securing a job requires a call-back phone number and showering facilities people on the street don't have; and that while the federal government has spent $80 billion dollars to prosecute a war in Iraq this year, funding for Community Development Block Grants (the single largest source of revenue for homeless agencies in San Diego County) is being slashed 20 percent nationally—by $736 million. Instead of frustrating, it's merely amusing to Bull that on his $800-a-month Navy disability pension, the cheapest housing available to him —the transient hotels of downtown—cost $600 to $800 a month, double the rates at more reasonable habitats requiring references or good credit standing.

In the modern paradigm of neocapitalism, it matters not that the man's a fount of stories born of far-off American locales and intriguing plots; that he's quick-witted and a good conversationalist; that he's efficient and industrious at the various tasks that make up his daily routine; or that he's generous to a fault with his money. As far as modern culture is concerned, Bull is a failure in terms of society's most revered and fundamental determinant of worth: production. Because he's not producing— a negative state exacerbated by his worn and utter ennui—it's that lack of recognition of his own humanity that Bull says piques his ire. Ironically, it's men and women like him, these paragons of failure, who through the mere fact of their existence stir up a twisted and polemical cauldron of compassion, resentment, guilt, sorrow, confusion and consternation among the general population. They are the physical manifestation of a vast and sprawling designation —homelessness—that's as varied in terms of roots and demographics as it is controversial; one that's succeeded in further polarizing an already disparate political spectrum.

For Bull and dozens of other denizens of the park, all the shouting and lofty posturing on their behalf are irrelevant. They're but simple absurdities that won't make concrete beds any more comfortable or the miles-long walk to a soup kitchen any less arduous.

**Cash Strapped** Forecasters estimate 4.157 billion federal dollars will be aimed at homelessness in 2007. More than $70 million (mostly federal) was committed to fighting San Diego County homelessness in 2005, with 36 percent going to the city of San Diego. Much of that money has begun working its way into the county's burgeoning 10-year plan to end chronic homelessness—a program begun in 2001 by the Bush administration.

The voluntary initiative asks local governments to design and implement their own 10-year plans based on innovations in the homeless services industry.

Robert McElroy, president and CEO of local homeless service provider Alpha Project, acknowledges the initiative as a step in the right direction—while glancing furtively at a calendar. After five years, the homeless picture in the United States looks much as it did in 2001. And as McElroy points out, the winds of political change will likely erase the plan's budding accomplishments when the Bush administration leaves office after 2008.

A straight shooter with a self-mandated, Christ-inspired mission to help the needy, McElroy has little time for high talk and arcane plans. With ailing seniors passing their dying days in the tent his agency operates, and the daily hassle of appeasing a bevy of city departments, the forthright CEO struggles to maintain a positive attitude by focusing on the hundreds of individual success stories he's seen in 20 years of service.

Sharon Johnson, San Diego's homeless services coordinator, knows the challenge of remaining upbeat in an outreach community where the need is so great and the resources are so thin. A skeptic by nature, particularly regarding America's track record with homelessness, she believes that the 10-year plan may be the solution advocates have been waiting for.

Johnson says it's evidence of a paradigm shift—a move away from traditional social and faithbased models, toward permanent supportive housing. Instead of putting homeless people into temporary shelters—a practice some say traps targeted populations in the system—permanent supportive housing is based on the idea of offering recipients their own living accommodations and a case manager (an approach that touts an 80 percent success rate).

According to statistics from San Diego's Regional Task Force on the Homeless (RTFHSD), there are nearly 10,000 homeless in the county, with fewer than 3,500 beds to accommodate them. The city has a homeless population of 4,458, with only 2,019 beds. Local mental health agencies say 1,417 of the county's homeless are mentally ill, and 2,000 are veterans.

Nationally, the chronically homeless— those sleeping in doorways and pushing carts—are said to represent only 15 percent of all homeless. The vast majority, the transitionally homeless—those who sleep in cars, stay with friends or use temporary shelters—are the unseen victims of the convergence of two national trends: an increasing poverty rate and a decrease in affordable housing.

The pinch is only aggravated by a sprawling social services mechanism. More than 70 percent ($44.5 million) of public funds allocated for homeless programs in San Diego County are being channeled through 73 community programs, such as Alpha Project, St. Vincent de Paul Village and Vietnam Veterans of San Diego; the remainder is directly delivered by government agencies. After such an involved bureaucratic process, one wonders how much of the $70 million pledged to fighting homelessness in the county actually makes it to men like Bull.

Meanwhile, with all of its innovative design and determined leadership, the Bush administration's 10-year plan lacks one vital component: financial assistance. It's up to already cash-strapped cities and regions to ante the millions of dollars it will take to procure permanent supportive housing for the country's estimated 1 to 3 million homeless.

**The Civic Nomads** Living on the streets is full-time work, and you never punch out. When you're not scrounging to make enough to get something to eat or a pack of smokes, you're lugging around all of your possessions.

Imagine having to walk wherever you need to go with a heavy bag strapped on your back. Few of us realize the luxury of having a secure place to store belongings.

Beyond the logistical difficulties, you have to be smart on the streets; everybody's out to put one over on you. The mainstream population, meanwhile, pretends you don't exist. Those people look determinedly through and around you—if they don't acknowledge you, they don't have to deal with the implications of your condition. What, after all, does your homelessness say about society? Equally important, an unstated covenant is at work: If they don't see you, they don't have to give you money.

Whether by fortuitous timing or park tradition, during the two weeks I was out there, every evening about sundown somebody would amble over to our "home" bench with chow. One night, it was a Good Samaritan, loading Bull down with 3 pounds of homemade lasagne.

Another night, it was "Scrub," toting a bag of recently trashed convenience store sandwiches and chocolate milk. On a different occasion, someone had scrounged a 10-pack of raw hot dogs.

For people with very little, the homeless I encountered were surprisingly generous. Down to the last cigarette or cracker, the final sip of a beer, they all shared—whether I knew them or not. Beyond being generous, many were interesting—some were downright compelling. Most of them have life experiences those of us in mainstream society will never understand —or want to. They've seen the system from within and without, lending them an arresting perspective on the meaning of it all.

Many of the homeless I encountered had partnered up—an arrangement that offered mutual security and a bit of independence; a break from the constant minding of belongings, procuring of provisions and foot-bound travel. Despite the realities of rugged individualism and personal autonomy, I found a strong sense of community. Every homeless person in the park had a nickname, a history and a reputation.

Bull's most recent traveling buddy, Wesley, is a light-skinned African-American, the son of white adoptive parents in New Jersey. Nothing about him—his educated speech, voracious reading habit or tidy

appearance— suggests homelessness. After being sent to jail for passing a bad check, Wesley broke his back in a work mishap and hasn't had a job since. He gets a small disability stipend every month. He'll be first to tell you he's responsible for his own homeless condition (though fate, no doubt, has played a role). He'll also tell you living on the street is hard, very hard, and that from that perspective, looking straight up from the bottom, you can't help but see the depth of all the b.s.

As I talked with Wesley in the park, all of San Diego's homeless shelters were full—there was no legal place for us to sleep. We didn't discuss the fact that lawyers for city councilmen have spent an estimated $1.5 million dollars in the past year plotting defenses for legal actions that don't yet exist and likely never will.

Several days after our conversation, three ailing senior citizens died quietly of natural causes in the city's emergency tent—to be buried in pauper's graves. Bob McElroy lambastes the system for allowing its citizens to die in such an undignified manner. "But at least they weren't alone," he says. "There were 210 fellow homeless in that tent. At least they didn't die in an abandoned doorway somewhere."

Of the 12 homeless men I was detained with in the back of an SDPD van en route to jail, one had AIDS, one was schizophrenic, one was a felon, four were veterans —and all, as far as I could tell, had drug problems. In two weeks on the streets, and through dozens of contacts— who offered dozens more anecdotal accounts—I found a glaring preponderance of a combination of mental illness and drug addiction.

Bull, for instance, diagnosed with depression and post-traumatic stress disorder (a result of the knife attack), has been losing his frustrating battle with methamphetamine addiction for several years. His case is common. Bipolar disorders, schizophrenia and depression are widespread among the homeless.

I met Terrance, a 30-something black man with a passing resemblance to Popeye's Bluto, on a chilly night in Balboa Park. I'd watched him for a week, standing or lying still in different peculiar positions, talking to himself or slowly tracing random patterns with his steps. When I finally approached him, as I set off for pizza with Shawn—a homeless vet who'd come into $20—I broke through some kind of invisible barrier. I asked his name, and there was such a long pause I figured he couldn't speak.

"Starving," he suddenly blurted.

Cold and shivering, Terrance came across as soft-spoken, engaging and—save for enigmatic pauses—coherent. I didn't see him again until we were thrown into the paddy wagon together. I talked to him briefly in jail but never learned his mental disability—perhaps severe schizophrenia or autism. He told me he'd done a four-year hitch in the Marines, started college and then become a motorcycle mechanic. When the U.S. mental health field deinstitutionalized, starting in the 1960s, some mentally ill people fell through the cracks of privatization and ended up on the streets. Despite those unfortunates lost in the shuffle, few would say it was a mistake to end the era of enforced mental committals and insane asylums. In the evolving American system, thousands of mentally ill people are (and will continue to be) the hard-reality, collateral fallout of progress. Terrance, for instance, acutely in need of mental health services, and a prototypical candidate for permanent supportive housing, has been thrown in jail several times for 647j illegal lodging offenses.

Neil Besse, one of San Diego's deputy public defenders, wonders how a person, sleeping in the open, on public property, without damaging anything or bothering a soul, can be accused of lodging illegally.

S

cott Dreher, a homeless advocacy attorney, says jailing the homeless only succeeds in clogging the courts and overfilling local jails. He's involved with one of two class-action lawsuits brought against the city, the SDPD and Police Chief William Lansdowne for arresting people on 647j misdemeanor (normally ticketable) offenses. "You're getting a first-hand view of what those [homeless] people face every day," says Dreher.

My first homeless-person experience with the SDPD was a crash course in the underlying rancor that exists between local law enforcement and the area's homeless. Rolling his cruiser up onto the grass to confront a small group of us, Officer Dick Ward (known in the park as Robocop) looked to me.

"What are you doing, just hanging out?" he asked.

19.5

"Yes," I said, wondering what one is supposed to do in the park. "Where'd you sleep last night?" he asked.

That question is a particular point of contention to many homeless. The natural reaction is to ask the interrogator where he spent last night.

"Not here," I said, opting out of potential conflict.

"I'm going to ask questions," he shot back with hostility. "And you're going to answer them."

My second police encounter was with arresting officer Stephen Zasueta, part of a six-man team that swept into the park at daybreak on February 22 and rounded up a dozen poor and homeless men for sleeping. Zasueta was alternately condescending and derisive.

Though everything was done according to procedure, his taunting of the detainees and his superior attitude were insulting.

Two days after I was released from jail, SDPD Homeless Outreach Team (HOT) Officer Olun Graves met me on a street corner in Bankers Hill. After I assured him I didn't need drug or alcohol counseling, he tried to get me a bed in one of the area shelters. As several homeless vets had already told me, there were no open spots. I asked Graves' partner what I should do that night. He gave me a damned-if-you-do look and told me to sleep somewhere I wouldn't get caught. Both men were professional and respectful and told me to call back the next day, assuring me they'd eventually find a bed.

Despite the positive interaction with HOT officers, I came away from my arrest and subsequent incarceration with a collective sense of impotence, loathing, searing frustration and angst. The police quickly came to represent hostility and aggression, and seemed more threatening than the potential for robbery or attack. It's a mental complex no doubt derivative of the tacit notion that homeless people, by simply existing, are illegal—another burden to bear in an already onerous way of life.

Notwithstanding Sharon Johnson's optimism, and her hard-held notion that persistence and creativity can overcome our most persistent social ills, it's safe to say homelessness will never be "cured."

Sullied wards of all the thousands of nasty reasons that have put them on the streets, homeless people have always been a part of society—and always will be. Perhaps instead of seeking solutions for this infinitely complex problem, society needs to move toward acceptance and mitigation.


The author, after his first week living homeless on the streets of San Diego.

Many of those I lived with for two weeks are damaged, afflicted and unambiguously ignored. They are the niggers of the post-colonial world, one that ironically eschews discrimination based on the color of skin while reinforcing an entrenched system of economic elitism.

They're abused by a long list of industries and people—from the social services organism that (however unintentionally) exploits their thin resources to the recycling center employees who systematically underweigh their plastic bottle returns. And from their point of view, the police forces charged with maintaining society's security are a hostile, almost enemy force.

On the reverse side of that coin, San Diegans ask the SDPD to defend against the horrors of John (or James or George) Simms while simultaneously playing frontline social workers to 5,000 often-afflicted, chronically homeless persons—a dual role destined to fail.

Bull, meanwhile, is numb to all of those twisted ironies. Perched in his camping chair in the park, next to a worn, framed picture of a girl he hasn't seen in three decades, he looks to clouds in the eastern sky. They're bearing water, he points out. Better find plastic bags before nightfall.

© 2006 San Diego Magazine

→ <u>Did you like what you read? Subscribe to San Diego Magazine.</u>

19.6

**INFO LINE of San Diego County**     **Shelter Report July 2004 through June 2005**

| | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | YTD Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Call Statistics** | | | | | | | | | | | | | |
| Total shelter calls* | 802 | 858 | 755 | 748 | 631 | 587 | 728 | 573 | 759 | 787 | 769 | 686 | 8,683 |
| | | | | | | | | | | | | | |
| **Area** | | | | | | | | | | | | | |
| District 1 (Gregory Cox) | 392 | 405 | 422 | 375 | 339 | 284 | 360 | 289 | 365 | 434 | 424 | 334 | 4,423 |
| District 2 (Dianne Jacob) | 212 | 197 | 129 | 132 | 120 | 111 | 125 | 101 | 169 | 136 | 135 | 134 | 1,701 |
| District 3 (Pam Slater) | 18 | 21 | 17 | 15 | 19 | 16 | 19 | 10 | 12 | 18 | 21 | 21 | 207 |
| District 4 (Ron Roberts) | 107 | 159 | 124 | 152 | 106 | 120 | 158 | 124 | 155 | 141 | 134 | 126 | 1,606 |
| District 5 (Bill Horn) | 69 | 71 | 55 | 66 | 40 | 51 | 60 | 46 | 49 | 54 | 45 | 66 | 672 |
| Other and Unknown | 4 | 5 | 8 | 8 | 7 | 5 | 6 | 3 | 9 | 4 | 10 | 5 | 74 |
| **Total by district** | 802 | 858 | 755 | 748 | 631 | 587 | 728 | 573 | 759 | 787 | 769 | 686 | 8,683 |
| | | | | | | | | | | | | | |
| **Cases Referred To** | | | | | | | | | | | | | |
| Total referred to shelters | 91 | 87 | 76 | 81 | 71 | 238 | 629 | 501 | 648 | 345 | 189 | 235 | 3,191 |
| | | | | | | | | | | | | | |
| INFO LINE-Call Back | - | 1 | - | - | - | - | - | | | | | | 1 |
| | | | | | | | | | | | | | |
| **Cases Unable to Aid** | | | | | | | | | | | | | |
| Client hung up | 2 | 6 | 5 | 10 | 5 | 7 | 10 | 2 | 2 | 1 | - | 4 | 54 |
| Client ineligible/rejected | - | 2 | 5 | 4 | 2 | 3 | 8 | 3 | 2 | 5 | 1 | - | 35 |
| Client refused referral | 9 | 19 | 18 | 20 | 18 | 15 | 27 | 24 | 31 | 13 | 1 | 5 | 200 |
| No transportation | - | - | - | 15 | 1 | - | 1 | 1 | 1 | - | - | - | 18 |
| Other | - | 3 | 1 | - | 4 | 1 | 7 | 7 | 5 | 1 | 1 | 1 | 35 |
| Shelter is full | 699 | 741 | 648 | 620 | 543 | 326 | 50 | 18 | 48 | 454 | 589 | 470 | 5,206 |
| **Total cases unable to aid** | 710 | 771 | 677 | 669 | 573 | 352 | 102 | 55 | 89 | 474 | 592 | 484 | 5,548 |

\* Note: Total shelter calls = Monthly total for shelter calls from the shelter database.

19-7